## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| KYLE MCHUGH and LARRY MEEK, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | Civil Action |
| v. | ) | |
| | ) | File No. _____ |
| OLLIN SYKES; SCOTTY SYKES; | ) | |
| SYKES & COMPANY, P.A.; ERNEST | ) | |
| NESMITH; MARCUS ROGERS; | ) | |
| NESMITH ROGERS, FINANCIAL | ) | |
| CONSULTING GROUP, LLC; ROBERT | ) | |
| D. KELLER; JOSEPH SKALSKI; | ) | |
| ATLANTIC COAST CONSERVANCY, | ) | **JURY DEMAND** |
| INC.; NANCY ZAK; LISA CANTRELL, | ) | |
| JOSH STANLEY; FOREVER FORESTS, | ) | |
| LLC; GREEN EARTH RESERVE, LLC; | ) | |
| TERRY HEATH; FIELDSTONE SOUTH, | ) | |
| LLC; DENNIS W. BENSON; BENSON | ) | |
| APPRAISAL SERVICES; DOUGLAS | ) | |
| ROSS KENNY; RICK A. KENNY; | ) | |
| KENNY & ASSOCIATES, INC.; DOLPH | ) | |
| WINDERS; FISHERBROYLES LEGAL | ) | |
| COUNSEL; FISHERBROYLES, LLC; | ) | |
| SKALSKI LAW FIRM, LLC; KIMBERLY | ) | |
| A. SKALSKI; SKALSKI CPAS, LLC; | ) | |
| LAMB & BRASWELL, LLC; ARTHUR J. | ) | |
| GOOLSBY, JR.; and BLAIR K. | ) | |
| CLEVELAND; | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## COMPLAINT

COME NOW the Plaintiffs Kyle McHugh and Larry Meek, by and through undersigned counsel, hereby files this Complaint against Defendants Ollin Sykes, Scotty Sykes, Sykes & Company, P.A., Ernest Nesmith, Marcus Rogers, Nesmith Rogers, Financial Consulting Group, LLC, Robert D. Keller, Joseph Skalski, Atlantic Coast Conservancy, Inc., Nancy Zak, Lisa Cantrell, Josh Stanley, Forever Forests, LLC, Green Earth Reserve, LLC, Terry Heath, Fieldstone South, LLC, Dennis W. Benson, Benson Appraisal Services, Douglas Ross Kenny, Rick A. Kenny, Kenny & Associates, Inc., Dolph Winders, FisherBroyles Legal Counsel, FisherBroyles, LLC, Skalski Law Firm, LLC, Kimberly A. Skalski, Skalski CPAs, LLC, Lamb & Braswell, LLC, Arthur J. Goolsby, Jr., and Blair K. Cleveland and states as follows:

## INTRODUCTION

1.    For years, unscrupulous professionals have promoted Syndicated Conservation Easement Transactions ("SCE Scams") as a way for their unwitting victims to preserve and protect the environment in exchange for purportedly legitimate tax deductions. The above-named Plaintiffs were unwitting victims of such scams.

2.    Victims were told that the United States Government and the Internal Revenue Services ("IRS") wanted to incentivize and further the noble goal of environmental conservation by providing taxpayers significant tax

2

credits for permanently preserving vulnerable land with conservation easements.

3. Victims were targeted and aggressively solicited to "invest" in SCE Scams by their own retained accountants, the scam promoters, and other professionals including attorneys, financial consultants, certified public accountants ("CPAs"), appraisers, administrative staff, landowners, land trusts, and others (the "Enterprise" or the "RICO Enterprise").

4. The Enterprise assured its unwitting victims that the SCE Scams were completely legal and done in strict compliance with all federal tax laws.

5. The Enterprise strategically utilized its many licensed CPAs, who are experts in tax and accounting matters, to lull victims, who are not such experts, into a false sense of security about the SCE Scams.

6. The Enterprise intentionally and strategically targeted victims who did not know that the SCE Scams could not possibly deliver the tax and environmental benefits they were promised. The Enterprise, and its many ostensibly credible professionals, however, were well aware of the fraudulent nature of their SCE Scams but relentlessly promoted them anyway.

7. The Enterprise specifically sought to invoke the reliance of its victims through its many lawyers, financial consultants, and CPAs.

8. The Enterprise sought to induce its victims to rely on its statements about the propriety of the SCE Scams, because doing so was fabulously profitable. Various Enterprise members personally pocketed hundreds of thousands of dollars per scam.

9. The victims did not know that the CPAs, financial consultants, and attorneys who aggressively solicited their "investment" in the SCE Scams personally owned the very entities that controlled the transactions.

10. The precise and complex mechanics of the SCE Scams are described in detail herein. Put simply, SCE Scams involve soliciting unwitting victims to "invest" in a limited liability company that donates an outrageously overvalued conservation easement ("CE") to a land trust. The donor then claims a charitable tax deduction that far exceeds the fair market value of the CE, then passes those improper deductions on to the victims.

11. The promoters and professionals of the Enterprise solicit unwitting victims to purchase membership interests (also referred to as "shares") in a Capital Company ("CapCo") that is formed to purchase shares in a Property Company ("PropCo"), whose only asset is the land to be encumbered by the CE. Post donation, the victims are entitled to a pro rata portion of the tax deduction claimed by the PropCo (the "Syndicate").

4

12.   The value of the shares purchased by victims were inflated from the start and could not possibly yield the returns that were repeatedly advertised and promised.

13.   SCE Scams are both incredibly complex and incredibly simple. The crux of the fraud lies with the appraisals. The charitable deduction cannot legally exceed the fair market value ("FMV") of the donated CE, which can in some instances be determined by a calculation of the difference between of the land before it is encumbered with a CE and the value after the land is encumbered with a CE. The Enterprise hand picks feckless appraisers that it knows will consistently abuse the relevant appraisal standards to arrive at a grossly inflated value of the land before the encumbrance.

14.   The appraisers will arrive at these fraudulent FMVs by fabricating a "highest and best use of the land" that is not feasible or possible. While the highest and best use ("HBU") standard can legitimately be considered in some appraisals, the Enterprise abuses it by ignoring the tremendous risk, time, and resources the hypothetical development would require, and the fact that the location of the land is not realistic for such development.

15.   To illustrate, an Enterprise member will purchase a parcel of undeveloped swamp land, knowing it will be encumbered with a CE and donated to generate significant and improper tax deductions. The land will

00470619

have characteristics that make it undesirable to the market, and thus cheap to purchase. The Enterprise will purchase such a parcel for $1,000,000. The Enterprise's hand-picked appraisers will then claim that this parcel could hypothetically be developed into a fabulously profitable residential housing development with a HBU of $12,000,000 before being encumbered by a CE which would forbid the land's development.

16.   The Enterprise's appraisers then subtract the land's value "after" encumbering it with a CE from the fabricated "before" value ($12,000,000). The "after" amount is typically close to the purchase price, or true FMV, of the land ($1,000,000). The Enterprise will then claim a $11,000,000 tax deduction ($12,000,000 minus $1,000,000), which it divides between the investor-victims based on their percentage ownership in CapCo.

17.   These appraisals are totally bogus. The Enterprise will knowingly rely on its hand-picked appraisers to provide sufficient paperwork to substantiate its significant tax deductions in hopes of surviving the IRS's audit lottery.

18.   Indeed, the IRS found that the Enterprise's appraisals are sloppily cut and paste from other unrelated appraisals, as they were never intended to be legitimate appraisals.

6

19. Ridiculous as this may sound, there are countless ostensibly respectable CPAs that for years have aggressively solicited their clients and others to "invest" in such schemes, even though these CPAs knew this structure was illegal and cannot possibly deliver the promised tax or environmental benefits.

20. Indeed, Plaintiffs' former accountants at Sykes & Company are such ostensibly reputable and successful CPAs that pitched their clients what they knew to be fraud.

21. Ollin and Scotty Sykes assured Plaintiffs that such transactions, claiming these significant tax deductions in this way, were completely proper.

22. Plaintiffs' former CPA, Scotty Sykes, wrote to Plaintiff Kyle McHugh in November 2016 and told him a $210,000 SCE Scam "investment will correlate to an approximate charitable contribution deduction of $840,000," a four-to-one return on investment.

23. Scotty Sykes made this representation to McHugh because Sykes knew he was a member of a RICO Enterprise that was designed and deployed to consistently yield a minimum 4:1 return on investment by abusing the tax laws and appraisal rules.

7

24.   In reliance on their CPAs' emphatic advice at Sykes & Company, Plaintiffs, none of whom are tax or accounting professionals, "invested" into the SCE Scams, not knowing them to be completely fraudulent.

25.   There are various cells of SCE Scam promoters operating across the country, such as the RICO Enterprise described in this lawsuit. This Enterprise has defrauded the United States and the public out of billions of dollars.

26. Plaintiffs were aggressively targeted by the Enterprise and unfortunately fell victim to three of the Enterprise's SCE Scams; (1) the Muskogee Scam in 2016, (2) the Walnut Creek Scam in 2017; and (3) the Little Ocmulgee/Ancient Oaks Scam in 2018.

27.   The IRS has audited both the Muskogee Scam and Walnut Creek Scam and disallowed the Enterprise's charitable tax deductions in their entirety for several independent reasons, as outlined in Revenue Agents Reports that exceed one-hundred pages.

28.   Relevant here, the IRS found that the Muskogee and Walnut Creek Scams' purported "donations" were not made "exclusively for conservation purposes," as required, and that they used grossly inflated appraisals that were produced in exchange for fifteen times the market rate for comparable appraisal services.

29. Plaintiffs' independent investigations have confirmed that these Scam donations had nothing to do with charity or environmental protection, but instead had everything to do with unlawfully enriching the Enterprise.

30. In the Muskogee and Walnut Creek Scams, the Enterprise used hand-picked Appraiser Dennis Benson to opine that undeveloped swamp land in Georgia purchased for roughly one million dollars could be donated for a roughly twelve-million-dollar charitable contribution tax deduction.

31. In the Little Ocmulgee/Ancient Oaks Scam, the Enterprise used hand-picked Appraisers Douglas Ross Kenny and Rick Kenny to claim that a roughly one-to-two-million-dollar parcel of undeveloped swamp land could be donated for a one hundred-and-twelve-million-dollar charitable tax deduction.

32. The Little Ocmulgee/Ancient Oaks Scam is currently under audit and its claimed tax deduction is certain to be disallowed in its entirety for the same reasons that the IRS completely disallowed the deductions claimed by the Muskogee and Walnut Creek Scams.

33. It is beyond dispute that these cells of professionals and promoters are fraudulent enterprises and not merely independent professionals who are innocently and unknowingly pursuing their own interests.

00470619

34.   The Enterprise is made possible by a network of longtime friends and associates, each filling crucial roles that could not be trusted to legitimate and intendent professionals.

## JURISDICTION AND VENUE

35.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(a) because the Plaintiffs are from a different State than all of the Defendants, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

36.   This Court also has jurisdiction pursuant to 28 U.S.C. §1331, because the matter in controversy poses a federal question arising under the Constitution and Laws of the United States, including but not limited to Section 10(b) of the Exchange Act and Rule 10(b)-5(1), (2), and (3) promulgated thereunder.

37.   Personal jurisdiction comports with due process under the United States Constitution, the long-arm statute of Georgia, and the provisions of 18 U.S.C. §1965(b) and (d).

38.   Without limiting the generality of the foregoing, each Defendant (directly or indirectly) has:

   a.    Transacted business in Georgia;

   b.    Contracted to supply or obtain services in Georgia;

10

c.  Availed themselves intentionally of the benefits of doing business in Georgia;

d.  Produced, promoted, sold, marketed, and/or distributed their products or services in Georgia and, thereby, have purposefully profited from their access to markets in Georgia;

e.  Caused tortious damage by act or omission in Georgia;

f.  Caused tortious damage in Georgia by acts or omissions committed outside such jurisdiction while (i) regularly doing business or soliciting business in such jurisdiction, and/or (ii) engaging in other persistent courses of conduct within such jurisdiction, and/or (iii) deriving substantial revenue from goods used or consumed, or services rendered, in such jurisdiction;

g.  Committed acts and omissions that the Defendants knew or could reasonably foresee would cause damage (and, in fact, did cause damage) in Georgia to Plaintiffs while (i) regularly doing or soliciting business in such jurisdiction, and/or (ii) engaging in other persistent courses of conduct within such jurisdiction, and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in such jurisdiction;

11

h.    Engaged in a conspiracy with others doing business in Georgia that caused tortious damage in Georgia; and/or

i.    Otherwise had the requisite minimum contacts with Georgia such that, under the circumstances, it is fair and reasonable to require the Defendants to come to this Court to defend this action.

39.  Thus, this Court has personal jurisdiction over each Defendant pursuant to the U.S. Constitution and the laws of the United States and the State of Georgia. At all relevant times and as described herein, these Defendants have done and are doing business in the state of Georgia, have contracted with Georgia residents, and were to perform contracts in whole or in part in Georgia. Additionally, these Defendants have committed torts, in whole or in part, in Georgia. These Defendants have purposefully availed themselves of the benefits and protections of the laws of the State of Georgia and could reasonably anticipate being subject to the jurisdiction of Georgia courts. This suit will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.

40.  Venue is proper under 28 U.S.C. §1391(b)(2)-(3), because, inter alia, a substantial part of the events or acts giving rise to the causes of action alleged in this Complaint arose in, among other places, this District, and the harmful

00470619

effects of the Defendants' fraud and wrongful conspiracy were felt in, among other places, this District.

41.   Venue in this Division is proper under LR 3.1 because at least one Defendant resides in this Division. Indeed, most of the Defendants reside in this Division.

## PARTIES

42.   Plaintiff Kyle McHugh is an individual and a citizen of Lexington County, South Carolina. This Plaintiff lives in Swansea, South Carolina.

43.   Plaintiff Larry Meek is an individual and a citizen of York County, South Carolina. This Plaintiff lives in Rock Hill, South Carolina.

44.   The Sykes Defendants: Ollin Sykes, Scotty Sykes, and Sykes & Company, P.A. are herein referred to as the "Sykes Defendants".

    a.   Defendant Ollin Sykes is an individual and a citizen of Chowan County, North Carolina. This Defendant lives in Edenton, North Carolina.

    b.   Defendant Scotty Sykes is an individual and a citizen of Chowan County, North Carolina. This Defendant lives in Edenton, North Carolina.

    c.   Defendant Sykes & Company, P.A. ("Sykes & Co.") is a North Carolina professional corporation with its principal place of

13

00470619

business at 401 East Church Street, 3rd Floor, P.O. Box 1050, Edenton, NC 27932. This Defendant may be served with process through its registered agent, Ollin Sykes, at 214 W Eden Street, Edenton, NC 27932.

45. The Nesmith Rogers Defendants: Ernest Nesmith, Marcus Rogers, and Nesmith Rogers Financial Consulting Group, LLC are herein referred to as the "Nesmith Rogers Defendants".

a. Defendant Ernest Nesmith is an individual and a citizen of Palm Beach County, Florida. This Defendant lives in West Palm Beach, Florida.

b. Defendant Marcus Rogers is an individual and a citizen of Indian River County, Florida. This Defendant lives in Vero Beach, Florida.

c. Defendant Nesmith Rogers Financial Consulting Group, LLC ("Nesmith Rogers" or "Nesmith Rogers Financial Consulting") is a Florida limited liability company with its principal place of business at 2046 Treasure Coast Plaza, Suite A 349, Vero Beach, FL 32960. This Defendant may be served with process through its registered agent, Marcus Rogers, at 2046 Treasure Coast Plaza, Suite A 349, Vero Beach, FL 32960.

00470619

46. The ACC Defendants: Robert D. Keller, Joseph Skalski, and Atlantic Coast Conservancy, Inc. are herein referred to as the "ACC Defendants."

    a.    Defendant Robert D. Keller is an individual and a citizen of Pickens County, Georgia. This Defendant lives in Jasper, Georgia.

    b.    Defendant Joseph Skalski is an individual and a citizen of Dekalb County, Georgia. This Defendant lives in Atlanta, Georgia. Joseph Skalski is a member of the ACC Defendants, but also played tortious roles in the RICO enterprise outside of his role with ACC as well.

    c.    Defendant Atlantic Coast Conservancy, Inc. ("ACC") is a domestic nonprofit corporation with its principal place of business at 80 S. Main Street, Jasper, GA 30143. This Defendant may be served through its registered agent, Robert D. Keller, at 72 S. Main St., Jasper, GA 30143.

47. The Zak Defendants: Nancy Zak, Lisa Cantrell, Josh Stanley, Forever Forests, LLC, Green Earth Reserve, LLC, T.J. Heath, and Fieldstone South, LLC are herein referred to as the "Zak Defendants."

    a.    Defendant Nancy Zak is an individual and a citizen of Cherokee County, Georgia. This Defendant lives in Ball Ground, Georgia.

00470619

b.   Defendant Lisa Cantrell is an individual and a citizen of Pickens County, Georgia. This Defendant lives in Talking Rock, Georgia.

c.   Defendant Josh Stanley is an individual and a citizen of Cherokee County, Georgia. This Defendant lives in Canton, Georgia.

d.   Defendant Forever Forests, LLC ("Forever Forests") is a domestic limited liability company with its principal place of business at 1058 Dornell Rd., Ball Ground, GA 30107-4949. This Defendant may be served through its registered agent, Nancy Zak, at the same address.

e.   Defendant Green Earth Reserve, LLC ("Green Earth Reserve") is a Delaware limited liability company with its principal place of business at 8014 Cumming Hwy STE 403369, Canton, GA 30115. This Defendant may be served through its registered agent, Northwest Registered Agent Service, Inc., at 8 The Green, STE B, Dover, DE 19901, in Kent County, Delaware.

f.   T.J. Heath is an individual and a citizen of Harnett County, North Carolina. This Defendant lives in Spring Lake, North Carolina.

g.   Fieldstone South LLC ("Fieldstone South") is a domestic limited liability company with its principal place of business at PO Box 1779, Gray, GA 31032. This Defendant may be served through its

16

registered agent, Terry "T.J." Heath, at 305 North Cross Road, Gray, GA, 31032.

48. The Appraisers: Dennis W. Benson, Benson Appraisal Services, Douglas Ross Kenny, Rick A. Kenny, and Kenny & Associates, Inc. are hereinafter referred to as "the Appraisers" or "the Appraiser Defendants."

a. Dennis W. Benson ("Benson" or "Dennis Benson") is an individual and a citizen of Bibb County, Georgia. This Defendant lives in Macon, Georgia.

b. Benson Appraisal Services is a domestic unregistered company with its principal place of business at 2070 Ingleside Avenue, Macon, GA 31204. This Defendant may be served through its owner, 2070 Ingleside Avenue, Macon, GA 31204.

c. Douglas Ross Kenny is an individual and a citizen of Fulton County, Georgia. This Defendant lives in Duluth, Georgia.

d. Rick A. Kenny is an individual and a citizen of Hall County, Georgia. This Defendant lives in Gainesville, Georgia.

e. Kenny & Associates, Inc. is a domestic profit corporation with its principal place of business at 327 Dahlonega Street, Suite 104, Cumming, GA, 30040. It may be served through its registered

agent, James G. Coyle, at 555 North Point Center Dr., Alpharetta, GA 30022.

49. The Legal Services Defendants: Defendants Dolph Winders, FisherBroyles Legal Counsel, FisherBroyles LLC, Joseph Skalski, and Skalski Law Firm, LLC are herein referred to as the "Legal Services Defendants".

a.  Dolph Winders is an individual and a citizen of Fulton County, Georgia. This Defendant lives in Atlanta, Georgia. He is a licensed attorney with the State Bar of Georgia.

b.  FSB Legal Counsel, FisherBroyles LLC ("FisherBroyles") is a domestic profit corporation with its principal place of business at 327 Dahlonega Street, Suite 104, Cumming, GA 30040. This Defendant may be served through its registered agent, James G. Goyle, at 555 North Point Center Dr., Alpharetta, GA, 30022.

c.  Defendant Joseph Skalski is an individual and a citizen of Dekalb County, Georgia. This Defendant lives in Atlanta, Georgia. Joseph Skalski is a member of the Legal Services Defendants, but also played tortious roles in the RICO enterprise outside of this role as well.

d.  Defendant Skalski Law Firm, LLC, is a domestic limited liability company with its principal place of business at 1867 Independence

18

Square, Suite 103, Dunwoody, GA 30338. This Defendant may be served through its registered agent, Joseph Skalski, at the same address.

50.   The Accounting Services Defendants: Kimberly A. Skalski, Skalski CPAs LLC, and Lamb & Braswell, LLC are herein referred to as the "Accounting Services Defendants".

   a.   Kimberly A. Skalski is an individual and a citizen of Dekalb County, Georgia. This Defendant lives in Atlanta, Georgia.

   b.   Skalski CPAs LLC ("Skalski CPAs") is a domestic limited liability company with its principal place of business at PO Box 468627, Atlanta, GA 31146. This Defendant may be served through its registered agent, Kimberly A. Skalski, at 1867 Independence Square, Suite 103, Dunwoody, GA 30338.

   c.   Joseph Skalski is an individual and a citizen of Dekalb County, Georgia. This Defendant lives in Atlanta, Georgia.

   d.   Lamb & Braswell, LLC ("Lamb") is a domestic limited liability company with a principal place of business at 4120 Arkwright Rd., Macon, GA 31210-1707. This Defendant may be served through its registered agent, James F. Braswell, at 4120 Arkwright Rd., Macon, GA 31210.

19

51.   The Landowner Defendants:

a.   T.J. Heath: T.J. Heath is an individual and a citizen of Harnett County, North Carolina. This Defendant lives in Spring Lake, North Carolina.

b.   Arthur J. Goolsby, Jr.: Arthur, J. Goolsby, Jr., is an individual and a citizen of Jones County, Georgia. This Defendant lives in Gray, Georgia.

c.   Blair K. Cleveland: Blair K. Cleveland is an individual and a citizen of Bibb County, Georgia. This Defendant lives in Macon, Georgia.

## GENERAL ALLEGATIONS AND FACTUAL BACKGROUND

## I.   The Syndicated Conservation Easement Scam Explained

### A.   Conservation Easements

52.   A Conservation Easement is a legal agreement between a landowner and another party, generally a land trust or government agency, that permanently encumbers the landowner's real property interests by restricting the development and/or use of the land with the purpose of achieving certain conservation or preservation goals.

53.   In the federal tax context, while a taxpayer may take a deduction for any charitable contribution made during the taxable year (subject to certain

20

limitations), a deduction is generally not allowed for a taxpayer's contribution of a partial interest in property. The Internal Revenue Code ("the Code") provides for certain exceptions where a deduction for the donation of a partial interest in property is permitted, one of which is for the donation of a "Qualified Conservation Contribution" ("QCC").

54.   A QCC is defined as a contribution: of a Qualified Real Property Interest; to a Qualified Organization; and made exclusively for conservation purposes. Before a deduction can be claimed, however, the Code's strict criteria must be met.

55.   A Qualified Appraisal by a Qualified Appraiser following Generally Accepted Appraisal Standards ("GAAS") and other laws is also necessary for a lawful, Code-compliant donation of a QCC for federal tax purposes.

56.   Defendants' scheme hinges upon: utilizing entities taxed as partnerships; and fabricating grossly inflated appraisals which misstate, contort, disregard, and abuse the applicable laws, regulations, and GAAS.

### i.      Entities Taxed as Partnerships.

57.   The Enterprise's SCE Scams hinge upon the use of an entity taxed as a partnership under subchapter K of the Code. The Enterprise uses entities organized as limited liability companies ("LLCs") under state law. Each conservation easement syndicate is an LLC that is taxed as a partnership, a

21

pass-through entity, for federal tax purposes. Without the use of an entity taxed as a partnership, the Enterprise would be unable to deliver the advertised tax deductions to their prospective victims, the members of the LLC.

58.   Defendants, who are highly credentialed professionals, including licensed attorneys, CPAs, financial consultants, and appraisers, knew that an entity taxed as a partnership is not liable for income tax; instead, its members (also referred to herein as "partners") are liable for income tax in their separate or individual capacities based on the income, losses, deductions, or credits that flow from the LLC (also referred to herein as a "partnership"). Because of the structure in which partnerships "pass through" income and losses to their partners, they are commonly referred to as "pass through" or "flow through" entities.

59.   Each partner takes account of his or her distributive share of the partnership's income or loss and any "separately stated items" in computing his or her income tax liability. "Separately stated items" are specific items of income, gain, loss, deductions and/or credits that a partner must account for separately; these items are not taken into account when computing the partnership's income or loss for a tax year. Charitable contributions (as defined in the Code §170(c)) constitute a "separately stated item."

22

60.   Although partnerships do not pay federal income tax, they still have tax filing requirements. Specifically, partnerships are required to file an annual return, Form 1065 (U.S. Return of Partnership Income) that reports the partnership's income, deductions, gain, losses, etc. The partnership is also required to furnish statements, or Schedules K-1, to its partners, and the IRS, reporting each partner's distributive share of partnership income or loss, and separately stated items, among other things.

### ii.   Grossly Inflated Appraisals.

61.   When valuing a CE for purposes of claiming a federal tax deduction, an appraiser must determine the easement's fair market value as of the date of the contribution. "Fair market value" is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Treas. Reg. §1.170A-1(c)(2).

62.   The Treasury Regulations set forth additional guidance for determining the fair market value of a perpetual conservation restriction on a given property as of the date of the contribution:

> If there is a substantial record of sales of easements comparable to the donated easement (such as purchases pursuant to a governmental program), the fair market value of the donated easement is based on the sales price of such comparable easements. If no substantial record of market-place sales is

23

> available to use as a meaningful or valid comparison, as a general rule (but not necessarily in all cases) the fair market value of a perpetual conservation restriction is equal to the difference between the fair market value of the property it encumbers before the granting of the restriction and the fair market value of the encumbered property after the granting of the restriction.

26 C.F.R. §1.170A-14(h)(3)(i) (emphasis added).

63.   Appraisers may take into account the HBU of the subject land when appraising the FMV of a donated CE and, accordingly, the value of a QCC tax deduction. The applicable regulations state that the HBU determination must take into account whether the claimed HBU is physically possible, legally permissible, and financially feasible.

64.   Even if a donor is able to meet all the requirements of a QCC under §170 of the Code, the value of a QCC tax deduction may never exceed the FMV of the property. Otherwise, one could obtain a greater tax deduction by donating a QCC than by making a charitable cash contribution; something Congress has made clear it did not intend.

65.   The promoters of the SCE Scam hire feckless appraisers who are willing to ignore and contort the applicable regulations and practice standards to grossly inflate the valuation of the subject land in order to grossly inflate the value of the QCC tax deduction. The appraisers are aware their appraisals are fraudulent and are being used to claim improper tax deductions. Yet, they

24

willingly ignore this in exchange for substantially higher-than-market rate fees.

66. The SCE Scam promoters intentionally seek cheap, undeveloped land, often in rural parts of the country, which often have characteristics or defects that impair the development value of the land, such as substantial parts of the land being inside a high hazard flood zone or below the water table.

67. The SCE Scam promoters want to spend as little as possible on acquiring the land, as this makes the Enterprise more profitable.

68. The members of the SCE Scam, many of whom are licensed CPAs and attorneys, ridiculously claim that the Code authorizes them to hire an appraiser to fabricate the HBU of the undeveloped and undesirable land, which is tens of millions of dollars higher than the price the promoters purchased the land for, often only months before the date of the appraisal.

69. Simply put, the Enterprise will hire a hand-picked appraiser who they know will opine that the Enterprise's undeveloped land could potentially be developed into a fantastically profitable residential, commercial, or industrial development. Accordingly, the appraiser opines that the Enterprise's land, typically purchased for less than a million dollars, has an HBU worth tens of millions to hundreds of millions of dollars. The appraiser will erroneously conclude that the HBU is one and the same as the FMV of the

25

land "before" being encumbered with a CE, even though this ignores the GAAS, the Code, and basic economic reality.

70.   The appraiser will then subtract this grossly inflated "before" HBU value from the value of the land "after" being encumbered with a CE. Ironically, this "after" value is typically close to the true fair market value of the land. This makes sense. The Enterprise intentionally seeks out undeveloped land. It will claim this land could hypothetically be worth tens of millions of dollars more than its purchase price because of its imagined HBU. Encumbering the land with a CE means that the land cannot be developed. Thus, the value of the land "after" being encumbered with a CE which forbids development is very close to the price the Enterprise purchased the already undeveloped land for.

71.   The Enterprise and its appraisers have an obvious incentive to inflate the "before" value as much as possible. The "after" value of the land is insignificant and thus the subtraction of the "after" value from the "before" value results in an amount that is virtually the same as the grossly inflated "before" value, which is one and the same with the wholly imagined HBU.

72.   The Enterprise will claim that the "before" and "after" subtraction is the fair market value. But this is not the case when the Enterprise knowingly

00470619

inflates the "before" value for the purposes of generating a significant QCC tax deduction in this manner.

73.   The value of a QCC deduction is the actual FMV of the donated easement, not a wholly-imagined HBU from a captured and feckless appraiser.

74.   The real mechanics of how the Enterprise valued the land was generally kept secret from the victims. All the victims knew was that the Enterprises' many captured professionals emphatically vouched for its fraudulent methodologies. Indeed, the Enterprise repeatedly assured Plaintiffs that their SCE's were properly appraised in an attempt to distinguish their SCE's from other SCE's which had been successfully challenged by the IRS.

## B.   The Structure of the Syndicated Conservation Easement Scams

76.   The Enterprise's SCE Scam is highly structured and typically involves multiple entities. At the very least, the scheme involves one LLC (or other state law entity) taxed as a partnership in which victims are induced to "invest." Defendants marketed (or assisted in marketing) these LLC membership interests to the victims, including the Plaintiffs. Defendants' scheme has evolved over the years and has been executed in different iterations and permutations, but the general pattern of the SCE Scam is as follows:

27

77. The Enterprise creates an LLC ("CapCo") with the express purpose of acquiring membership interests in another LLC ("PropCo") with funds obtained through the solicitation of the SCE Scam to unwitting victims like the Plaintiffs. The PropCo acquires title to the land that will become encumbered by the donated CE.

78. The Enterprise either forms a new PropCo or finds an existing LLC that can be used for a conservation easement syndicate. At the time the PropCo is formed or repurposed, the Landowner is the 100% owner, or near 100% owner, of the PropCo. The Landowner then deeds the subject land into the PropCo if the land is not already owned by the Propco. The real property is transferred to the PropCo by the Landowner, in exchange for the LLC membership interests, in a transaction that is considered a "nonrecognition" transaction for federal income tax purposes. This means that the parties to the transaction do not have to recognize the gain or loss on the transaction for federal tax purposes.

79. The Enterprise then solicits victims to purchase membership interests (also referred to herein as "membership units" or "shares") in the CapCo, which was set up to purchase a near 100% interest in the PropCo, whose only real asset is the land. The price of the shares of the CapCo are set arbitrarily as the share price is irrelevant to the scheme. Instead, the

28

Enterprise requires victims to "invest" a minimum amount to participate in the SCE Scam, typically $25,000 to $50,000. This is because the Enterprise's only goal is raising as much money as possible from the victims to fund the SCE Scam and give handsome payouts, commissions, and kickbacks to the various licensed professionals who promote and facilitate these complex and illicit transactions.

80.   Both the PropCos and CapCos each act through a manager or a management company. In this case, both of the management companies were owned and controlled by the Enterprise. The Enterprise controls all aspects of the transactions necessary for the SCE Scam, but fraudulently dupes its victims into believing the transactions are independent and arm's length.

81.   The Enterprise handpicks a land trust known for accepting land donations that reputable organizations would not dare touch. The land trust is tasked with drafting the Baseline Documentation Report ("BDR") that documents the condition of the property at the time of donation, as required by law. The land trust will also draft the deed of conservation easement and a contemporaneous written acknowledgement of the so-called donation.

82.   The Enterprise likewise handpicks an appraiser to prepare an "initial valuation" of the proposed CE. In creating the initial valuation, the appraiser utilizes unrealistic assumptions, violates the standards governing

00470619

appraisal practice, and otherwise prepares valuations that grossly overvalue the CE's value. This initial valuation is used to market and sell the CapCo membership interests. The appraiser knows that the valuation will be used in this manner. The appraiser will then sometimes be hired to create a final appraisal, which is usually identical to the initial appraisal.

83.   The Enterprise engages a law firm to provide a tax opinion letter, confidential offering summary or private placement memorandum, and other transactional documents (subscription agreements for purchasing LLC membership units, operating agreements of the LLCs, redemption agreements, etc.) to be used in marketing and selling the LLC membership interests. The marketing materials include the initial valuation and typically state that the land trust has preliminarily accepted the draft deed of conservation easement.

84.   The CapCo's membership interests are marketed and sold as securities that are exempt from registration under Regulation D of the Securities Act. The CapCo's membership interests are generally marketed to taxpayers who, without the deductions stemming from the membership interests, would be in one of the highest federal income tax brackets. This scam, in particular, targets pharmacists and owners of pharmacies.

85.   Prospective investors are given an offering package with the marketing materials and transactional documents, including the confidential

00470619

offering summary or private placement memorandum, tax opinion, operating agreement(s), subscription agreement, and redemption agreement. Though, in this case, the victims were often deprived of these documents after participating in their first "project" or "easement." This is done to conceal the true nature and details from the scheme and to further induce reliance on the so-called professionals who run the scam. The offering package includes the anticipated value of the CE and the anticipated value of the corresponding tax deduction (as determined by the preliminary appraisal), and states that a draft deed of conservation easement has been approved by a land trust. Copies of the preliminary appraisal and draft deed are not provided but are available for review by prospective customers. The offering package includes an example of the tax benefit or a "tax savings analysis" of a customer's investment.

86.   Each customer who wants to purchase an interest in the CapCo must fill out certain transactional documents, including a subscription agreement, indicating the number of membership units to be purchased. The customer must also certify that the customer is an "Accredited Investor" as defined by securities law. No efforts are made to verify this by the Enterprise.

87.   After all the CapCo membership interests are subscribed and accepted by the victims, the closing transaction is executed. Victims wire money to the CapCo through a bank designated by the CapCo and proceeds are

31

distributed as described in the offering documents. The CapCo uses the proceeds to pay fees and expenses, redeem the membership interests of the original CapCo members, and set up an operating account and an audit reserve fund.

88. "Kickbacks" and "commissions" are then paid to the various promoters of the SCE Scam, for luring victims into the scam through false and misleading representations, out of the funds raised from the victims.

89. Shortly after closing, the PropCo or CapCo manager makes a recommendation to the members regarding the use of the property. The manager's recommendation is inevitably to "donate" a CE and claim a QCC tax deduction. The manager is often also the landowner who transferred the land to the PropCo, who retains a membership interest in the PropCo, and who, therefore, benefits from the QCC tax deduction while also recommending it to the victims.

90. Once victims have been successfully lured into the SCE Scam, they become entitled to "vote" on whether the CapCo should: (1) keep the land untouched in the hopes it appreciates; (2) develop the land after raising significant additional funds; or (3) encumber the land with a CE that is "donated" to a land trust for a substantial QCC tax deduction. The vote is a charade. Over the Enterprise's hundreds of scams, the vote is always to

32

"donate" the CE. The Enterprise promotes SCE Scams as ostensible tax savings devices. The vote is designed only to provide a veneer of legitimacy to the Enterprise's fraud.

91.   After the sham vote, the Capco then "donates" a CE to the land trust, which falsely purports to be a qualified organization.

92.   A return preparer prepares the CapCo's tax return, Form 1065 and accompanying schedules reporting the CE as a charitable contribution. As part of this process, the return preparer also prepares the Schedules K-1 for each victim/LLC member on which the victim's share of the CE deduction is reported. As part of the Form 1065, the CapCo files a Form 8283 (appraisal summary), which must be signed by the appraiser and the land trust. The appraiser also prepares a supplemental statement to accompany the Form 8283 and submits a copy of the final appraisal to the CapCo with the knowledge that it will be used to support a charitable contribution deduction reported on the Form 1065 and ultimately claimed by the individual victims.

93.   Victims file their income tax returns, unwittingly reporting grossly overvalued charitable contribution deductions in reliance of the advice of the Enterprise's accounting, legal, and tax professionals. The victims receive copies of their Schedules K-1, Forms 8283 (appraisal summaries), supplemental statements, and appraisal reports from the CapCo, all of which

33

are fraudulent, and submit them with their income tax returns as support for the improper and overstated deductions claimed.

94.   Continually and repeatedly, the Appraisers overstate the value of the CEs by tens of millions of dollars, which in turn results in the victims unwittingly grossly overstating their tax deductions.

## C.   The IRS Repeatedly Warns the Defendants About Abusing Syndicated Conservation Easements.

95. As early as 1984, the IRS warned professional advisors and promoters of CEs that the overvaluation of charitable contributions was improper and would not be tolerated (IRS News Release, IR-81-122). The Senate Finance Committee was aware of, and concerned about, tax shelter promoters exploiting opportunities to offset income through inflated valuations of donated property. Congress recognized that tax shelter promoters knew it was not possible for the IRS to detect most instances of excessive deductions. Due to the subjective nature of the valuation, some tax shelter promoters never get caught promoting and selling transactions that claim excessive charitable deductions. They also rely on the "audit lottery" to conceal the inflated charitable contribution deduction from the IRS. Because of these concerns, the Senate Finance Committee made it clear to professional advisors that stronger

00470619

substantiation and overvaluation provisions should be applicable to charitable contributions of CEs.

96. Congress took action to address the problem of overvaluing charitable contributions in the Deficit Reduction Act of 1984 ("DEFRA"). DEFRA which set forth specific provisions for the substantiation of charitable contributions, including instructing the Secretary to prescribe regulations under §170(a)(1) of the Code to require any individual, closely held corporation, or personal service corporation claiming a deduction under §170 of the Code to obtain a Qualified Appraisal for the property contributed and to attach an Appraisal Summary (Form 8283) to the return on which the deduction is first claimed for such contribution. This Qualified Appraisal was to specifically disclose the cost basis, acquisition date of the contributed property, and such additional information as the Secretary may prescribe in such regulations.

97. The Secretary complied with Congress' mandate by promulgating regulations pursuant to DEFRA §155(a). The relevant regulations reiterate that no deduction under Code §170 shall be allowed with respect to a charitable contribution unless the substantiation requirements are met. These Treasury Regulations require a fully completed Appraisal Summary (Form 8283) to be attached to the return and provide a list of what the Form 8283 must include, specifically including the identification of the cost basis of the property.

35

98. Professional advisors and promoters/sponsors of CEs, but not laypersons, would have read these regulations to mean that the failure to comply with the substantiation requirements would result in the disallowance of the claimed deduction. The Treasury Regulations expressly provide that a charitable deduction may only be allowed if the contribution is verified in the manner specified by the Treasury Regulations, DEFRA, and the Code.

99. In 2004, the IRS officially identified CEs as purportedly generated deductions that the IRS would carefully scrutinize and eventually disallow if certain circumstances were present, including inter alia, failure to substantiate the FMV of the tax benefit and other valuation issues. See IRS Notice 2004-41 (July 12, 2004). At that time, the IRS advised professional advisors and promoters that it would aggressively pursue back-taxes and enormous penalties from taxpayers who claim disallowed deductions from CEs.

100. In 2006, the IRS officially put professional advisors and promoters of CEs on notice of what constitutes a "Qualified Appraisal" and "Qualified Appraiser," including, for example, requiring a Qualified Appraisal to be consistent with the substance and principles of the Uniform Standards of Professional Appraisal Practice (USPAP) as developed by the Appraisal Standards Board of The Appraisal Foundation.

00470619

101. Even in the face of these warnings, the Enterprise continued to aggressively promote and heavily profit from CE scams. In fact, Defendants eventually moved into syndicated CEs, which greatly expanded the "market" for these Defendants by now making the scams available to individuals who were not individually able to participate in a capital-heavy CE transaction.

102. In 2016, the IRS once again advised professional advisors that it was heavily scrutinizing these transactions and would disallow tax deductions if certain circumstances existed, and that taxpayers who claimed disallowed deductions would pay a heavy price. On December 23, 2016, the IRS issued Notice 2017-10, which designated certain syndicated CEs (like the SCE Scams) as listed transactions. Specifically, the Notice listed transactions where members in pass-through entities receive promotional materials offering the possibility of a charitable contribution deduction worth at least two and a half times their contribution.

103. A "listed transaction" is a reportable transaction that is the same as, or substantially similar to, a transaction specifically identified by the Secretary of the Treasury as a tax avoidance transaction. Once the transaction becomes "listed," certain reporting and disclosure requirements arise. The 2016 Notice created reporting obligations for participants in CE syndications as well their

00470619

material advisors, including appraisers, for transactions entered into on or after January 1, 2010.

104. By 2019, the IRS added syndicated CE transactions to its "Dirty Dozen" list of tax scams to avoid. See https://www.irs.gov/newsroom/abusive-tax-shelters-trusts-conservation-easementsmake-irs-2019-dirty-dozen-list-of-tax-scams-to-avoid.

105. Most recently, on June 25, 2020, the IRS stated in IR-2020-130 that it "will continue to disallow the claimed tax benefits, asserting civil penalties to the fullest extent, considering criminal sanctions in appropriate cases, and continuing to pursue litigation of the cases that are not otherwise resolved administratively."

106. The IRS has completely disallowed charitable deductions claimed through the Enterprise's SCE Scam. Yet, the Enterprise continues to operate to this day.

**D.    The SCE Scam Players and their Essential Roles in the Enterprise.**

107. The Zak Defendants:

    a.    Nancy Zak is perhaps the nation's most prolific tax fraudster. In 2018, the United States Government filed a lawsuit against Zak for promoting dozens of fraudulent SCE scams that reported more

00470619

than $3 billion in improper tax deductions. Zak agreed to a civil injunction, promising to never promote or participate in another SCE scam again. Zak, her various entities, and her trusted associates owned, operated, controlled, managed, and profited from every aspect of the SCE scams. In this case, while Zak was essential to the Enterprise's operations and profits, she could not have completed these complex transactions alone. Zak relied on a hand-picked team of various captured professionals whom Zak knew would disregard their respective professional standards in return for fabulous profits.

b. Green Earth Reserve and Forever Forests are two of the many LLCs owned and operated by Zak and used to facilitate the Enterprise's affairs. Forever Forests and Green Earth Reserve, both controlled by Zak, handled both the buy and sell sides of the transactions. Green Earth Reserve controlled and managed the CapCo while Forever Forests controlled and managed the PropCo. These management companies were critical to facilitating the SCE Scam.

c. Lisa Cantrell and Josh Stanley are Zak's right hands. They work interchangeably for Zak's Green Earth Reserve and Zak's Forever

Forests wherever needed. Cantrell and Stanley each hold numerous roles with each entity and were the buffer between Zak and her victims during the scams.

d.   T.J. Heath is a trusted associate of Nancy Zak. Heath profited from the SCE Scams both by selling the subject land necessary for the SCE transactions and by participating in these very same transactions alongside Zak.

e.   Firestone South is a shell corporation owned by Heath through which he conducted some of the Enterprise's affairs.

108. The CPA Promoters: The ("CPA Promoters") are Ernest Nesmith, Marcus Rogers, Nesmith Rogers Financial Consulting, Ollin Sykes, Scotty Sykes, Sykes & Co., and others. The CPA Promoters are highly credentialed and licensed professionals who worked with the Zak Defendants to identify and refer their clients for participation in the SCE Scam. These CPA Promoters leveraged their trusted status as licensed tax professionals to dupe victims into "investing" in the SCE Scam. The victims would not have undertaken the SCE Scam without the recommendation, blessing, and assurances of the CPA Promoters. The CPA Promoters were handsomely compensated financially by the Sponsors and other Defendants for referring unwitting victims into the SCE Scam.

40

00470619

a.  Ernest Nesmith is a financial advisor and member of Nesmith
Rogers Financial Consulting. Nesmith's biography boasts: "Ernest
brings over 15 years of financial services experience that include
wealth management, insurance planning, and tax consulting. He
has held the Series 7, 63, and 66 investment securities licenses and
also holds his Life and Health Insurance License. Ernest leverages
the experience gained working in the corporate divisions of three
Fortune 100 companies that include Bank of America, Merrill
Lynch, and TIAA-CREF as well as working independently as a
financial   advisor."   Nesmith   directly   solicited   Plaintiffs'
participation in six different SCE Scams. Nesmith presented
alongside the Sykes Defendants and Marcus Rogers to promote the
SCE Scams at various professional conferences. Nesmith was also
a conduit between the victims and the other Defendants. He
enthusiastically encouraged participation in the SCE Scam, telling
Kyle McHugh, "It's a great strategy." Nesmith drafted and
collected documents necessary for the facilitation of the SCE Scam
and communicated with McHugh to further the scam. Nesmith is
also a minority owner of Nancy Zak's Green Earth Reserve, which
promoted and facilitated the very transactions he solicited

41

Plaintiffs to "invest" in. Nesmith himself is not a CPA but played a very similar role as the other CPA Promoters, with whom he is closely affiliated, and has thus been included in this nomenclature herein.

b. Marcus Rogers is Nesmith's partner. His biography boasts: "Marcus is on a very short list of distinguished professionals to have   amassed all four professional designations of CPA, MBA, JD, and LLM. It is this wealth of knowledge that he offers his clients coupled with the practical professional experience of working with premier firms such as KPMG, Deloitte & Touché, and his governmental experience obtained while working for the Department of Revenue for the State of Arizona." Rogers presented alongside the Sykes Defendants and Nesmith to promote the SCE Scam at various professional conferences. Rogers was also a conduit between the victims and the other Defendants. He provided both professional legal and accounting services to facilitate the SCE Scam. Rogers drafted and collected documents necessary for the facilitation of the SCE Scam and communicated with McHugh to further the scam. Rogers is also a minority owner of Nancy Zak's Green Earth Reserve.

42

c.     Nesmith Rogers Financial Consulting purports to be a professional financial services company. Nesmith Rogers appears to be staffed exclusively by Nesmith and Rogers. The company's website provides this blustering statement under a banner that reads, "KEEP WHAT BELONGS TO YOU":

Nesmith Rogers Financial Consulting specializes in developing business and tax strategies for both small business owners and high net worth individuals. Our group demystifies the complexities associated with advance business and tax planning and explains to you and your CPA how to reap the rewards of proper planning. What could you do with an additional 75k in tax and business savings? Are you tired of overpaying your income taxes? Do you get a sick feeling every time you send your hard-earned money to the IRS? A better question might be, why don't you do something about it and *Keep What Belongs To You* (emphasis in original). While the company holds itself out as providing sophisticated tax services, it appears to be little more than a conduit for SCE Scams and other abusive tax schemes.

43

d.   Ollin Sykes is a CPA, CITP, and CMA. His website biography boasts of the amazing accounting and tax services his firm can offer pharmacy owners like the Plaintiffs. Ollin Sykes is a managing member of Sykes & Co., and he uses his credibility as a successful CPA to obtain entrance into various professional conferences across the nation, such as the one Kyle McHugh attended. Sykes directed and recommended that McHugh "invest" in the Enterprise's SCE Scams for Sykes' own financial benefit.

e.   Scotty Sykes is a CPA and CFP, the son of Ollin Sykes, and a member of Sykes & Co. His website biography boasts of his expertise in pharmacy accounting and how he is a "speaker on pharmacy accounting and complex tax matters." Scotty Sykes played the same role as his father in the Enterprise's SCE Scams.

f.   Sykes & Co. is an accounting firm located in Edenton, North Carolina. The firm purports to assist clients with tax and accounting needs. While the business does appear to successfully provide legitimate accounting services, it is also a conduit for the SCE Scams in the "back of the house." Ollin and Scotty Sykes leverage their status as licensed CPAs, along with their successful CPA firm, to lure unwitting victims into the SCE Scams. Sykes &

44

Co. recommended that McHugh "invest" in the SCE Scams while acting as his CPAs. McHugh invested in the SCE Scams on reliance of Ollin and Scotty Sykes, his then CPAs, upon Sykes & Co.'s tax advice.

109. The Appraiser Defendants:

a.   Dennis W. Benson and Benson Appraisal Services fraudulently held themselves out as "Qualified Appraisers" who created "Qualified Appraisals" under the Code. These Defendants appraised the lands in the Muskogee and Walnut Creek SCE Scams. The IRS found that Benson's appraisals grossly misstated the valuation of the donated CEs by tens of millions of dollars and that Benson's appraisals appeared to be sloppily cut and paste from other unrelated appraisals. The Enterprise paid Benson fifteen times what a legitimate appraiser was hired to do only months before.

b.   Doug R. Kenny, Rick A. Kenny, and Kenny & Associates falsely and fraudulently held themselves out to be "Qualified Appraisers" who created a "Qualified Appraisal" under the Code. These Defendants appraised the land in the Ancient Oaks SCE Scam where they opined that a parcel of undeveloped swamp land, worth

00470619

approximately $245,000, could potentially be worth over $112,550,000, thus making the donated CE and federal tax deduction worth $112,305,000. This appraisal is currently under audit and the IRS will inevitably find that these Defendants grossly misstated the value of the land.

110. The ACC Defendants:

a. Atlantic Coast Conservancy is a nonprofit organization that falsely purports to be a Qualified Organization for the purposes of a valid conservation easement. ACC accepted the donations in each of the three SCE Scams that injured the Plaintiffs, and prepared or coordinated preparation of various transactional documents necessary to substantiate the SCE Scams. Zak handpicked ACC to serve these roles as ACC is famous for accepting CE donations that reputable organizations wouldn't touch with a twenty-foot pole.

b. Robert Keller is the CEO of ACC. He prepared the fraudulent deeds of conservation easements and 8283s, among other legal documents necessary to the Enterprise's SCE Scams. Keller is a longtime associate of Zak. Keller attempted to apply ACC for membership in a legitimate CE organization but withdrew. Keller stated he withdrew ACC's application because he knew ACC

46

wouldn't be accepted, presumably to avoid the additional public disgrace.

c.    Joseph Skalski is an attorney licensed to practice in the State of Georgia. Zak was not the Enterprise's only mastermind. Attorney Skalski played more roles in the Enterprise than one can count on one hand. He and his wife made hundreds of thousands of dollars for each of the many Enterprise scams that they were instrumental in facilitating. Joseph Skalski also sat on the Board of Directors for ACC during each of the three SCE Scams described herein. Attorney Skalski even represented his victims before the IRS audits, for a stint, even though his fraud directly caused the scams and resulting audits.

111. The Landowner Defendants:

a.    Arthur Goolsby, Jr., Blair Cleveland, and T.J. Heath made the SCE Scams possible by purchasing the land to be encumbered. They purchased the necessary lands with full knowledge that such lands would be used for a fraudulent SCE Scam. They also served other roles in the Enterprise and were longtime friends and associates of fraudsters Nancy Zak, Robert Keller, and Joseph Skalski.

47

112. The Legal Services Defendants:

a.   Dolph Winders and FisherBroyles played critical roles in the SCE
     Scams. Winders is an attorney licensed to practice in the State of
     Georgia and a partner at FisherBroyles. Winders provided the
     Enterprise essential legal services sorely needed by the multi-
     tiered, nine-figure tax transactions. Winders repeatedly hired
     Douglas Benson to provide the singularly important Qualified
     Appraisal. Winders holds himself out as a SCE expert yet kept
     hiring Benson even though it would have been facially obvious to
     any such an expert that Benson's reports were grossly inflated by
     tens of millions of dollars and appeared to be sloppily cut and
     pasted from unrelated appraisals. Of course, Attorney Winders
     was well aware Benson's appraisals were fraudulent; this was
     precisely why he repeatedly hired Benson to appraise the
     Enterprise's land.

b.   Joseph Skalski and Skalski Law Firm played many roles in the
     Enterprise which Skalski masterminded alongside Zak. Skalski
     unconscionably used his law firm to conduct Enterprise affairs at
     the expense of his victims.

113. The Accounting Services Defendants:

48

a.  Kimberly A. Skalski and Skalski CPAs were hired by the Enterprise, specifically her husband Joseph Skalski, to perform crucial accounting services. Kimberly Skalski was more intimately involved in the Enterprise than one would expect from an ordinary accountant. As the wife of Joseph Skalski, she was familiar with nearly all of the Enterprise's affairs. Skalski knew her husband was engaged in fraud yet provided victims with K-1's reflecting significant tax deductions she knew were improper and knew would be provided to the IRS. Skalski may have performed some or all of her services for the Enterprise under her previous company, Kimberly A. Skalski CPA, PLLC, which was recently dissolved on September 30, 2021. Although, her website biography states that she "opened Skalski CPAs, LLC in 2015."

b.  Lamb & Braswell similarly assisted in furthering the Enterprise's many crucial accounting needs. Specifically, it prepared the accounting records for the various Enterprise members and prepared the fraudulent Form 8283s and 8886s. Like Kimberly Skalski, Lamb knew that the Enterprise's SCE Scams were fraudulent, but managed and operated the Enterprise's affairs for

49

fabulous fees and kickbacks that it could not have otherwise generated.

**II.    Defendants Jointly Develop, Promote, Sell, and Implement the SCE Scams for their Own Personal Financial Benefit at the Unconscionable Detriment of Their Victims Who Trusted Them.**

    **A.    The Enterprise Intentionally Targets Plaintiffs for its SCE Scams.**

114. Plaintiff Kyle McHugh is a pharmacist and the owner and founder of McHugh Pharmacy Group, which manages eleven different pharmacies across the south-east region of the United States.

115. Plaintiff Larry Meek is a pharmacist and a longtime business partner of Plaintiff Kyle McHugh.

116. A sixteen-year-old Kyle McHugh met a twenty-year old Larry Meek when McHugh was working as a stock-boy at a local pharmacy Meek interned for. After working their way up through the pharmacy industry, McHugh and Meek now own and operate a string of successful pharmacies across the southeast. Together they own Lake Wylie Pharmacy Health Investors.

117. McHugh manages their pharmacy business at large while Meek manages the actual pharmacies.

118. As early as March 18, 2015, Ernest Nesmith began aggressively soliciting individuals in the pharmaceutical services industry for SCE Scams.

00470619

Meek received such a solicitation from Nesmith via email on this date which stated: "are you aware that most tax accountants and CPAs commonly use 15-20 [tax saving] strategies when preparing a client's tax return? Yet that is not even a fraction of what is available to you in the Tax Code. There are more than 400 legal tax deductions available to you when properly implemented and documented . . . Want to know more tax strategies that will save you up to six figures . . . At the 2015 PDS Conference, Ernest Nesmith with Tax Savings Professionals wowed the crowd with winning tax strategies that would save owners big on their taxes . . . After his presentation, you will be able to ask Ernest the questions you weren't able to ask at the PDS Conference! Take advantage of this opportunity to talk to a tax expert free of charge." Here, one can see how the Enterprise lured unsuspecting victims into investing in SCE Scams Nesmith knew to be fraudulent and improper. The Enterprise, through its CPA Promoters and supposed tax experts, disparage the work of legitimate CPAs to induce victims into "investing" into SCE Scams which are offered by entities owned by the very promoters.

119. On or about February 2016 McHugh attended a conference hosted by Pharmacy Development Services. There, Olin Sykes and Scotty Sykes of Sykes & Company and Ernest Nesmith and Marcus Rogers of Nesmith Rogers

00470619

Financial Consulting ("the CPA Promoters")[1] presented on syndicated conservation easements and their purported tax benefits to the conference attendees.

120. On or about October 2016 McHugh attended another conference hosted by National Community Pharmacists Association where the CPA Promoters again presented about SCE's and the purported tax benefits pharmacists and pharmacy owners like McHugh could take advantage of.

121. Olin Sykes is a licensed Certified Public Accountant ("CPA") and the owner and founder of Sykes & Company, P.A., a large and successful accounting firm that focuses on the pharmaceutical services industry. His website biography boasts that he is "intricately involved in all aspects of the [accounting] business with a concentration in tax, business advisory services, and technology consulting for independent pharmacies."

122. Scotty Sykes is the son of Olin Sykes and is likewise a CPA employed by Sykes & Company, P.A. His biography boasts "he is actively involved in all areas of pharmacy accounting and tax with an emphasis on high-level advisory

---

[1] Note, Olin Sykes, Scotty Sykes, and Marcus Rogers are all licensed CPA's who run and are employed by businesses that offer professional tax and accounting services. Ernest Nesmith is not a CPA, but nevertheless holds himself out as a "tax consultant" and "financial advisor," as is described as such herein.

for pharmacy clients. Scotty Sykes is heavily involved in the community pharmacy industry and is a frequent speaker on pharmacy accounting and complex tax matters. He is also an avid writer providing a progressive approach to operating a successful pharmacy."[2]

123. Ernest Nesmith holds himself out as a financial and tax advisor. His biography on Nesmith Rogers Financial Consulting's website boasts he has "over 15 years of financial services experience that include wealth management, insurance planning, and tax consulting. He has held the Series 7, 63, and 66 investment securities licenses and also holds his Life and Health Insurance License. Ernest leverages the experiences gained working in the corporate divisions of three Fortune 100 companies that include Bank of America, Merrill Lynch, and TIAA-CREF as well as working independently as a financial advisor."[3]

124. Marcus Rogers boasts that he is "on a very short list of distinguished professionals to have amassed all four professional designations of CPA, MBA, JD, and LLM. It is this wealth of knowledge that he offers his clients coupled with the practical professional experience of working with premier [accounting] firms such as KPMG, Deloitte & Touché."

---

[2] https://www.sykes-cpa.com/about-us/your-team/scotty-sykes/
[3] http://www.rognesconsulting.com/whoarewe

125. As licensed accounting and tax professionals representing a large and successful accounting business, the CPA Promoters hold themselves out as experts in accounting and tax matters.

126. Plaintiffs Kyle McHugh and Larry Meek are entrepreneurs and pharmacists. Respecting tax and accounting issues they are at best a lay person without any specialized knowledge or skills in these fields.

127. The CPA Promoters knew that Plaintiffs, and the other conference attendees, had at best a lay person's understanding of tax and accounting issues. Indeed, this imbalance of professional knowledge and power was the very reason the CPA Promoters attended these various conferences. The CPA Promoters ostensibly attended to help inform those in the pharmaceutical services industry about tax and accounting issues outside of their areas of expertise. Unconscionably, rather than properly inform the conference attendees, the CPA Promoters elected to mislead the conference attendees for the CPA Promoters illicit financial gain.

128. The CPA Promoters abused their position as licensed professionals by leveraging their vastly superior knowledge of tax and accounting issues to lure unsuspecting business owners into "investing" in the SCE scam.

129. The CPA Promoters presented SCEs as a completely legitimate means for business owners to save on taxes while protecting the environment.

54

00470619

During the presentation, the CPA Promoters falsely held out the purportedly large tax savings benefits from SCEs as an incentive created and blessed by the IRS and Federal Government for people to advance the noble goal of environmental protection.

131. The CPA Promoters and Enterprise knowingly invoked the noble goal of environmental protection to disguise their despicable fraud.

132. After the presentation, the CPA Promoters solicited private questions and comments from the audience. Curious about the purported tax benefits provided by syndicated conservation easements, as falsely described by the CPA Promoters, Kyle McHugh approached Ernest Nesmith with questions about the propriety and practicality of participating in a SCE syndication, something Nesmith encouraged conference attendees to do.

133. Nesmith assured McHugh that SCEs were a remarkable tax savings strategy that were both legal and even safe investments. Nesmith told McHugh that the SCE's offered by the CPA Promoters consistently carried 4:1 return on investment or higher – meaning that for every dollar an "investor" gave to the CPA Promoters, the "investor" could expect $4+ in tax savings. Nesmith told McHugh these large returns were perfectly acceptable and legal when "done in the right way."

134. Nesmith was able to comfortably make these statements because he knew the SCE Scams he and the CPA Promoters were pitching had a network of captured professionals who understood they were to abuse their positions of trust to create inflated appraisal values for the land in question. For example, Nesmith knew that Dennis W. Benson of Benson Appraisal Services had delivered overvalued and unsustainable appraisals for SCE scams in the past and knew that Benson could be relied on to deliver an equally fraudulent appraisal in the future.

135. The CPA Promoters' presentation at the NCPA conference proved to be so convincing that McHugh and several other pharmacists in attendance promptly began investing in the SCE scams offered by the CPA Promoters.

136. The Nesmith Rogers Defendants never disclosed, however, that the SCE Scams they would solicit to McHugh were owned and operated by Green Earth Reserve, an entity they owned with the prolific fraud Nancy Zak.

137. The Nesmith Rogers Defendants also failed to disclose they co-owned Green Earth Reserve with the prolific fraud Nancy Zak.

138. Following the conference, McHugh asked Olin and Scotty Sykes how he and his business could take advantage of the significant tax savings gained through participation in the SCE scam as falsely and fraudulently descried by the CPA Promoters.

56

139. On November 4, 2016, Scotty Sykes emailed Kyle McHugh an email titled "Conservation Easements." This email contained a contact card for Ernest Nesmith of Nesmith Rogers Financial Consulting. Scotty Sykes sent the email knowing that McHugh intended on "investing" in a CPA scam due to his and his father's fraudulent presentation. Scotty Sykes also knew that he and his father would be financially compensated for referring a fresh victim to the SCE scam.

140. McHugh would eventually become victim to three SCE Scams, the Muskogee Scam, the Walnut Creek Scam, and the Little Ocmulgee/Ancient Oaks Scam, each of which is addressed in turn below.

141. Based on the advice from Plaintiff's then accountants at Sykes & Company advice, Larry Meek, McHugh's longtime business partner, began to "invest" in the SCE Scams Sykes recommended McHugh invest in. Of course, Meek did not know that Sykes referred Plaintiffs to SCE Scams owned and controlled by Olin Sykes longtime friend the prolific fraud Nancy Zak.

142. Larry Meek became a victim on two SCE Scams, the Walnut Creek Scam and the Little Ocmulgee/Ancient Oaks Scam.

**B.    The Muskogee Scam.**

143. Muskogee Partners, LLC was registered as a domestic LLC on August 31, 2016, and is the CapCo in the Muskogee SCE Scam (the "Muskogee

57

CapCo"). Before shares in the Muskogee CapCo were sold to the victims, the Muskogee CapCo was owned 100% by Green Earth Reserve, which was managed by Nancy Zak. Green Earth Reserve was owned by Nancy Zak, Ernest Nesmith, and Marcus Rogers.

144. Shares in the Muskogee CapCo were solicited to victims at an arbitrary price of $245 per share with a minimum investment price of $25,000. The Muskogee CapCo was organized for the express purpose of raising money from victims to purchase shares in Muskogee OWV LLC, a domestic LLC registered on September 11, 2015 (the "Muskogee PropCo"). The primary and/or only asset of the Muskogee PropCo was approximately 398.78 acres of land in Pulaski County, Georgia (the "Muskogee Land"). Upon the successful "sale" of shares in the Muskogee PropCo to the Muskogee CapCo, Green Earth Reserve, and therefore Zak, would select a manager and Tax Matters Partner ("TMP") for the project. Zak selected herself to serve both roles.

145. The Muskogee PropCo had 10,000 total shares. The Muskogee CapCo planned to raise $2.45 million from victims, of which $1,506,000 would be used to purchase 9,700 shares of the Muskogee PropCo and the remaining almost million dollars would be used to pay off the various promoters and "professionals" who facilitated the scam. Specifically:

  a.      $365,000 was to be paid to Nancy Zak's Green Earth Reserve, LLC;

58

b.    $60,000 was to go to Nancy Zak's Forever Forests, LLC;

c.    $55,000 was to go to undefined legal fees, Dolph Winders, FisherBroyles, and possibly others;

d.    $56,935.31 was to go to Atlantic Coast Conservancy;

e.    $15,000 was to be paid to Dennis Benson of Benson Appraisal Services;

f.    $25,000 was to be for "accounting" presumably Kimberly Skalski;

g.    $250,000 was to be kept as an "operating reserve"; and

h.    The remaining money would be used to compensate the various promoters who referred unwitting victims to the scheme, such as the CPA Promoters, Nancy Zak, and others.

146. The Muskogee PropCo was previously owned by Blair K. Cleveland (5%) and Arthur James Goolsby, Jr. (95%). The plan was for both Goolsby and Cleveland to collectively retain 300 shares or 3% of the outstanding shares not offered to victims. These men would later sell all but 1% of their shares. Joseph Skalski stated to the IRS that this was done because of "greed" on behalf of Goolsby and Cleveland.

147. The Muskogee Land was comprised of two parcels of land. The southern portion of the land was sold to Muskogee PropCo on October 23, 2015, for $435,000. The northern portion was previously purchased by Pine Land

59

Property, LLC, owned by Arthur J. Goolsby Jr, on July 15, 2015, for $351,716; then was conveyed to the Muskogee PropCo on May 10, 2016, in exchange for shares in the PropCo.

148. Accordingly, the entirety of the Muskogee Land was purchased for $786,716.

149. Benson's own appraisal states that the Pulaski County tax commissioner's office appraised the Muskogee Land for only $449,223 in 2015.

150. Yet, the Muskogee CapCo, run by Zak and the Zak Defendants, sought to raise $1,506,000 to buy 97% of the Muskogee PropCo, whose only hard asset was the Muskogee Land.

151. On November 18, 2016, Ernest Nesmith solicited Plaintiff Kyle McHugh to buy 756 shares in the Muskogee CapCo for a total price of $185,220. Nesmith's email contained the following documents: (1) an investor questionnaire; (2) a private placement memorandum; (3) a subscription and suitability agreement ("subscription agreement"); and (4) wiring instructions.

152. Nesmith instructed McHugh and other victims to complete and sign the subscription agreement and questionnaire and send the executed documents to FisherBroyles with attention to Attorney Dolph Winders. Victims were also instructed to wire funds to First Landmark Bank, with attention to Vivian Battershill-Diaz, to participate in the Muskogee Scam.

60

153. On December 12, 2016, Muskogee CapCo purchased 99%, as opposed to the solicited 97%, of Goolsby and Cleveland's interest in the Muskogee PropCo for $1,506,000. The entirety of the Muskogee Land was purchased by the Muskogee PropCo, however, for only $786,716, just months earlier, between October 23, 2015, and May 10, 2016.

154. The Muskogee Land was acquired in transactions between willing buyers and sellers for a total amount of $786,716, meaning the FMV of the Muskogee land was around $786,716. Yet, the Muskogee CapCo invested in this very same land, by purchasing shares in the Muskogee PropCo, for $1,506,000 only months later, on December 12, 2016.

155. The Zak Defendants, Muskogee CapCo, Muskogee PropCo, Benson, Dolph Winders, and others knowingly and intentionally overstated the base value of the $786,716 Muskogee Land by $719,284 or nearly 100%. This initial overvaluation of the Muskogee Land unjustly enriched these Defendants by $719,284. These Defendants then used these fraudulently obtained funds to line their own pockets and provide a slush fund to pay the corrupt and captured professionals facilitating the scam "under the table."

156. In other words, these Defendants initially inflated the value of the Muskogee Land to dupe unwitting investors and the IRS into believing that they had purchased a more expensive parcel of land than they actually did.

61

This served to help provide a more plausible basis for Benson's fraudulent appraisal and the resulting QCC tax deduction.

157. The Muskogee Land would then be grossly overvalued once again, this time by appraiser Dennis Benson and his company Benson Appraisal Services. Benson would go on to claim that this $786,716 piece of land was worth a staggering $12,000,000, for the purposes of a federal tax deduction, because he opined the HBU of the undeveloped swamp land was worth $12,000,000.

158. Benson knew that all but 40 acres of the roughly 400-acre Muskogee Land were in a high-risk flood zone. Yet, Benson's appraisal falsely and fraudulently states that only half of the acreage was in a flood zone. Benson knowingly made this fraudulent representation because he believed that honestly representing the true flood zone acreage would cast substantial doubt on his fraudulent and grossly inflated appraisal and, therefore, the amount of the QCC tax deduction the Enterprise hired him to fabricate.

159. Upon information and belief, Dolph Winders, who commissioned Benson's Muskogee appraisal and other SCE appraisals from Benson, instructed Benson to make such fraudulent representations so as to increase the value of the SCE tax deduction.

62

160. Benson knew that the Muskogee Land was not worth even a fraction of this value, yet he used his position of trust, as a licensed appraiser, to grossly inflate the Muskogee Land's value to assist Nancy Zak and the other RICO Defendants' tax fraud scheme, as discussed more below.

161. The Muskogee CapCo's Private Placement Memorandum noted that the CapCo "investigated" two possible uses for the subject land: (1) the CapCo could continue to hold the Muskogee Land for investment, which could involve developing it; or (2) the CapCo could grant a CE on the property "or a portion of the property to achieve certain business and tax objectives."

162. Before the completion of the scam transaction, the Muskogee PropCo was managed by T.J. Heath. As such, he was given broad authority to manage the Muskogee PropCo and was responsible for making a proposal to the member-victims of Muskogee CapCo respecting which of these two options the victims should choose.

163. T.J. Heath recommended that the victims vote for the conservation easement option. Heath did this because he knew that this would result in he and his wife being personally compensated to the tune of hundreds of thousands of dollars; even though Heath knew that the value of the deduction he and his co-conspirators fabricated was wildly fraudulent.

00470619

164. The Muskogee Capco's Private Placement Memorandum also stated that the choice of which option to pursue would be up to a vote of the 38 member-victims of the Muskogee CapCo. Member-victims of the Muskogee CapCo, like McHugh, were given ballots and instructed to cast a vote for which option they wanted to choose. On December 16, 2016, Kyle McHugh cast his vote for the conservation option as recommended by T.J. Heath.

165. Yet, the member-victims of Muskogee PropCo's votes were a complete façade as, on December 15, 2016, Goolsby sent a letter to the two other members of the Muskogee PropCo: Cleveland and the Muskogee CapCo. The vote appears to have in reality been decided by a majority vote of the three members of the Muskogee PropCo, not the thirty-eight members of the Muskogee CapCo, as advertised. Moreover, the PropCo's choice was made before the members of the Muskogee CapCo cast their votes, which unbeknownst to them were completely meaningless.

166. Goolsby and Cleveland knew that their land was being used for a fraudulent SCE Scam. They also served other roles in the Enterprise, and were longtime friends and associates of fraudsters Nancy Zak, Robert Keller, and Joseph Skalski.

167. Joseph Skalski, acting as the authorized Power of Attorney ("POA") for the Muskogee PropCo before the IRS, stated that "he did not know if any

64

vote took place among the members of [Muskogee PropCo] or [Muskogee CapCo]." This is shocking and a lie, as the so-called vote is part of what the promoters of the SCE Scam claim helps increase the Scam's legitimacy.

168. The vote was a façade in another respect as the Muskogee CapCo's Private Placement Memorandum reveals that no one in the Enterprise had any intention of developing the Muskogee Land. Indeed, this document repeatedly discourages members from voting for the development option and encourages members to vote for the conservation option. The memorandum states that the development option would involve a very high degree of risk and would require an undetermined and substantial amount of additional funds that the CapCo did not have and did not intend on raising.

169. In other words, victims were told that their "initial investment" was enough only to pursue the conservation option. Should the victims wish to pursue the development option, this would require another round of funding and enormous risk (if development was even possible), something the Enterprise expressly had no interest in pursuing.

170. The Enterprise was responsible for a mindbogglingly large number of these transactions, all of which pursued the "conservation option" over the costly and risky "development option."

00470619

171. By deed of easement dated December 28, 2016, the Muskogee PropCo granted ACC a conservation easement on the Muskogee Land. The Deed of Conservation Easement was recorded in Pulaski County, Georgia that same day.

172. Muskogee PropCo claimed a $11,400,000 deduction on its December 31, 2016 tax return based on Benson's and Winders' false and fraudulent appraisal.

### C.    Plaintiffs Become Victims of the Muskogee Scam.

173. The individuals and entities listed below were part of the RICO Enterprise that promoted, devised, solicited, sold, marketed, operated, managed, controlled, and facilitated the Muskogee Scam:

### i.    The CPA Promoters.

174. On November 18, 2016, Kyle McHugh emailed Ollin and Scotty Sykes and Kathy Blanchard of Sykes & Co. stating that McHugh intended to purchase 756 shares, totaling $185,220, into the Muskogee Project recommended by the CPA Promoters. In this email, McHugh asked his then accountants whether he should "invest" via one of his corporations or personally.

00470619

175. Within minutes, Scotty Sykes replied "Kyle, you will want to do it personally. You may draw the money from the corporation, but it should be done personally. Thanks for the update."

176. In this email, Scotty Sykes, acting as a licensed CPA and employee of Sykes & Co., encouraged and blessed McHugh's participation in the Muskogee Scam, knowing it was a fraud.

177. Without giving any reason, Scotty Sykes insisted that McHugh make the investment personally, meaning McHugh would ultimately be personally liable for the so-called investment.

178. Scott Sykes made this recommendation, not for the benefit of his firm's then client, Kyle McHugh, but for his and his father, Ollin Sykes', illicit financial gain.

179. Later that same day (on November 18, 2016), Nesmith sent McHugh a series of documents for participation in the Muskogee Project, including an investor questionnaire and a subscription agreement.

180. Also, later that day, McHugh emailed Nesmith his signed "Subscription and Suitability Agreement" for participation in the Muskogee Scam as requested by Nesmith.

181. This form asked the signer to indicate how many shares of Muskogee CapCo they wanted to purchase at the arbitrary rate of $245.00 per share.

00470619

McHugh wrote that he wished to buy 756 shares in reliance of his then CPA's advice for a total price of $185,220.

182. The form also asked the victim to "Provide the name, address and professional affiliation of your investor representative, if any." Here, McHugh wrote "Olin Sykes, 401 E Church St. 3rd Floor Edenton, NC 27932." McHugh wrote Ollin Sykes' name here because Sykes referred McHugh to the Muskogee Scam in his capacity as McHugh's retained CPA. Indeed, McHugh paid Sykes & Co. $25,000 for the privilege of being defrauded by his own accountants.

183. This section of the Subscription and Suitability Agreement was to inform the Promoters of the scam of those who they would give a commission to for the referrals.

184. Both the Muskogee CapCo and PropCo were managed and controlled by the prolific fraud Nancy Zak through her various entities. It is no coincidence the Sykes Defendants recommended his then client McHugh invest in a SCE Scam controlled by Nancy Zak because Ollin Sykes is a longtime friend of Nancy Zak.

185. The CPA Promoters received financial compensation for referring McHugh to the Muskogee Scam.

186. On November 21, 2016, McHugh emailed Ernest Nesmith and Marcus Rogers, inquiring about the funding timetable for the Muskogee

00470619

project. Within minutes, Nesmith responded that McHugh should fund the investment "as soon as you can," adding "most people fund within 1 to 2 business days of the docs being received." Here, the CPA Promoters sought to create a false sense of urgency to maximize their chances of successfully taking their unwitting victim's money; a tactic they used at every possible opportunity.

187. On November 21, 2016, Scotty Sykes emailed McHugh on behalf of Sykes & Co., sending him a preliminary tax plan, as discussed more below. Of note here, the Sykes & Co.'s plan included a $210,000 conservation easement "investment" which CPA Sykes told McHugh "will correlate to an approximate charitable contribution deduction of $840,000."

188. By November 21, 2016, the member-victims had not even completed the so-called vote about whether to donate a CE on the Muskogee Land or keep it as an investment. Yet, Scott Sykes told McHugh that the project "will" yield a four times tax deduction for every dollar invested.

189. Scotty Sykes knew that there was no way he could guarantee any legitimate SCE project would yield a 4:1 return. Sykes made this representation to McHugh, however, because he knew he was a member of an Enterprise that consistently hired the Appraiser Defendants to make

69

fraudulent appraisals, which would consistently and exponentially overstate the value of any given conservation easement.

190. The Sykes Defendants made the "investments" in the fraudulent SCE Scam a central part of their financial and accounting advice to McHugh and his businesses. The Sykes duo treated a 4:1 minimum return as a given because they were aware of the mechanics of the tax fraud scheme they were promoting.

191. On November 21, 2016, McHugh wired Nesmith $185,220 to participate in the Muskogee Scam.

192. On November 23, 2016, McHugh emailed Nesmith, asking if he had received the funds. Later that day, Nesmith responded that he did.

193. On January 4, 2017, McHugh wrote the Sykes Defendants, "we are also grateful for your putting us in contact with the conservation easement folks [Nesmith Rogers and Nancy Zak.]" At this time, McHugh was still under the false impression that these successful licensed professionals were not acting solely for their own illicit financial benefit.

194. It was this reliance on the advice of Sykes & Company that caused McHugh's business partner Larry Meek to invest in the subsequent Walnut Creek and Little Ocmulgee/Ancient Oaks Scams.

195. The CPA Promoters were keystone figures in the fraudulent SCE scheme. The weight and seeming legitimacy of their status as CPAs running a successful accounting firm was essential to luring and lulling unsuspecting victims into participating in the SCE Scam.

196. Kyle McHugh paid Sykes & Co. $25,000 for accounting and tax planning services. McHugh, like any reasonable person, assumed that his CPA was not a fraudster seeking to exploit him for illicit profit.

197. But for the Sykes Defendants' ostensible credibility as prominent CPAs, neither McHugh nor Meek would never have followed their advice to invest in the SCE Scams they promoted.

198. But for the Nesmith Rogers Defendants' ostensible credibility as prominent CPAs and financial consultants, McHugh would never have followed their advice to invest in the SCE Scams they promoted.

199. McHugh unwittingly invested into these scams in reliance of the tax and financial advice provided to him by his former CPAs, the Sykes Defendants, and the Nesmith Rogers Defendants.

### ii.    Dennis Benson and Benson Appraisal Services.

200. Dennis Benson and his company, Benson Appraisal Services, falsely and fraudulently held themselves out to be Qualified Appraisers who created Qualified Appraisals as required under the Code.

71

201. Benson is a complete and utter fraud who abused his position of trust as a licensed appraiser to scam innocent victims like the Plaintiffs for fabulous profit.

202. IRS Revenue Agent Athena O'Connor reviewed Benson's so-called Qualified Appraisal and found it failed to satisfy even the most basic requirements of a Qualified Appraisal under the Code.

203. Benson's appraisal determined that the FMV of the worthless flood hazard Muskogee Land, before being encumbered by a CE, was a preposterous $12,000,000. The IRS determined Benson's appraisal "is unreliable in that is incomplete, based on unsupportable assumptions, flawed in its methodology, and bearing no correspondence to the amount paid for the 99% property interests just days before the easement was donated. . . The taxpayer has offered no credible evidence of value for the conservation Easement and therefore has failed to establish a greater value [for the CE] than $0." Plaintiffs' independent investigation has confirmed this.

204. Benson's Muskogee Appraisal was an absolute farce. Benson's appraisal repeatedly contradicts itself about basic issues of fact, such as which city the Muskogee Land is located in, as the appraisal repeatedly claims that the land is both inside and outside the city limits of Hawkinsville, Georgia.

00470619

205. Indeed, the IRS noted that Benson's Muskogee appraisal "appears to have been developed for another property, with names changed where necessary. However, some details have been missed," such as a location of the property. The IRS also noted that "Mr. Bensons [sic] appraisal suggests that it was prepared for a different entity and facts changed to fit the current taxpayer. Information he used to prepare the appraisal was irrelevant (from another county) or incorrect (city limits.)"

206. Benson's Appraisal falsely and fraudulently states that only half of the Muskogee Land's acreage is in a flood zone. In fact, all but 40 acres of the roughly 400-acre Muskogee Land is located in a Zone A flood zone, as Benson knew.

207. Zone A flood zones are considered very high risk, and landowners in such zones are required to carry flood insurance by federal law.

208. As noted by the IRS, Benson's appraisal does not take this basic yet crucial detail into account and does not establish such basic facts as what the 100-year flood level is or how this necessary flood insurance would affect the appraisal.

209. On December 12, 2016, Goolsby and Cleveland sold 99% of their 100% interest in the Muskogee PropCo to the Muskogee CapCo for $1,506,000. On December 28, 2016, Muskogee PropCo donated a CE to ACC, claiming an

$11,400,000 deduction based on Benson's appraisal. Contrary to Benson's fraudulent appraisal, the IRS determined the true FMV of the Muskogee Land to be at most $1,090,672. Indeed, the true value of the land is closer to $800,000 for the reasons discussed above.

210. Under §170 of the Code, a QCC tax deduction may not exceed the FMV of the contributed CE on the date of the contribution. See Treas. Reg. §1.170A-1(c)(1), (h)(1) and (2). The FMV is the price at which the contributed property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell, and each having reasonable knowledge of relevant facts, per Treas. Reg. §1.170A-1(c)(2) and Treas. Reg. §1.170A-14(h)(3) and (4).

211. No reasonable willing buyer, with knowledge of all facts, would believe that a property worth at most $1,090,672 could appreciate to $12,000,000 in just sixteen days – the amount of time between the sale of the Muskogee PropCo's shares to the Muskogee CapCo and the date of the "donation."

212. The IRS concluded that "the [Muskogee PropCo] grossly overstated the pre-easement fair market value of the subject property. In doing so it disregarded the obvious fact that the total amount paid to purchase the property was only $1,090,672 and performed no good faith investigation to

74

reconcile its claimed [12 million dollar] value and the investment amount." The IRS concluded, therefore "the taxpayer overstated its deduction for the conservation easement by at least $10,907,328."

213. Accordingly, the IRS determined that the gross valuation misstatement penalty under I.R.C. §6662(h) is applicable.

214. The IRS also determined that a penalty for a reportable transaction understatement under I.R.C. §6662A applies as well.

215. The cost of these penalties will be borne by Benson's victims, like the Plaintiffs.

216. Benson's Appraisal also failed in other material respects. It appears Benson failed to visit the property as required by the federal regulations, a conclusion also reached by the IRS.

217. Further, Benson failed to use any comparable commercial or residential land sales within Pulaski County. Instead, Benson looked to properties outside Pulaski County, all of which were located in more urban areas. Benson did this knowing that using improper comparisons would help to inflate his already-inflated valuation.

218. Benson was previously professionally cited for doing just this by his governing appraisal licensing board.

219. Benson also failed to deduct the value of the enhancement to Arthur Goolsby's other land by the conservation easement, which was located only feet away from the Muskogee Land, as discussed in greater detail herein.

220. Were Benson an independent appraiser, he would have offset the increased value provided to Goolsby's personal land by the neighboring Muskogee Land being forever encumbered with a CE.

221. This provides further evidence that Benson, Goolsby, Zak, Winders, and the other Defendants were in a coordinated RICO enterprise. There is no reason Benson would have neglected to take this deduction into consideration unless he was instructed to by his co-conspirators, the RICO defendants.

### iii.    The Zak Defendants.

222. In 2018, the United States Government filed a lawsuit against Zak for promoting dozens of SCE scams that reported more than $3 billion in tax deductions. *U.S v. Zak*, 18-cv-5774, U.S. District Court, Northern District of Georgia (Atlanta).

223. Zak and her companies could have gained well over a half million dollars per transaction.

224. On March 25, 2021, Zak entered into a permanent injunction barring her from ever organizing, promoting, or selling any plan or arrangement that involves a deduction for a qualified conservation contribution; making or

00470619

furnishing a statement about the allowance of any federal tax benefit as a result of participating in a conservation easement syndicate; or representing any individual before the IRS with respect to any donation that is intended to qualify as a qualified contribution easement. Id.

225. Yet, as recent as January 31, 2022, Nancy Zak emailed her victims, acting as Manager of both Green Earth Reserve and the Muskogee CapCo. Nancy Zak informed her victims that she has engaged her fellow co-conspirator, Joseph Skalski, to represent them before the IRS during the audit caused by Skalski's and Zak's own fraud.

226. Zak is currently violating her sweeping civil injunction by sending such emails.

227. Prior to entering into this injunction, Zak caused severe financial harm to her countless victims, such as the Plaintiffs.

228. On January 27, 2017, Kyle McHugh received an email from Nancy Zak, who served as the "Managing Principal" and "Tax Matters Partner" for the Muskogee Project, and Lisa Cantrell, who served as a "Manager of Investor Relations," writing on behalf of Green Earth Reserve, an entity controlled by Zak. The email thanked McHugh for his participation in the project and informed him that a majority of the victims voted to "donate" a CE on the

Muskogee Land. She also informed McHugh that the CE was donated on December 30, 2016.

229. The Zak Defendants knew that the vote was fraudulent, as it was actually decided by the biased Landowner Defendants, Goolsby and Cleveland, who comprised a majority of the three members of the Muskogee PropCo; the choice was not made by a vote of the 38 members of the Muskogee CapCo as advertised.

230. The vote was also completely illusory. There was no possible outcome of the "vote" other than to "donate" a CE on the land, as the Zak Defendants, the CPA Promoters, and all other Defendants all knew from their dozens of identical SCE transactions.

231. By this time, the Muskogee CapCo had raised sufficient funds to purchase 99% of the shares in the Muskogee PropCo, whose only hard asset was the Muskogee Land.

232. The Muskogee CE was then "donated" to ACC on December 28, 2016. On that same day, ACC's CEO, Robert D. Keller, wrote a contemporaneous written acknowledgement of the Muskogee "donation."

233. Nancy Zak's involvement in SCE Scams across the country is prolific and cannot be understated. Nevertheless, she could not do this work alone. To further her scheme, Zak formed, owned, managed, directed, and otherwise

78

controlled several legal entities, such as Green Earth Reserve and Forever Forests. Green Earth Reserve managed and controlled the CapCos, and Forever Forests controlled the PropCos.

234. Zak also managed, directed, supervised, and otherwise oversaw several employees, including the other Zak Defendants. Zak's trusted associates, such as Josh Stanley and Lisa Cantrell, played interchangeable roles in all of Zak's organizations depending on the Enterprise's then needs. Here, the Zak Defendants all acted in concert to effectuate the SCE Scams as quickly and profitably as possible, without regard to the legality of the transactions. The Zak Defendants were crucial in effectuating the Muskogee Scam that resulted in the personal enrichment of all involved.

235. On June 15, 2017, Lisa Cantrell sent the victims an email on behalf of Forever Forests, informing investors that they had to file a Form 8886 with their tax returns. Cantrell told the victims that the PropCo (also referred to herein as the "syndicate") had drafted a Form 8886 which "will contain carefully chosen suggested language answering the complex questions contained in Form 8886. You may use this language as it stands or amend it to your satisfaction. Hopefully this will greatly diminish the time and research your tax professional will have to utilize to complete this newly required

00470619

disclosure." Cantrell informed victims that they could expect to receive the Enterprise-drafted Form 8886s shortly.

236. On June 30, 2017, Josh Stanley, this time acting as Project Manager for Forever Forests, sent victims the Enterprise-drafted Form 8886. Stanley told victims that the Enterprise hoped lobbying efforts would be successful in eliminating IRS Notice 2017-10, even though the Enterprise knew this was all but impossible. Nevertheless, Stanley told victims that "if these [lobbying] efforts are successful, it may be unnecessary to file these informational forms. Consequently we are recommending that you delay your filing until closer to the deadline." Stanley also wrote that the Enterprise-drafted forms had "suggested language . . . customized to reflect your project's specifics."

237. Stanley devoted the entirety of his email to attempting to downplay the seriousness and significance of the victims' need to file the required Form 8886 *i.e.* a "Please Audit Me Form." Stanley's email included an email from Frank Schuler, President of the Partnership for Conservation ("P4C"), a group of SCE promoters who lobby against the regulation of the multi-billion-dollar SCE industry. The email concluded with Stanley encouraging victims to provide financial support for the group's lobbying efforts.

238. Stanley's email served to further several aspects of the SCE scheme. First, it again served to lull victims into a false sense of security about the

00470619

legitimacy of their investments while downplaying the very serious risk posed by the IRS's notice. Stanley stated that P4C, an unnamed former IRS attorney, and unnamed "DC lobbying firm," were making a successful lobbying effort that may relieve the victims of any need to comply with IRS Notice 2017-10 at all. Stanley made this representation knowing that these lobbying efforts were virtually certain to fail to persuade the IRS to reverse course on Notice 2017-10.

239. Stanley implied the likelihood of success of these lobbying efforts is so high that investors can safely delay filing the required Form 8886, something he explicitly recommended the victims do. Stanley made this representation knowing that a delay in the victim's 8886 did not serve to benefit the victims whatsoever. Stanley also knew that advising investors to delay filing the mandatory 8886 would help to lull the victims into a false sense of security about the dire situation caused by the Defendants. Finally, Stanley begs the victims to contribute to P4C's lobbying efforts. Stanley did this knowing full well that the lobbying efforts would serve mostly to protect promoters of SCEs, such as himself and the Enterprise.

240. Suddenly, on September 28, 2017, Stanley again emailed the victims, acting as Project Manager for Forever Forests. Stanley informed victims that the Form 8886s he and Cantrell sent months ago, which they encouraged

81

victims to file with the IRS as is, were patently incomplete. Stanley sent an amended Form 8886 with substantial revisions, though these revisions still included false and fraudulent statements and omissions, as discussed later herein. Stanley told victims in bolded font, "the Donor forms must be modified for your use. Do not use them as-is," instructing victims to consult with their own tax professionals to complete the Forms.

241. Stanley also informed victims, again in bold, that "most legal and tax professions are strongly recommending that your Form 8886 be submitted no later than the original deadline of October 2. This next Monday." Of course, Stanley knew that the Enterprise did not want victims consulting with their own tax professionals. This is why Stanley gave victims months to file the Enterprises' admittedly insufficient Form 8886 in June but gave them only a single business day to consult with their tax professionals concerning the amended Form 8886, and file it with the IRS. Stanley knew this was impossible, as the Enterprise wanted the victims to file this document as-is while enjoying the imagined legal protections that would accompany such a disclaimer.

242. On August 14, 2017, Lisa Cantrell of Forever Forests sent McHugh the Reportable Transaction numbers for the Muskogee Project, ostensibly in

82

compliance with the IRS Instructions to Form 8918. The 8918s provided to McHugh were for Green Earth Reserve, listing Nancy Zak as a contact person.

243. Here, the Zak Defendants conspired to commit, and did commit, mail and wire fraud by knowingly producing false, fraudulent, and incomplete Form 8886s to the taxpayer victims and the IRS.

244. First, the language drafted in response to Form 8886 Line 7b falsely states that "[t]he amount of the federal tax deduction was determined in accordance with an appraisal report that is represented by the appraiser to constitute a qualified appraisal prepared by a qualified appraiser as required under Code Section 170." The Zak Defendants knew that Dennis Benson was not a qualified appraiser issuing a qualified appraisal, as he used improper methodologies to arrive at a grossly and fraudulently inflated value of the property. Likewise, the Zak defendants knew that the Muskogee syndicate hired Benson precisely because he would not follow the regular IRS rules in preparing his appraisal, as he had done in the past and continued to do in the future.

245. The amended 8886 also falsely states that "[t]he donation was made to a qualified charitable organization as required in Section 170(h)(3) of the Code." The Zak Defendants knew that ACC was not a qualified charitable organization, as they knew that ACC was notorious for accepting CE

"donations" that other reputable organizations wouldn't dare touch, as discussed more herein. These Defendants also knew that ACC was a part of their fraudulent conspiracy, as Joseph Skalski, husband of Kimberly Skalski, sat on ACC's board, and the Skalski duo financially benefited from each SCE Scam accepted by ACC. The 8886 also falsely states that "[t]his charitable action was structured to qualify for federal tax deductions under Section 170(h), the cash value of which was substantially less than the potential profit anticipated from the other alternatives, as estimated in the associated qualified appraisal." Of course, the Zak Defendants knew that the scheme was set up to generate a federal tax deduction through grossly inflated appraisals. Not a single Defendant contemplated going through the extremely costly and risky (and likely infeasible and impossible) process of developing this undeveloped swamp land.

246. Josh Stanley and Lisa Cantrell were Zak's right hands. They were hand selected by Zak to run her numerous fraudulent enterprises as Zak knew they had a demonstrated track record of turning a blind eye to her fraud for illicit financial gain.

247. Lisa Cantrell served multiple roles in the Enterprise. She served as the "Manager of Investor Relations" for Green Earth Reserve, which formed and managed the Muskogee CapCo. In this capacity, Cantrell knowingly

84

served as a conduit between Zak and the investor victims. Lisa Cantrell would co-sign many of the Enterprise's most important email correspondences alongside Zak. For example, Lisa Cantrell co-signed the Muskogee scam's acceptance of McHugh's money, even though Cantrell knew the Muskogee project was a fraud. This email from Zak and Cantrell instructed McHugh to file the syndicate's fraudulent K-1's with the IRS. Zak also instructed victims to contact Cantrell with any questions as she knew she could trust Cantrell to keep the fraud going.

248. Similarly, Cantrell co-signed an email informing the victims about IRS Notice 2017-10, making the Muskogee Scam a listed transaction, sent on March 28, 2017.

249. Green Earth Reserve was paid $365,000 over the table for its role in the Muskogee Scam. The Zak Defendants were all paid handsomely for their participation in the Muskogee Scam.

250. Upon information and belief, Lisa Cantrell and Josh Stanley were also paid handsome kickbacks by Zak under the table for serving as her highly trusted confederates.

251. The Muskogee Syndicate's own 8886 states that Forever Forests, owned by Zak, was a "Project Manager" for the Muskogee PropCo. Green Earth Reserve, also owned by Zak, managed the Muskogee CapCo. In sum, the Zak

85

Defendants managed and controlled both the CapCo and PropCo, even though this was a massive and improper conflict of interests.

252. Lisa Cantrell, Josh Stanley, Zak, Green Earth Reserve, and Forever Forests all served to hand pick, manage, and control the various professionals who were needed to effectuate the scheme. The Zak Defendants were tasked with conspiring with the various professional Defendants to ensure that the professionals played their illicit part in exchange for large payments of money.

### iv.    The ACC Defendants.

253. The ACC Defendants falsely and fraudulently held ACC out to be a qualified organization such that it could accept a qualified contribution of an interest in land for the purposes of a QCC under the Code to Plaintiff McHugh, the other victims, and the IRS.

254. In a legitimate CE donation, a qualified organization accepts a donation of a CE with the intention of preserving the land in its donated state in perpetuity.

255. The Code places onerous rules and costly responsibilities on such qualified organizations to avoid abuse and to ensure that the donated CE does indeed preserve land in perpetuity.

256. Of course, the qualified organization is crucial to the Enterprise's fraud. The Enterprise, accordingly, could not select any land trust to serve as

86

its qualified organization. This is because a legitimate organization would refuse to accept the Enterprise's donations and may alert the relevant authorities to the Enterprise's fraud.

257. Joseph Skalski is a leader in the Enterprise and a keystone figure in it. Joseph Skalski is also a longtime friend, partner, and associate of the prolific fraud Nancy Zak.

258. IRS Agent Chris Young determined that Joseph Skalski lied to her about his longtime relationship with Nancy Zak. Joseph Skalski made this lie in furtherance of the Enterprise and to avoid detection of it, in violation of several federal laws.

259. Joseph Skalski provided legal, tax, and accounting services to the Enterprise and the PropCos. Joseph Skalski's wife, Kimberly Skalski, provided tax and accounting services to the CapCos. Once again, one can see how the Enterprise secretly controlled all aspects of the transaction, a fact the Enterprise kept secret from its victims.

260. Joseph Skalski also sat on the Board of ACC from at least 2016 to 2018, including during the Muskogee Scam, Walnut Creek Scam, and Ancient Oaks Scam.

00470619

261. ACC also served as the "qualified organization" in dozens of other SCE Scam transactions. See *Hoover v. Strategic Capital Partners*, 1:21-cv-01299-SDG.

262. Accordingly, Joseph and Kimberly Skalski provided crucial legal, tax, and accounting services for the very same SCE transactions that were donated to Joseph Skalski's own land trust.

263. The Skalskis profited fabulously from all their many roles in the Enterprise.

264. Lisa Cantrell is one of Nancy Zak's most trusted associates, as described above. Mandy W. Cantrell served as an office administrator for ACC. Upon information and belief, Mandy Cantrell is related to Lisa Cantrell.

265. Robert D. Keller is the CEO of ACC and was ultimately responsible for determining which "donations" ACC would accept or not.

266. Keller has been labeled by one national publication as the "[m]ost prominent among the renegade land-trust leaders," as well as someone known to accept easements that other groups had refused due to excessive valuations.[4] That same publication indicates that "ACC oversees 80,000 acres

---

[4] See "The Billion-Dollar Loophole" (December 20, 2017) at https://www.propublica.org/article/conservation-easements-the-billion-dollarloophole/ amp (written in collaboration with Fortune) ("Billion Dollar Loophole").

00470619

of conserved land in 11 states" and that "a sampling of deal documents suggests it took easements and land donations responsible for as much as $1 billion in write-offs in 2017." The Billion-Dollar Loophole.[5]

267. ACC applied to become an accredited member of the Land Trust Alliance, a Washington DC-based association of old-guard land trusts who are critical of syndicated transactions but withdrew its application. In the words of Keller himself, he withdrew the application because "it was clear 'they were not going to let us through,'" due to disagreements about ACC's failures to question appraisers about excessive valuations being done in a short period of time on easements ACC had been accepting.[6]

268. Keller has known and been associated with Nancy Zak and Joseph Skalski for years.

269. Robert Keller holds himself out to be an expert in CEs to the public and to the IRS. The SCE Scams could not have happened without ACC and Keller's guidance and leadership.

---

[5] Id.
[6] See Id.

00470619

270. ACC was hand selected by the Enterprise because of its connections to Zak and Skalski, and its reputation for its willingness to accept donations legitimate organizations wouldn't touch.

271. The ACC Defendants provided the following services to each scam syndicate:

a.  Worked with the various professional Defendants and Zak Defendants to prepare the fraudulent Conservation Easement Deeds;

b.  Prepared preliminary studies and inspections that fraudulently represented that each respective property would satisfy one or more of the "conservation purposes" defined under §170 of the Code;

c.  Worked with the various professionals and Zak Defendants to prepare the fraudulent baseline documentation reports, which were filed with each syndicate's appraisal summaries (Form 8283) and tax returns;

d.  Provided a letter to each syndicate confirming the donation and representing that the syndicate would receive a full tax deduction for the value of the conservation easement donated; and

00470619

e. Countersigned the fraudulent Appraisal Summaries (Form 8283), verifying that the charitable contribution deduction complied with §170(h) of the Code.

272. It is clear that ACC is not an innocent third party or independent land trust.

273. One cannot have a CE without qualified land, and one cannot have a QCC tax deduction without donating a CE on said qualified land to a qualified organization. Accordingly, it was crucial that the Enterprise work with a land trust that would accept a CE that legitimate organizations wouldn't touch.

274. It was not just the Enterprise's appraisals that were fatally flawed. The IRS also found that the Enterprise's CE donations failed to meet the basic requirements of a CE.

275. For example, it is beyond settled that a CE subject to a non-subordinated mortgage cannot meet the Code's perpetuity requirements, as discussed more herein. Any reasonable, independent, or legitimate land trust would know this and would thus refuse to accept a purported CE donation if it was subject to a non-subordinated mortgage.

276. In the Muskogee Scam, ACC accepted a CE donation on the Muskogee Land even though it was subject to three non-subordinated mortgages.

277. A reasonable land trust outside of the Enterprise would not have accepted a CE donation on the Muskogee Land for this reason. But ACC did because the Scam required this and the Enterprise did not care if the CE actually protected the land.

278. A reasonable land trust outside the Enterprise would also not accept the Enterprise's donation knowing that the Enterprise would then claim a $12 million-dollar QCC tax deduction for the donation of a CE on undevelopable swamp land.

279. A reasonable land trust would indeed know that the donor is claiming a grossly improper tax deduction, as the donor and donee work very closely together and have a relationship that span years, such is here.

280. Keller can't honestly disclaim knowledge that the donations were being used to generate hundreds of millions of dollars in improper tax deductions, as Joseph Skalski serves on the ACC Board. Importantly, Attorney and CPA Skalski prepared the Enterprise's taxes along with his CPA wife, so they claimed these improper tax deductions for the Enterprise.

281. Arguably the most important responsibility of the qualified origination before a donation is to prepare a baseline documentation report ("BDR"). This required document is meant to establish the condition of the property at the time the easement is transferred and is the entire basis of

92

future conservation monitoring and enforcement. The BDR is also sent to the investor-victims and must be attached to their federal tax returns.

282. Legitimate land trusts go to great pains to ensure their BDRs are compliant with the many regulations they are subject to.

283. Robert Keller, on behalf of ACC, prepared the Muskogee Syndicate's and Walnut Creek Syndicate's BDRs.

284. The IRS found that the Muskogee Syndicate's and Walnut Creek's BDRs were fatally flawed for several elementary reasons, as discussed more herein.

285. Like the appraisals, Keller's BDRs were mere formalities designed to only look like Code-compliant documentation and were never designed to actually meet the Code's requirements.

286. Generally, a qualified organization for SCE purposes is a public charity described in section 501(c)(3) or a government unit described in section 170(b)(1)(A)(v) and (vi).

287. 26 U.S.C. §501(c)(3) states that a valid tax exempt 501(c)(3) organization is one which is "organized and operated exclusively for . . . charitable . . . purposes, adding "no part of the net earnings of which insures to the benefit of any private shareholder or individual."

288. ACC falsely held itself out and acted as a "qualified organization" to Plaintiffs and the IRS, fraudulently claiming that it operated exclusively for charitable purposes. ACC did not operate exclusively for charitable purposes, because it served to facilitate many of the Enterprise's SCE Scams for the fraudulent financial gain of the Enterprise. Further, ACC served to materially and personally benefit Robert Keller, Kimberly Skalski, Joseph Skalski, and the other RICO Defendants.

289. Robert Keller knew that by falsely holding ACC out as a "qualified organization" to the Plaintiffs and IRS for tax purposes, then at least one of its board members would personally benefit from the SCE Scam transactions in several different ways.

290. First, Joseph Skalski was paid a handsome sum to serve on ACC's board. ACC was kept alive and lucrative by facilitating the Enterprise's many SCE Scams which generated over a billion dollars in deductions. Second, Joseph Skalski financially benefited personally from the SCE Scams laundered through ACC through his fees and commissions. Third, Joseph Skalski's wife, Kimberly Skalski, financially benefitted personally from each additional SCE Scam that she made possible through her accounting services. Fourth, Joseph Skalski financially benefitted personally from providing legal and accounting services for the SCE Scams. Fifth, Joseph Skalski was paid to serve as the POA

94

for the Muskogee PropCo, representing victims of his own fraudulent enterprise. Sixth, upon information and belief, both Kimberly and Joseph Skalski were paid additional sums by Zak and the other promoters from the secret slush funds fraudulently raised from victims.

### v.     The Disastrous Result of the IRS's Audit of the Muskogee PropCo.

291. The Enterprise's many highly credentialed accounting, tax, financial, and legal professionals all repeatedly represented that they were SCE experts performing Code-complaint SCE transactions to the Plaintiffs and the public.

292. Yet, the IRS determined that the Muskogee Scam's CE donation failed to meet the basic requirements of IRC §170 for several reasons and disallowed the charitable deduction that the various Defendants sold to victims like McHugh.

293. Specifically, the IRS found that the Muskogee CE failed to meet the basic conservation and perpetuity requirements of a QCC.

294. Section 170(h)(1)(C) states that a QCC must be exclusively for conservation purposes. Section 170(h)(5)(A) provides that a contribution is not treated as exclusively for conservation purposes (and is therefore not a qualified conservation contribution) unless the conservation purposes is protected in perpetuity. Treas. Reg. §1.170A-14(g) further states that no

95

deduction will be permitted for an interest in property which is subject to a mortgage unless the mortgagee subordinates its rights in the property to the right of the qualified organization, to enforce the conservation purposes of the gift in perpetuity.

295. The U.S. Court of Appeals for the Tenth Circuit has held that "because a conservation easement subject to a prior mortgage obligation is at risk of extinguishment upon foreclosure, requiring subordination at the time of the donation is consistent with the Code's requirement that the conservation purpose be protected in perpetuity." *Mitchell v. Commissioner*, 775 F.3d 1243, 1251 (10th Cir. 2015.)

296. The Muskogee Land was subject to three mortgages, none of which were subordinated by the lenders to ACC.

297. Accordingly, the Muskogee Land's perpetual CE could potentially be extinguished at any time by any of these three lenders. In other words, the permanent environmental protections required by the Code for a QCC could potentially be revoked by one of the three lenders.

298. Accordingly, the IRS determined that the Muskogee CE failed to meet the perpetuity requirement under the Code and disallowed the deduction in its entirety.

299. It is only a matter of time before the IRS disallows McHugh's personal QCC tax deduction in its entirety as well.

300. Further, the CE failed the Code's perpetuity requirements because the Deed of Conservation Easement allows one to construct buildings anywhere on the property. Accordingly, the Deed of Conservation Easement never protected the land. It is axiomatic that an unfettered ability to build homes or other structures is in direct conflict with a perpetual easement that is intended to protect land for environmental purposes.

301. Of course, the Zak Defendants, Appraiser Defendants, Legal Services Defendants, Landowner Defendants, and ACC Defendants had at this point facilitated dozens of SCE transactions. Indeed, these Defendants held themselves out to be experts respecting CEs. As such, these Defendants knew that these obvious flaws were fatal to establishing a proper QCC under the Code.

302. This did not deter the Defendants, however, because the SCE Scams were not about protecting the environment. Rather, they were about personally enriching the RICO Enterprise run by the Defendants.

303. The CPA Promoters knew that the CEs they were soliciting victim's involvement in failed as a basic matter of law. Yet they consciously disregarded this to further the Enterprise's tax fraud scheme and to enrich themselves.

97

304. Dolph Winders and FisherBroyles knew that the CEs he was facilitating, promoting, and soliciting to victims failed as a basic matter of law. Yet, Winders continued to facilitate these transactions for fabulous profit.

305. Furthermore, Winders knew that Doug Benson was a hack and fraud who would give any valuation to any piece of land if he was being paid enough. As an attorney, Winders knew that Benson's appraisal failed to meet even the most basic requirements of law. The IRS simply does not allow one to claim a 10:1 tax deduction simply because one pays a feckless appraiser enough money to say so. Yet, Winders continued to hire Benson for appraisals, at an exorbitant rate, because Winders too is a fraudster, and it was his intention to participate in the fraud for the financial gain of himself and his law firm, FisherBroyles.

306. Green Earth Reserve and Forever Forests likewise knew that Benson's appraisals failed as a basic matter of law and that the CEs failed even the most basic Code requirements for these reasons. Yet, these organizations continued to promote doomed CEs anyway, for the sake of furthering the RICO Enterprise's fraud scheme.

307. The IRS audit further determined that the BDR prepared by Robert Keller of ACC was incomplete and contained unsubstantiated claims about the protected wildlife supposedly living on the land.

00470619

308. The IRS audit also found that Benson failed to deduct the increase in value brought to Goolsby's personally owned land, which sat only feet away from the Muskogee Land. As outlined above, Goolsby held a minority interest in the Muskogee PropCo at the time the CE was donated.

309. This is significant because the Code provides there is an "enhancement rule" that applies to any contiguous or noncontiguous property owned by a relative party to the donation. Benson's report noted that there are "homes located within 1,500 feet" of the Muskogee Land, yet Benson curiously neglects to mention one of these homes is owned by Goolsby, who also owned the Muskogee Land prior to the fraudulent QCC donation.

310. Benson's letter to Attorney Dolph Winders stated that Benson searched nearby properties and found no contiguously owned properties by the subject owners or family members. Yet, Goolsby owns a house just 1,200 feet south of the Muskogee Land.

311. There is no reason why Benson, a licensed and experienced appraiser, would have omitted this crucial information were this a regular arm's length transaction.

312. Were this a regular, legitimate, arm's length transaction, Benson would have no reason to risk his professional license, and risk an IRS

00470619

disallowance of the QCC tax deduction he appraised, for the sole benefit of Arthur J. Goolsby, Jr.

313. Yet, Benson did just this because he was instructed to. Benson knew this was not a legitimate arm's length transaction and that the "enhancement rule" would only serve to reduce the value of his appraisal and, accordingly, the value of the QCC.

314. Indeed, Benson's many "errors" all served to increase the value of the QCC and enable a quick and profitable QCC tax deduction for the Syndicate and RICO Enterprise.

315. The IRS determined that Muskogee Partners failed to obtain a qualified appraisal within 60 days before the date of the contribution in accordance with Treas. Reg. §1.170A-13(c)(3)(i).

316. The IRS noted that Dennis Benson's Muskogee Appraisal appeared to have been created for a different project and simply had the names and details randomly switched out for the Muskogee project. Indeed, Benson's appraisal repeatedly contradicts itself about basic facts, such as the city the easement is located in.

317. Finally, the IRS found that the $12,000,000 QCC tax deduction could not at all be supported given the above and the true fair market value of the property.

00470619

318. Accordingly, the IRS disallowed the QCC in its entirety.

**D.    The Walnut Creek Scam.**

319. The Walnut Creek SCE Scam operated in a similar way to the Muskogee Scam. Victims like McHugh were solicited to purchase membership interests in Walnut Creek Land Partners, LLC, a domestic LLC registered on July 27, 2017 (the "Walnut Creek CapCo"), at an arbitrary price of $2,460 per share and with a minimum investment requirement of 13 shares per victim or $31,980. Blair Cleveland has served as the registered agent for the Walnut Creek CapCo since its formation. Cleveland also owned a 5% interest in the Muskogee PropCo, which owned the Muskogee Land.

320. Walnut Creek CapCo was formed with the express purpose of obtaining funds from victims to acquire a 99% interest in Walnut Creek Land Holdings LLC, a domestic LLC registered on October 24, 2016 (the "Walnut Creek PropCo"), whose sole hard asset is 461.59 acres of land in Jones County, Georgia (the "Walnut Creek Land").

321. Like the Muskogee Land, the Walnut Creek Land was not selected for environmental or conservation purposes. Rather, the land was selected because it was owned by a member of the RICO Enterprise, T.J. Heath, and his wife.

101

322. The Walnut Creek Land was described by a legitimate appraiser as having "a very irregular shape" with 8% of the property in a FEMA-designated flood hazard area.

323. The land is in a generally undeveloped part of the state. The land presented very limited development potential; meaning that the land was cheaper for the RICO Defendants to purchase, thereby allowing for greater profits.

324. The Enterprise sought to raise $2,435,400 from the victims. This price was to pay off T.J. Heath's personal $1,197,629 debt on the property. The remaining $1,547,806 was designated to pay the various RICO Defendants for their roles in furthering and facilitating the Enterprise and SCE Scam.

325. To participate in the Walnut Creek Scam, victims were instructed to email the requisite subscription documents to Josh Stanley in his capacity at Green Earth Reserve.

326. Victims were then asked to vote whether they wanted to: (1) sit on the land and hope it appreciates; (2) develop the land using untold amounts of additional funds that were not raised by the offering; or (3) donate the land, claim a QCC tax deduction, and reap purportedly legitimate tax benefits.

327. Victims were actively discouraged from voting for any option other than the conservation option.

00470619

328. The ballot provided to the victims had the "conservation proposal" as the first option and, in parentheticals next to this choice, states that it was "recommended by the Company and its Manager."

329. Unlike the Muskogee Scam, the Walnut Creek Scam appears to have been decided by a vote of the twenty-five CapCo member-victims, like McHugh, and not the biased two-landowner members of the PropCo.

330. Regardless of the vote, however, the Enterprise had zero intention of doing anything with the Walnut Creek Land but encumbering it with a CE for the sake of a significant QCC tax deduction.

331. Zak, as manager for Green Earth Reserve, signed her ballot on December 13, 2017, voting for the conservation option. Every vote cast was for the conservation option.

332. The CE was ostensibly donated on the Walnut Creek Land on December 27, 2017. The Deed of Conservation Easement was prepared by ACC and was recorded in Jones County at Book 964, pages 312-475.

333. The Walnut Creek Land was worth roughly $1.5 million, as described in detail below. Yet, Dennis Benson fraudulently appraised this swamp land to have a HBU worth $12,258,000. Benson then opined that a CE would limit the land's value to $1.5 million because no one could develop it.

00470619

334. Here, again, one can see the crux of the fraud. The Enterprise purchases land with little to zero development potential. It then hand picks appraisers who opine that the undeveloped land would be worth substantially more if it was hypothetically developed, illegally fabricating the FMV of the land. The appraiser then says that the value of the land, once encumbered by a CE, is the exact price the land was purchased for by the Enterprise (the true FMV). The appraiser then subtracts the "after" value from the "before" value to determine the amount of the QCC tax deduction, which the Syndicate will claim and pass through to its victims.

335. Congress does not sanction this unmistakable fraud. There is no limiting principal here. The only limit is how bold any given appraiser is willing to be with their sham appraisal. For example, Benson could have equally opined that the swamp land's HBU would be the construction of a three-billion-dollar Disney theme park.

336. Plaintiffs have already discovered documents that prove the Enterprise was explicitly instructing Benson, likely through Winders, to grossly inflate the value of his appraisals for QCC deduction purposes.

337. The PropCo owner and manager, T.J. Heath, hired Forever Forests, which was owned and controlled by Zak, to manage the transaction per his signature on a Walnut Creek Consulting Services Agreement ("FF

104

Agreement") dated June 20, 2017. In this agreement, Heath paid Zak and Forever Forests $150,000 to:

    a.    "Recommend one or more optimal strategies to maximize [Heath's] interests";

    b.    "Manage team determination of highest & best use";

    c.    "Provide oversight of appraisal preparation";

    d.    "Recommend legal counsel for legal and tax review";

    e.    "Assure completion of comprehensive Baseline Report";

    f.    "Assist in negotiation of Conservation Easement"; and

    g.    "Manage distribution of required IRS tax forms."

338. But there is no such thing as a "team determination of highest & best use" under the Code, and certainly not from an unqualified fraudster like Nancy Zak.

339. In a legitimate CE donation, an independent appraiser properly appraises the FMV of the CE according to the Code and USPAP's strict requirements, neither of which allow an appraiser's client to directly influence the FMV amount.

340. The FF Agreement also required Heath to notify Forever Forests in the event of an audit. Forever Forests agreed to assist in the case of an audit for $250 an hour. The Agreement then curiously states: "recognizing that an

00470619

audit or tax court case could have an impact beyond the scope of this project, [Forever Forests] may elect to have greater involvement in the defense of an audit of this project at FF's own expense."

341. Here again, one can see the presence of a larger Enterprise with interests beyond any one syndicated CE transaction.

342. Again, Nancy Zak controlled both Forever Forests and Green Earth Reserve. Nancy Zak's Forever Forests was hired by Heath to manage the Walnut Creek PropCo for $150,000. Forever Forests/Zak had a contractual agreement with Heath to "manage team determination" of HBU. Nancy Zak's Green Earth Reserve then managed and controlled the Walnut Creek CapCo, which solicited funds from victims by promising legitimate tax deductions. Green Earth Reserve was paid a $200,000 management fee for its role in the SCE Scam. Thus, Zak's companies were paid a collective $350,000 for the Walnut Creek Scam.

343. The Nesmith Rogers Defendants were also minority owners of Green Earth Reserve and solicited victims to invest only in projects managed by Green Earth Reserve/Forever Forests.

344. The Walnut Creek PropCo was audited by the IRS in 2021. IRS Revenue Agent Chris Young authored a scathing 170-page audit report which tore the Walnut Creek Scam to shreds.

00470619

345. IRS Agent Young found, among other things, that the appraisal grossly overstated the value of the land, and the Enterprise's accompanying QCC deduction.

346. Agent Young disallowed the Walnut Creek QCC deduction in its entirety for several independent reasons.

347. Agent Young also determined that the Walnut Creek PropCo's books and records were manipulated prior to being provided to the IRS.

348. Joseph Skalski, T.J. Heath, and others were responsible for providing this information to the IRS.

349. Upon information and belief, Joseph Skalski, T.J. Heath, and others manipulated this data to evade detection of the Enterprise's affairs.

350. The Walnut Creek Syndicate's Form 8886, filed with the IRS, shows that the Defendants listed below were compensated the following sums over the table for their role in facilitating the Enterprise's unlawful goals:

    a.      ACC was paid $52,593.79;

    b.      Benson Appraisals was paid $15,000;

    c.      Green Earth Reserve was paid an undisclosed amount, but other records show it was paid at minimum $200,000;

    d.      Walnut Creek CapCo was paid $365,000;

00470619

e.    Forever Forests was paid $150,000 to manage the fraud transaction;

f.    FisherBroyles was paid $60,000 for legal services;

g.    Kimberly Skalski was paid an undisclosed amount for accounting services;

h.    Upon information and belief, these Defendants and others, such as the CPA Promoters, were paid significant additional sums under the table for their role in the fraud.

351. The Walnut Creek CapCo's Closing Statement reveals that most of the monies paid to the Enterprise came from funds solicited by the victims. The Defendants listed below were paid the following sums from victim funds:

a.    T.J. Heath was paid $398,565.93;

b.    Megan Heath was paid $3,621.88;

c.    T.J. Heath's Walnut Creek PropCo was paid $402,593.79 for "check legal reserve" and "check operating reserve";

d.    Walnut Creek CapCo was paid $36,490.00;

e.    Forever Forests was paid $80,000;

f.    FisherBroyles was paid $40,000.

00470619

352. Because the Defendants were running a massive fraud enterprise, it is not surprising that the Enterprise's financial records do not reconcile, as noted by Agent Young.

**E.    Plaintiffs Become Victims of the Walnut Creek Scam.**

353. Below Plaintiffs describe the Walnut Creek Scam and the Enterprise members' role in it.

**i.    The CPA Promoters.**

354. Larry Meek is Kyle McHugh's longtime business partner. McHugh was taken in by the Nesmith Rogers Defendants and Sykes Defendants promises of legitimate investment opportunities and their accompanying legitimate tax savings strategies. McHugh was encouraged to invite others to "invest" in the SCE Scams by these individuals, who aggressively promoted the scams to people in the pharmaceutical services industry.

355. Meek, believing the SCE Scams to be legitimate, decided to "invest" in the Walnut Creek Scam alongside McHugh. Nesmith had personally targeted Meek for SCE Scam participation as early as March 2015.

356. In his January 4, 2017, email to Scotty and Ollin Sykes (mentioned above), Kyle McHugh thanked the Sykes duo for introducing him to the facilitators of the Muskogee Scam, the Nesmith Rogers Defendants: "We are

00470619

also grateful for your putting us in contact with the conservation easement folks."

357. McHugh and Meek reasonably believed that licensed accounting and financial professionals such as the CPA Promoters wouldn't recommend an improper tax savings strategy but were unfortunately wrong.

358. Sykes & Co. specifically targets pharmacists and pharmaceutical businesses for tax and accounting advice, as the company boasts on its website and in the tens of thousands of social media posts. Sykes & Co. holds itself out as "The Premier Accounting Firm for Pharmacies" and claims:

> If you're a pharmacy owner, we understand how your business operates. We know your industry benchmarks. We can help you outperform national averages. We also know that making your pharmacies more successful gives you a better quality of life and we work to help you achieve that. We believe in putting our clients' needs first. We will be there when you need us. We respond quickly to your needs, often within minutes, no matter your question or concern.

359. Believing that the Muskogee SCE Scam recommended to him by his CPAs at Sykes & Co. was legitimate, McHugh emailed Ernest Nesmith on June

13, 2017, stating: "we would be interested in doing this again for 2017 if its available again."

360. Within minutes, Nesmith replied: "Ok, when the project opens, I'll send you the info. It's good to here [sic] from you." Nesmith further stated: "that's good to hear. It's a great strategy."

361. Nesmith knew that the SCE Scam was not "a great strategy" as it was currently under unprecedented IRS scrutiny. Nesmith made this false statement to deceive McHugh and lull him into a false sense of security about his "investment."

362. A former employee of Forever Forests, Brian Sullivan, testified before the IRS that he worked alongside Ernest Nesmith in his capacity at Zak's Forever Forests. Sullivan described Nesmith's role in the Enterprise, testifying that Nesmith "recommended people for Conservation Easements" offered by Zak's Forever Forests.

363. Again, this is significant because both Nesmith and Rogers are part owners of Green Earth Reserve. As such, they had a vested personal financial interest in each SCE Scam they solicited and advertised. As members of Green Earth Reserve and as highly credentialed professionals who share numerous professional degrees between them, the Nesmith Rogers Defendants knew the exact fraudulent nature of the scheme.

111

364. The Nesmith Rogers Defendants only solicited the Plaintiffs' involvement in SCE transactions offered by their own company, Green Earth Reserve, but never once disclosed this to the Plaintiffs. This was fraud by omission, designed to dupe McHugh into "investing" money that would end up in the Nesmith Rogers Defendants' pockets.

365. Nesmith and Zak are longtime associates. Nesmith worked for disgraced attorney, Drew Miles, at Pathfinder Business Strategies; a group infamous for promoting improper tax schemes. Unsurprisingly, Zak was a longtime client of Pathfinder. Marcus Rogers also worked for Drew Miles at Pathfinder Business Strategies.

366. The Enterprise is made up of a network of longtime friends and business partners, not random independent professionals.

367. At some point thereafter, the Nesmith Rogers Defendants became formal business partners of the prolific fraudster, Nancy Zak, when they became members of Green Earth Reserve.

368. On November 7, 2017, the Nesmith Rogers Defendants solicited McHugh to participate in a second SCE Scam. In his email, Nesmith included: (1) an investor questionnaire; (2) a Subscription and Suitability Agreement; and (3) a set of wiring instructions. Significantly, Nesmith did not include the Private Placement Memorandum ("PPM"), which describes in detail the

112

structure of the Walnut Creek Scam and contains crucial investor information required by federal securities law.

369. The Nesmith Rogers Defendants omitted this crucial PPM to keep their victim in the dark about the details of the scheme. The Nesmith Rogers Defendants merely provided McHugh with the minimum legal paperwork the CPA Promoters and Zak Defendants needed to put McHugh on the hook for his money.

370. The Nesmith Rogers Defendants purposely omitted this crucial PPM to help reduce the chance that the illicit nature of the scheme would be uncovered by McHugh, or an agent hired by McHugh, such as a legitimate tax advisor. This too was an act of fraud by omission by the Nesmith Rogers Defendants.

371. Once again, Nesmith ended his email by stating "try and get them back to me as soon as possible," again trying to create a false sense of urgency in his unwitting victim. The email was signed "Ernest & Marcus."

372. Without the detailed information from the PPM, or other comparable document, the Plaintiffs cannot fully ascertain the structure of the Walnut Creek Scam without discovery. Likewise, Plaintiffs cannot ascertain other crucial details about the players in the Walnut Creek Scam due to the limited information provided to McHugh. This was a conscious and intentional

00470619

strategy of the CPA Promoters and the Zak Defendants to evade detection of the Enterprise.

373. On November 8, 2017, Meek sent Nesmith a signed subscription agreement to purchase 25 shares in the Walnut Creek CapCo for $61,500 or $2,4600 a share. This subscription agreement was later signed by the prolific fraud Nancy Zak acting on behalf of Walnut Creek CapCo and Green Earth Reserve.

374. On November 30, 2017, Plaintiff McHugh wired Nesmith $246,000 to purchase 100 shares in Walnut Creek CapCo. This subscription agreement was later signed by the prolific fraud Nancy Zak acting on behalf of Green Earth Reserve, which managed the Walnut Creek CapCo.

375. Plaintiff Meek also invested in the SCE scam. On November 9, 2017, Ernest Nesmith emailed Plaintiff McHugh telling him "you are both good to go." In reference to Plaintiff McHugh's and Meek's "investment."

376. On December 11, 2017, Josh Stanley acting as Project Manager for Green Earth Reserve emailed Meek informing him that the manager of the Walnut Creek PropCo recommended that Meek vote to "conserve" the Walnut Creek Land with a CE.

377. On January 25, 2018, Marcus Rogers emailed McHugh and Meek, informing them that the majority of the Walnut Creek CapCo member-victims

114

voted to place a CE on the land and donate it for a QCC. In fact, 100% of the votes were for this option as the Enterprise designed, structured, and marketed its transactions as CE donations and nothing else. The Nesmith Rogers Defendants thanked Meek for helping to "permanently [preserve] this important habitat" adding "we hope [this] brings you great satisfaction." The email concluded by informing Meek that the Enterprise's SCE Scams are "highly sought after, and if you choose to get involved again, it is recommended that you secure a spot as early as possible."

378. IRS Agent Chris Young interviewed Ernest Nesmith during her investigation.

379. Nesmith lied to the IRS when he told Agent Young that "he does not advertise the [SCE] investment and investors find him through word of mouth." In truth, Nesmith solicited McHugh's participation in the SCE Scams while he was promoting them at a professional conference, and then through several solicitation emails.

380. Nesmith again lied to the IRS when he told Agent Young that "investors were not solicited for this investment opportunity." In truth, Nesmith himself solicited victims into these scams in written emails to Plaintiffs.

115

381. Nesmith again lied to Agent Young when he said the Nesmith Rogers Defendants "only educate clients about conservation easements and if they are still interested, they forward the name over to whoever is running that particular project."

382. In reality, the Nesmith Rogers Defendants aggressively solicited McHugh's participation in the scam, telling him the SCE Scam is "a great strategy." Further, the person who "is running that particular project," was inevitably Green Earth Reserve, an entity they owned.

383. Nesmith again lied to Agent Young when he claimed that the Nesmith Rogers Defendants "are not paid through green Earth Reserve[], LLC or Forever Forest." Nesmith stated these lies to Agent Young in furtherance of the Enterprise's RICO conspiracy.

384. On May 5, 2021, Agent Young interviewed a member-victim of Walnut Creek CapCo who stated that Nesmith Rogers "discussed the benefit of conservation easements, specifically the tax deduction and the conservation of the land. Nesmith told him that they find people that find or own land in rural areas and try to find land to keep as green space. [The victim] was told 'it's a legal IRS thing' by Nesmith."

00470619

385. McHugh was told similar things by Nesmith. In particular, the CPA Defendants repeatedly told McHugh that these transactions were perfectly legal and, indeed, desirable due to their purported conservation benefits.

386. This victim also told Agent Young that the Nesmith Rogers Defendants told him how they manipulate the appraisal results: "[the victim] said [Nesmith Rogers] told him they were getting an appraiser for subdivisions or shopping malls and it would be worth that much per acre if it had those things on them."

387. Here, the Nesmith Rogers Defendants admitted to the crux of the fraud. The Enterprise goes out with the intent of finding cheap land to purchase with the express goal of encumbering it with a CE. The Enterprise then hires hand-picked and feckless appraisers to fabricate an outrageous HBU, which results in an improper appraisal and a wildly illegal QCC tax deduction.

388. Of course, the Nesmith Rogers Defendants, whose website boasts of their many professional degrees, knew that the IRS does not allow a taxpayer to claim an eight-figure charitable tax deduction simply because they hire an appraiser (at 15 times the normal rate) to say the undeveloped land would be worth $12,000,000 if one infeasibly developed it for an improbable (and likely

00470619

impossible) use. The Enterprises' fraud scheme is both incredibly complex and incredibly simple.

### ii.   The Zak Defendants.

389. The Zak Defendants played the same role in the Walnut Creek Scam as they did in the Muskogee Scam. Simply put, the Zak Defendants owned, controlled, or managed nearly every aspect of the scam alongside an army of captured and corrupt professionals.

390. The CPA Promoters and the Zak Defendants solicited victims to purchase shares of Walnut Creek CapCo, to buy an interest in Walnut Creek PropCo, whose only asset was the Walnut Creek Land, which is 449.125 acres located near Georgia Highway 18 and McKay Road in the 8th Land District of Jones County, Georgia.

391. Green Earth Reserve served as the manager of the Walnut Creek CapCo, and Nancy Zak served as the manager of Green Earth Reserve.

392. Upon information and belief, the Walnut Creek Land was subdivided from a larger chunk of land owned by Blair Cleveland and Arthur Goolsby. They subdivided a single piece of the land for sole purpose of creating more land to create more SCE Scams, thereby enriching themselves more than if this was a single project.

00470619

393. It is no surprise that the same names keep coming up in different transactions. The Enterprise needed to work only with those who were already initiated into the Enterprise and willing to facilitate its illicit business for fabulous profit.

394. Cleveland was fully aware of the fraudulent nature of the SCE Scams and was compensated with shares in the various fraud entities, such as Muskogee PropCo, fraudulent tax deductions, and cash compensation from the Enterprise.

395. The wiring instructions sent by Nesmith instructed victims to send their funds to First Landmark Bank in Marietta, GA with the customer's name noted as "Walnut Creek Land Partners, LLC."

396. On or about November 13, 2017, Kyle McHugh wired $246,000 to purchase 100 shares to unwittingly participate in the Walnut Creek Scam.

397. On November 30, 2017, Nancy Zak, acting as Manager of both the Walnut Creek CapCo and Green Earth Reserve, signed a document acknowledging McHugh's wire.

398. On December 11, 2017, Josh Stanley, acting as Project Manager for Green Earth Reserve, emailed the victims of the Walnut Creek scheme. Stanley provided the victims a "ballot" and instructed them to "vote" on how the Walnut Creek entity should handle the land purchased with the victim's

00470619

funds. Stanley wrote that the "Manager of Walnut Creek Land Holdings, LCC" has reviewed a proposal to develop the land, conserve the land, and keep the land as an investment; informing the victims that the "Manager" of the scheme recommends the victims vote to "conserve" the land via a syndicated CE.

399. Stanley attached a ballot listing these three options. "Conserving" the land via a syndicated CE was listed as the very first option with a parenthetical next to it stating this option was "recommended by the Company and its Manager."

400. On February 19, 2018, Josh Stanley, acting as Director of Investor Relations at Green Earth Reserve, emailed Meek to confirm his "participation" in the Walnut Creek Scam. This email contained a copy of Meek's subscription agreement signed by the fraud Nancy Zak acting on behalf of Walnut Creek CapCo and Green Earth Reserve.

401. On May 29, 2018, Meek received an email from Josh Stanley acting as Director of Investor Relations for Green Earth Reserve. This email included a fraudulent K-1 prepared by Kimberly Skalski and a Template Form 8886. Stanley told Meek "it is of crucial importance that you[r] accountant provides ALL of these items in your [tax] filing." Here, Stanley knew that he was providing Meek with fraudulent documents which he demanded Meek file with the IRS, but disregarded this because it personally financially benefitted him.

120

402. On June 15, 2018, Meek received an email from Forever Forests which provided him with the Material Advisor Numbers for the Walnut Creek Scam.

403. On July 16, 2019, Meek received another fraudulent K-1 for tax year 2018 from Green Earth Reserve.

404. On January 5, 2022, Nancy Zak, acting on behalf of Green Earth Reserve, sent Meek an email with information pertaining to the IRS audit caused by Zak's fraud, in violation of her civil injunction.

405. Every member who "invested" in the Walnut Creek CapCo was awarded a 4.5-times return on investment. Green Earth Reserve, however, who only contributed $182.00, enjoyed a $110,917 charitable contribution, which amounts to a 609-times return on investment.

### iii.    The ACC Defendants.

406. Robert Keller of ACC drafted a BDR of the Walnut Creek Land and recorded it on December 27, 2017. The report purports to document the state of the Walnut Creek Land at the time of the donation.

407. In the report, Keller claims to have personally visited the property, as required, but did not provide a date.

408. Upon information and belief, Keller did not personally visit the property but fraudulently wrote that he had.

00470619

409. The report is signed by both T.J. Heath, acting as manager of Fieldstone South, which served as the management company for the PropCo until management authority was delegated to Zak's Forever Forests, and Robert Keller of ACC. Yet curiously the document does not contain the date it was signed.

410. Agent Young found that the BDR was insufficient to establish the condition of the Walnut Creek Land at the time of the gift, as required by Treas. Reg. §1.170A-14(g)(5). This regulation requires that a valid QCC must provide documentation sufficient to establish the condition of the property at the time of the gift.

411. Indeed, Agent Young found "it is impossible to determine the condition of the [Walnut Creek] property at the time of the donation. The baseline documents do not state when it was prepared, when the photos were taken or when the doner and donee signed it. . . . Although the donee signed the Certification of the Baseline Documentation Report absent all dates, it is impossible to determine if it was signed before the date the baseline study was prepared."

412. Keller holds himself out to be a CE expert. ACC has churned through countless QCC's totaling over a billion dollars in tax deductions. Yet, Keller

failed to meet the basic CE requirement of having an adequate BDR; ostensibly Keller's main duty in any given CE project.

413. Agent Young then determined that the Walnut Creek easement deed failed to satisfy the perpetuity requirement of the Code, disqualifying it as a QCC, and disallowed the charitable deduction in its entirety for this reason, among others.

414. The BDR was attached to the PropCo's tax return.

415. Keller repeatedly stated and wrote that ACC served as a Qualified Organization under the Code and that ACC effectuated a QCC under the Code. Keller knew these many representations were false and fraudulent for the reasons discussed above.

416. Keller also knew that his BDR was insufficient to establish a bona fide CE or QCC. The Enterprise relies on ostensibly legitimate professionals to fabricate just enough paper to give the appearance of a Code-compliant transaction.

417. In reality, the ACC Defendants accepted the Walnut Creek Land because they were compensated by the Enterprise to do so. The ACC Defendants had no real intention of conserving the land for the elementary and fatal flaws discussed herein.

00470619

### iv.   Dennis Benson, Benson & Associates, Winders, FisherBroyles, and Heath:

418. As outlined above, T.J. Heath was a facilitator of the Muskogee Scam. He was also a 99% owner of the Walnut Creek PropCo prior to the buyout. The Walnut Creek PropCo was managed on paper by Fieldstone South, whose only members are TJ Heath and his wife, Megan Heath, who owned a negligible amount of the company.

419. The Walnut Creek PropCo and Heath, however, had a contractual agreement with Forever Forests (the "FF Agreement"), which delegated management authority from Fieldstone South to Zak's Forever Forests.

420. Documents show that Forever Forests, not Fieldstone South, managed the Walnut Creek PropCo during and after the solicitation of victims into this SCE Scam, as was customary in the Enterprise's scams.

421. Fieldstone South was little more than a shell corporation and liability shield for Heath. Fieldstone South is and was the alter ego of T.J. Heath.

422. Heath, who owned 99% of the Walnut Creek PropCo prior to the buyout of his shares by the CapCo, purchased 100 shares of the Walnut Creek CapCo for either $100 or $1 per share. These same shares would be offered to victims at a rate of $2,460 per share.

423. Heath now serves as the Tax Matters Partner for the Walnut Creek Scam before the IRS, even though he is irreconcilably conflicted due to his personal role in the fraud and his own personal financial interests in the Walnut Creek Scam.

424. Heath and his wife also received nearly $400,000 for their role in the Walnut Creek Scam alone; all with funds raised from the victims.

425. These conflicts of interest were never disclosed to the member-victims of the Walnut Creek Scam.

426. Dolph Winders is a licensed attorney who has attained partner level at his firm, FisherBroyles. He holds himself out to be an expert in CEs.

427. Winders' online biography boasts "his practice specialties include significant experience with conservation easements . . . . He has been an active speaker on conservation easements . . . over the years."

428. Sometime in 2017, Attorney Winders solicited the Benson Defendants to create the sham appraisal to facilitate the Walnut Creek Scam.

429. A reasonable attorney, let alone a reasonable legal expert on CEs, would see Benson's Muskogee appraisal was fatally flawed many times over.

430. Yet, rather than fire Benson for his obviously fraudulent and inadequate appraisal, Dolph Winders hired Benson again to appraise the Walnut Creek Land.

00470619

431. Indeed, the poor quality and grossly inflated values of Benson's Muskogee appraisal (and likely other fraudulent appraisals) was precisely the reason Winders hired Benson to appraise the Walnut Creek Land.

432. On December 31, 2017, Benson completed his sham appraisal for the Walnut Creek Scam.

433. Benson's appraisal states that the subject Walnut Creek Land was purchased by the Walnut Creek PropCo on December 20, 2016, for $1,083,800, from Plum Creek Land Company, a large timber company.

434. Benson's appraisal also states that the Walnut Creek Land was appraised to be worth $1,057,847 in 2016 by Jones County.

435. Benson's Walnut Creek appraisal opines that the HBU of the Walnut Creek Land is residential development as a subdivision.

436. Benson proclaimed that the FMV of the land, which appraised months prior for roughly $1,500,000, is magically $12,258,000 "before" the encumbrance. Benson then opined that the value of the land "after" being encumbered by a CE is $721,688.

437. Finally, Benson calculated the difference of these two amounts, stating that if one donated a CE on the roughly $1,500,000 piece of land, they could claim a $11,535,352 non-cash charitable contribution on their federal taxes.

00470619

438. For the reasons discussed above, the federal government unsurprisingly does not allow a taxpayer to purchase an approximately $1 million parcel of land and then donate it for a 11x tax write off, as Benson, the Legal Services Defendants, the Zak Defendants, the CPA Promoters, the ACC Defendants, and the Accounting Services Defendants well knew but disregarded.

439. The evidence clearly shows that the Benson Defendants were instructed to grossly inflate the Walnut Creek Appraisal to support an improper QCC deduction.

440. This illegal conduct is exacerbated by the fact that the FF Agreement between Forever Forests and the Walnut Creek PropCo and T.J. Heath, stated that Forever Forests would "manage team determination of highest and best use." Clearly the evaluation of the HBU was not left to a Qualified Appraiser.

441. It is not surprising that the IRS found that Benson's Walnut Creek Appraisal grossly inflated the value of the Walnut Creek Land. Benson's fraudulent appraisals were a feature, not a bug, of the Enterprise's scams, as the FF Agreement reveals that the Enterprise was controlling the HBU determinations behind the scenes.

442. Upon information and belief, Attorney Winders also instructed and assisted Benson in grossly inflating his appraisal, as evidenced by the FF

00470619

Agreement and Winders' otherwise inexplicable hiring and rehiring of Benson, an obvious fraudster to an experienced attorney.

443. Heath's facilitation of the Walnut Creek Scam ran even deeper. While he was the 99% owner of the Walnut Creek PropCo, Heath borrowed $1,199,279 from Morris Bank to refinance the Walnut Creek Land.

444. Following the closing of the Walnut Creek Scam, Heath's bank was wired $1,180,618.40, which relieved Heath of his own personal debt for the property

445. It is suspicious that Heath refinanced the Walnut Creek Land. This is because Heath knew that the Enterprise would pay him in cash for the buyout of his interest in the PropCo. Heath took this loan out to enjoy this significant seven-figure liquidity knowing that he could immediately pay it back with victim funds.

446. Heath used the funds obtained from Morris Bank to fund the Enterprise before it had obtained enough funds from victims.

447. To obtain this $1,199,279 loan, Morris Bank obtained an appraisal from C.A. Yarbrough, III of Yarbrough & Company, appraising the Walnut Creek Land.

448. Yarbrough is a legitimate appraiser with over 40 years of appraisal experience.

00470619

449. Yarbrough determined that the true value of the Walnut Creek Land was agricultural/timberland/residential and valued the property at $1,520,000. Yarbrough states that the intended user of his appraisal was Morris Bank who paid Yarbrough $1,000 for his appraisal.

450. Yarbrough completed his appraisal on March 2, 2017. Yet, three months later, Heath, via Dolph Winders, requested a new appraisal from Benson. The intended use of this appraisal was "to assist the client in asset evaluation for a conservation easement" on June 7, 2017. Benson appraised the very same land for $12,258,000, which only three months earlier had been appraised for $1,520,000.

451. The Walnut Creek PropCo paid Benson $15,000 for his appraisal, fifteen times what Morris Bank paid Yarbrough for his appraisal.

452. In return, Benson appraised the land at more than ten times its true value.

453. Benson, the Zak Defendants, the ACC Defendants, the Landowner Defendants, the Legal Services Defendants, and the Accounting Services Defendants knew that Heath obtained a $1,199,279 refinance loan based on a Morris Bank appraisal which appraised the land's value at $1,520,000.

454. The Enterprise knew that the land was worth roughly $1.1 to $1.5 million.

00470619

455. The Enterprise also knew that Zak and Forever Forests were hired to "manage team determination of highest and best use."

456. The Enterprise knew that using an appropriate appraisal would not net them the profits they needed to obtain. Thus, the Enterprise hired Benson because they knew from experience that he was willing to produce ridiculous and fraudulent appraisals to support the Enterprise's goal of illegally making money.

457. The IRS found that Benson "grossly overstated the pre-easement fair market value of the Property. In doing so, it disregarded the obvious fact that the total fair market value of the Property per [a recent bank appraisal] was $1,520,000. The taxpayer borrowed money against the property and the bank, a third party, appraised the property less than 10 months before the donation. Although banks can be conservative with their appraisals, their appraisal was conducted by a qualified outside contractor with over 40 years of appraisal experience. It is unrealistic to think the property value would have risen by more than 8 times to $12,258,000 in less than 10 months. Therefore, the taxpayer overstated its deduction for the conservation easement by at least $10,757,917."

00470619

458. The IRS then concluded that a gross valuation misstatement penalty under I.R.C. §6662(h) applies due to Benson's and Winder's grossly inflated appraisal.

459. The Georgia Real Estate Appraisers Board professionally cited Dennis Benson in July 2021 for multiple violations and breaches. Benson was cited and fined a significant sum of money for thirteen different professional violations. Relevant here, Benson was cited for failing to provide sufficient documentation to substantiate his conclusions about market research; wrongfully valued a property by using "comparable sales that were all located in higher demand, more densely populated areas."

460. The IRS found that Benson did this very same thing in his Muskogee and Walnut Creek appraisals.

461. The IRS also found that Walnut Creek PropCo failed to make a reasonable attempt to ascertain the correctness of the charitable contribution deduction.

462. The ACC Defendants, Accounting Services Defendants, Landowner Defendants, Legal Services Defendants, Appraiser Defendants, Zak Defendants, and CPA Promoters all knew that their Enterprise failed to make reasonable attempts to ascertain the correctness of the deduction. This is because the Enterprise was not organized to structure SCEs in compliance

with the Code. Rather, the Enterprise was structured to maximize profits by slamming through as many grossly overvalued SCEs as possible.

463. Benson's appraisal falsely stated that Benson visited the Walnut Creek land on December 30, 2017, only one day before the effective date of his appraisal.

464. To prove this, Benson attached photographs of the land in the idyllic throws of summer, even though Benson claims the photos were taken in the winter.

465. The IRS attached photos of the same property in winter and compared them to the photos Benson claimed to have taken during his property visit. This comparison clearly shows that the photos Benson claimed to have taken in December were taken at some other time.

466. Accordingly, Benson falsely and fraudulently claimed to have personally visited the property, as he is required to do, and included these photos in his report to give it the appearance of a qualified appraisal by a qualified appraiser, even though he knew it was not and he is not.

467. The IRS also found that the Enterprise failed to meet the requirement to obtain a qualified appraisal within 60 days before the date of the contribution in accordance with Treas. Reg. §1.170A-13(c)(3)(i), and denied the charitable contribution outright for this reason as well.

00470619

468. The IRS determined that Benson's preliminary appraisal was nearly identical to his final appraisal. The IRS found that Benson's appraisal was therefore not a qualified appraisal because "it was merely an exact copy of the draft appraisal conducted more than 4 months prior to the contribution." Accordingly, the IRS found that the appraisal was prepared more than 60 days prior to the date of easement granted by the Walnut Creek PropCo.

469. Agent Young determined that the financial information provided to the IRS had been modified and deleted prior to being given to the IRS by Heath and Joseph Skalski. Upon information and belief, Heath and Skalski manipulated, modified, and deleted the financial data for the Walnut Creek PropCo as an affirmative act of fraud designed to prevent detection of their scheme.

470. Agent Young determined that one of the data entries that was altered involved Dolph Winders' role in the scam. On June 22, 2017, Winders was paid $20,000, which was originally coded as "Easement Expense", but was changed to "Development Cost" before being provided to the IRS.

471. Agent Young likewise determined that another piece of data was altered to hide the role of Dennis Benson, who was repeatedly hired by Winders, in the scam.

00470619

### v.    The Accounting Services Defendants.

472. On May 29, 2018, McHugh received an email from Josh Stanley, then acting as Director of Investor Relations for Green Earth Reserve. Included in this email is a 2017 K-1 for the Walnut Creek Land scheme drafted by Kimberly A. Skalski.

473. On June 24, 2019, Kimberly Skalski emailed McHugh a K-1 for the 2018 tax year.

474. On March 24, 2020, Dorte H. Bieber, acting on behalf of Kimberly A. Skalski. emailed McHugh a 2019 K-1 for the Walnut Creek scheme for the 2019 tax year.

475. Like with the Muskogee Scam, the Accounting Defendants knew that the tax documents they were preparing contained false and fraudulent information about the nature and amount of the Syndicate's claimed tax deductions.

476. Lamb & Braswell knew and that the SCE transactions they were repeatedly hired to facilitate were not in compliance with the Code.

477. Agent Young interviewed T.J. Heath about his involvement in the Walnut Creek Scam. Heath was represented by Joseph Skalski, who also represented several other Enterprise members, including himself. Such roles are another way Joseph Skalski profits from his own fraud.

00470619

478. Agent Young noted, "Skalski appears to be very familiar with the transaction as he was responsible for several roles." Skalski served as the representative for the Walnut Creek PropCo. He also served on the Board of Directors and was the Treasurer of ACC, who accepted the CE donation. He also prepared Walnut Creek PropCo's Form 8283.

479. Joseph Skalski's wife, Kimberly Skalski, CPA, prepared the Walnut Creek CapCo's tax return.

480. Kimberly Skalski also prepared the fraudulent K-1s that were issued to the victims.

481. Kimberly Skalski knew that her husband sat on the board of ACC and was also being paid several times over for his various roles in facilitating these scams.

482. Kimberly Skalski is not an innocent accountant hired to provide independent tax services. She and her husband were intricately involved in the Enterprise's fraud.

483. Skalski also knew that she and her husband were being paid hundreds of thousands of dollars for their roles in facilitating the scams.

484. Respecting Kimberly Skalski and Joseph Skalski, there are more conflicts of interest than one can easily count. The victims were not informed that the CPA preparing their tax returns and K-1s was married to a CPA and

135

lawyer who represented the PropCo, but also sat on the Board of Directors and served as the Treasurer of the organization that received the donated CEs.

485. Joseph Skalski has known and done business with Nancy Zak for years. Yet, Joseph Skalski lied to the IRS when he stated that he did not know who owned Forever Forests and lied about his relationship with Zak, according to Agent Young.

486. Joseph Skalski's lies to the IRS are an affirmative act of fraud, designed to evade detection of his scheme to defraud victims, such as McHugh, for his and his wife's personal financial gain.

487. Kimberly Skalski is likewise a longtime associate of Zak.

**F.    The Little Ocmulgee/Ancient Oaks Scams.**

488. On August 27, 2018, Ernest Nesmith solicited McHugh to participate in a third SCE Scam, the Little Ocmulgee Scam. Nesmith wrote that "this is a $1.2 million project that once voted into conservation is expected to have a 4.6 to 1 deduction. As with the 1st project of the year, we are expecting this one to close relatively soon. . . This is a good project to get some of your deductions for the year out of the way."

489. Attached to Nesmith's email was a Subscription and Suitability Agreement and Confidential Investor Questionnaire. Once again, Nesmith purposely excluded the PPM which provides in depth details about the scam.

136

Nesmith intentionally omitted this document because the Enterprise had no interest in educating their victim investors about the scheme.

490. Rather, the Enterprise hoped that the reliance induced by their many professional degrees and licenses would be enough to convince investors to turn over their money while minimizing the risk of detection.

491. Indeed, the fact that Nesmith repeatedly solicited investors' participation in his scams, without providing the legally required details, shows that the Nesmith Rogers Defendants knew that their victims were relying on them.

492. Without this detailed PPM, or comparable document, it is difficult to ascertain the full structure of the Little Ocmulgee Scam. It is also impossible to identify the various players in the Little Ocmulgee Scam, for this same reason, as they were never disclosed to victim McHugh. This is by design of the Enterprise to shield themselves from discovery, liability, and justice.

493. Adding to the confusion, sometime during December of 2018, the Enterprise suddenly switched from the Little Ocmulgee Scam in Georgia to the Ancient Oaks Scam in Louisiana.

494. No one involved in the Enterprise asked McHugh's permission to suddenly switch the project and McHugh did not authorize it.

00470619

495. On December 3, 2018, McHugh was sent a ballot which purports to ask the member-victims of the Little Ocmulgee Scam whether they wanted to: (1) develop the land with money the Syndicate did not have and did not have a plan to raise; (2) encumber the land with a CE; or (3) sit on the undeveloped land indefinitely and hope it appreciates in value.

496. The ballot stated that the "conservation option" is "recommended by the PropCo and its Manager," which statement was next to the box victims were instructed to check.

497. Like the previous scams, the PropCo and its Manager were both controlled by the Enterprise through Nancy Zak.

498. McHugh voted for the conservation option as he was recommended to by the PropCo, its Manager, and the CPA Promoters.

499. Suddenly and without notice to the member-victims, the Enterprise switched to the Ancient Oaks Scam after the member-victims had already ostensibly invested and cast their votes in the Little Ocmulgee Scam.

500. The member-victims were not asked to sign paperwork authorizing participation in the Ancient Oaks Scam, nor were they given ballots to vote on switching to the Ancient Oaks Scam.

501. Presumably this new Scam would have been similar in scope to the previous scams where the Enterprise purchased an ~$1 million parcel of land

00470619

and a fraudulent appraiser opined that its HBU was worth ~$12 million. This was not the case.

502. The Enterprise claimed a QCC tax deduction of $112,305,000 for the Ancient Oaks Scam, over one-hundred million dollars.

503. The Ancient Oaks Syndicate's Form 8886 states that the Ancient Oaks CapCo sought to raise $21,747,013.

504. Nearly all of the funds raised from victims were used to pay the Enterprise's members.

505. Indeed, the Ancient Oaks Syndicate's Form 8886 neglected to disclose the monies paid to nearly all of the Enterprise's members, including Green Earth Reserve, the Kenny Defendants, the Accounting Services Defendants, the Legal Services Defendants, the ACC Defendants, T.J. Heath, and the CPA Promoters. This omission was fraudulent and designed to evade detection of the Enterprise's players and affairs.

506. The Form 8886 does note, however, that Forever Forests was paid $200,000 over the table to manage the scam.

507. On December 28, 2018, the Ancient Oaks PropCo donated a CE on the Ancient Oaks Land to ACC. The Deed of Conservation Easement was signed by Nancy Zak, as Manager of Green Earth Reserve, and Robert Keller, on behalf of ACC. This Deed falsely and fraudulently represented that it

00470619

created a valid CE that perpetually protected the Ancient Oaks Land, even though the signers knew this was false.

508. Also on December 28, 2018, Robert Keller, acting on behalf of ACC, wrote a contemporaneous written acknowledgment of the so-called donation. In it, he falsely and fraudulently represents that ACC is a Qualified Organization that can accept a valid Code-compliant QCC.

## G.  Plaintiffs Become Victims of the Little Ocmulgee/Ancient Oaks Scams.

509. Unwittingly trusting the legitimacy of the SCE Scams recommended to him by his CPAs at Sykes & Co., and in reliance on Nesmith Rogers' advice, McHugh purchased 17 shares in the Little Ocmulgee CapCo for $209,913 on August 30, 2018.

510. The Enterprise also solicited Meek for participation in the then Little Ocmulgee Scam. On December 16, 2018, Meek purchased 4.3497 units in the Little Ocmulgee CapCo for a total price of $96,712.

511. Fast forward to February 17, 2021, Nancy Zak, acting simultaneously as: (1) Member Manager of Green Earth Reserve; (2) Manager of Ancient Oaks CapCo; and (3) Partner Representative of Ancient Oaks PropCo, wrote to McHugh, informing him that the Ancient Oaks Syndicate was under audit.

512. Once again, Nancy Zak is revealed to be controlling and directing almost every aspect of the SCE Scams.

513. Zak informed the victims that her co-conspirator, Joseph Skalski, was engaged to represent the partnership before the IRS audit.

514. The Enterprise did not disclose the fact that Skalski was intimately involved in the fraud that caused the IRS to audit the partnership.

515. Many of the Defendants played special roles in the SCE Scam that brought on this IRS audit.

### i.    The Kenny Defendants.

516. The Zak Defendants hired Kenny & Associates and Appraisers Douglas R. Kenny and Rick A. Kenny (the "Kenny Defendants") to appraise 405.647 acres of land located along the south side of Highway 46 and the north side of Highway 300/Bayou Road, just east of Highway 39 in St. Bernard Parish, Louisiana (the "Ancient Oaks Land").

517. The Kenny Defendants' appraisal shockingly claimed that this undeveloped rural swampland's HBU was a mining operation worth a staggering $112,550,000.

518. The Appraisal states "the typical purchasers of properties with a similar highest and best use as the subject property (mining) are often mining

00470619

companies that seek opportunities for expanding operations on a regional or national basis."

519. Yet, the Kenny Appraisal fails to substantiate this ridiculous claim with any comparable mines.

520. In a nutshell, the Kenny Defendants claim that if a gigantic mining conglomerate purchased the Enterprise's undeveloped land and then built a nine-figure mining operation on it, the Ancient Oaks Land would be worth nine figures. That is under the "extraordinary assumption" that such a hypothetical mining conglomerate were able to obtain all the necessary permits and government approvals for such a mine in an area surrounded by residential homes.

521. But there were no mining activities and no mining development on or near the Ancient Oaks Land.

522. The Kenny Defendants' appraisal devotes a single paragraph to the financial feasibility of such an entirety-hypothetical, nine-figure mining operation.

523. The Kenny Defendants failed to consider the financial feasibility and untold costs associated with developing this land into a nine-figure mining operation.

00470619

524. The Kenny Defendants could have equally opined that the Ancient Oaks Land's HBU could be worth 100 trillion dollars because NASA and the Walt Disney Corporation could hypothetically buy the land and develop it into an intergalactic theme park. This would be no less absurd, frivolous, or fraudulent from the IRS's perspective.

525. The IRS is currently auditing the Ancient Oaks Scam. Given that the IRS found Benson's $12,000,000 appraisals were grossly inflated, it is inevitable they will find the Kenny Defendants' $112,550,000 appraisal is grossly inflated as well.

526. The Kenny Defendants used the same flawed methodologies, and ridiculous and unreasonable Code interpretations, to arrive at this facially absurd valuation.

527. The Kenny Defendants ridiculously opined that the undeveloped Ancient Oaks Land's HBU was worth $112,550,000 "before" being encumbered with an CE. They also opined that the value of this same land would be $245,000 "after" being encumbered with a CE. They then subtract the "after" value from the "before" value to opine that the Syndicate could claim a $112,305,000 QCC tax deduction.

528. Upon information and belief, the Ancient Oaks Land's true fair market value was $245,000 or less.

00470619

529. The Enterprise then claimed and passed through a 459-times return on investment as a QCC on the federal tax return based on the Kenny Defendants' fraudulent appraisal.

530. Upon information and belief, Nancy Zak also had a written agreement with the PropCo and/or CapCo to "manage team determination of highest and best use" of the Ancient Oaks Land.

531. Here, ACC was the client requesting the appraisal from the Kenny Defendants.

532. The Kenny Defendants signed the Syndicate's fraudulent Form 8283 alongside Robert Keller of ACC. This document falsely states:

a.   That a Qualified Conservation Contribution was donated to ACC;

b.   That the Kenny Defendants were Qualified Appraisers who created a Qualified Appraisal;

c.   That ACC was a Qualified Organization under the Code;

d.   That the so-called donation was compliant with §170(h) of the Code;

e.   That the Deed and Baseline Documentation Report prohibits the construction and or development of the land consistent with the Code's perpetuity requirements;

00470619

f.   That the easement will exclusively serve the Code's mandatory Conservation Purposes; and

g.   That the conservation easement will yield a "significant public benefit" under Treasury Regulation §1.70A-14(d)(4)(iv).

### ii.   The Accounting Services Defendants.

533. Kimberly Skalski was once again hired to prepare the victims' K-1s.

534. On June 14, 2019, McHugh received a K-1 and Form 8886 for the Ancient Oaks Partners scheme from Kimberly Skalski for tax year 2018.

535. Kimberly Skalski knew that the K-1s she prepared caused victims to claim improper tax deductions to the IRS. Yet, Kimberly Skalski did not care about the fathomless harm she was causing the victims because doing so made her and her husband so much illegal money.

536. Skalski instructed victims to attach (1) the Form 8283; (2) the Kenny Defendant's Appraisal; (3) the Baseline Documentation Report; (4) the Deed of Conservation Easement; and (5) Keller's Contemporaneous Written Acknowledgement.

537. Skalski knew and that the documents she instructed the victims to send to the IRS were fraudulent, as they were prepared by her co-conspirators:

00470619

a.   Skalski knew that the Form 8283's prepared by her husband contained the false and fraudulent representations described herein;

b.   Skalski knew that the Kenny Defendants' Appraisal was facially absurd and fraudulently inflated at the request of her and her husband's long time business associate Nancy Zak;

c.   Skalski knew that the BDR, Deed, and Contemporaneous Acknowledgment prepared by ACC were false and fraudulent, as was ACC's custom, as her husband sat on ACC's board;

d.   Skalski also knew that her husband was representing the Enterprise's past SCE Scams during the IRS audits, which revealed all of the similar aforementioned documents were false and fraudulent.

538. On April 6, 2020, Kimberly Skalski acting on behalf of Kimberly A Skalski CPA, PLLC emailed Plaintiff Larry Meek with a fraudulent K-1 for the Ancient Oaks Scam.

539. On February 17. 2022 Kimberly Skalski acting on behalf of Kimberly A Skalski, CPA, and Skalski CPAs, LLC emailed Plaintiff Larry Meek a fraudulent K-1 for the Ancient Oaks Scam.

540. Upon information and belief, Lamb & Braswell provided similar tax and accounting services, knowingly and intentionally facilitating this scam as they did in the previous two scams.

### iii.    The Zak Defendants.

541. On December 3, 2018, Josh Stanley emailed Meek telling him that the Little Ocmulgee manager recommended that the investor-victims vote for the conservation option. Meek voted for the conservation option, as he was recommended to by the Enterprise, but this did not matter. The Little Ocmulgee Scam was switched to the Ancient Oaks Scam without Plaintiffs' knowledge or consent and was voted into conservation without Plaintiffs' vote.

542. On March 15, 2019, McHugh received an email from Amy Diar of Green Earth Reserve and Nancy Zak acting as the Ancient Oaks Partners LLC Manager. The email provided that they were working on the tax information for the project, stating "we advise that each member be prepared to file an extension for their 2018 personal tax return" due to the supposed complexity of the transaction.

543. Here, Green Earth Reserve served several different roles. It served as both the manager for the CapCo, Ancient Oaks Partners, LLC, and as the manager for the PropCo, Ancient Oaks Holdings, LLC.

00470619

544. On February 17, 2021, McHugh received a letter from Nancy Zak acting as Manager of Green Earth Reserve, Manager of the Ancient Oaks CapCo, and Partnership Representative of the Ancient Oaks PropCo. This email informed McHugh and the other victims that the IRS started an audit of the Ancient Oaks schemes. The letter informed investors they may be personally liable. The letter informed investors that they (Zak) have engaged the Skalski Law Firm to represent the Partnership during the audit.

545. Nancy Zak controlled, managed, or had material input on nearly all aspects of the Ancient Oaks SCE Scam. The Zak Defendants played similar roles in facilitating the Ancient Oaks Scam as they did in facilitating their previous two scams.

**H.    Other Solicited Syndicated Conservation Easement Scams.**

546. On December 19, 2019, Nesmith solicited Kyle McHugh's and Larry Meek's participation in the Tayes Hollow Project.

547. On October 28, 2020, Nesmith solicited McHugh and Meek's participation in the Harris County solar scheme. His solicitation email stated: "please jump on this ASAP as the project will fill up quickly due to demand and scarcity."

00470619

548. On December 4, 2020, Nesmith solicited McHugh and Meek's participation in the Potato Creek scheme. The email stated that the amount of money the project hopes to raise is $8.2 million, adding: "therefore, the highest and best use value is 4.681 time(s) higher than the raise." It stated that this project will likely be their last offering.

## I.     The Sykes Defendant's Additional Fraudulent Acts.

549. In or about October 2016, McHugh attended a National Community Pharmacists Association (NCPA) conference, where the CPA Promoters presented about ostensible tax savings plans for pharmacists through SCEs. These men, three of whom are CPAs, collectively held twelve professional licenses and pitched participation in the SCE Scam to unwitting victims, specifically targeting successful pharmacists like McHugh.

550. On November 4, 2016, Scotty Sykes sent Pamela McHugh an email titled "Conservation Easements" which provided the name and contact information of Ernest Nesmith of Nesmith Rogers Financial Consulting.

551. On November 18, 2016, Scotty Sykes advised Kyle McHugh to personally invest in the Muskogee Project, the first SCE Scam, offered through Nesmith Rogers.

552. On November 18, 2016, McHugh sent Ernest Nesmith the necessary executed legal documents to participate in the Muskogee Scam.

149

553. In or about November 2016, the Sykes Defendants solicited Kyle McHugh to hire Sykes & Co. for a so-called audit of McHugh Pharmacy Group's financials and his personal financials. The Sykes Defendants sought ostensibly to further assist McHugh with his businesses' tax and financial needs. This was just another part of the sprawling tentacular of the SCE Scam. Little did McHugh know this so-called financial audit was part of the Sykes Defendants' scheme to further enrich themselves through deceptive and fraudulent business practices.

554. The Sykes Defendants sought to audit the Plaintiffs' financial records for several illicit reasons. First, they hoped to identify McHugh as an individual of a sufficiently high net worth to refer to the SCE Scam and the other Defendants. Second, they hoped to use their position as McHugh's CPA to encourage him to invest in the SCE Scam, knowing that this would result in the illicit enrichment of the Sykes Defendants. Third, the Sykes Defendants hoped to gain McHugh's private financial data to use in their own databases for the purposes of advancing their own business interests and identifying other possible SCE Scam victims. Fourth, the Sykes Defendants hoped to steal McHugh and his sizeable business from other reputable CPAs by falsely claiming that his prior CPAs had committed accounting malpractice, thereby requiring substantial CPA work from Sykes & Co.

555. On November 21, 2016, McHugh received a tax plan from Sykes & Co. via email. The tax plan states, "all columns include a conservation easement investment of $210,000 which will correlate to an approximate charitable contribution deduction of $840,000."

556. Of course, there is no possible way Sykes & Co. could have known that any $210,000 "investment" would result in an $840,000 return, let alone for the purposes of assuming a near million-dollar tax write off, for the purposes of a CPA-prepared tax plan designed to be relied upon by the client. Yet, this email from the Sykes Defendants clearly states that a $210,000 investment "will correlate" to a charitable contribution deduction of four times the investment, because the Sykes Defendants were aware of a RICO Enterprise comprised of captured professionals, like themselves, who were generously rewarded for structuring SCE Scams that produce consistent 4:1 returns. The Sykes Defendants used the word "will" in this context as they knew with certainty that the captured appraisers, captured consultants, captured legal counsel, and captured accountants would inevitably facilitate a SCE project, with a 4:1 or higher return on investment, by fraudulently manipulating the relevant appraisal, financial, and legal standards for their own gain.

151

557. On November 30, 2016, McHugh received an email from the Sykes Defendants, stating: "upon closer review, it is clear there are some concerns with the prior CPA basis schedules." They claimed that several of McHugh's businesses "do not have matching AAA (Accumulated Adjustments Account) & Retained Earnings." The Sykes Defendants added that several of McHugh's businesses "have had distributions in excess of AAA but there are no corresponding taxable gains on your personal tax returns nor reduces in debt basis." The email concluded: "we feel it is important that we get these corrected." The Sykes duo then requested seventeen different tax returns for four different businesses for Sykes & Co. to "correct" at a tremendous expense.

558. On December 1, 2016, McHugh replied to the Sykes Defendants, after receiving their staggering accounting bill. McHugh stated that, while "we never really discussed an hourly rate for your services or how many hours it would take to transition," he would pay the requested sum. However, McHugh informed the Sykes Defendants that he would not continue using Sykes & Co. as their hourly rate was higher than his attorneys' rate.

559. On December 2, 2016, the Sykes Defendants replied, stating that the issues raised in their previous email were very serious and that Sykes & Co. could not assist McHugh further unless he engaged them to correct the purported errors of his prior CPA.

00470619

560. The December 2, 2016 email further stated, "please keep in mind that we suggested conservation easement options that we believe will provide you six figures of federal and state tax relief [and] in addition suggested you consider investment into SC Conservation easement credits [which] could bring thousands more of SC tax relief."

561. On January 4, 2017, McHugh replied, declining Sykes & Co.'s offer for more high-priced accounting services and adding, "we are also grateful for you putting us in contact with the conservation easement folks [the Nesmith Rogers Defendants and the Zak Defendants]."

## CAUSES OF ACTION

## COUNT ONE

### VIOLATIONS OF THE GEORGIA RICO ACT
### (By all Plaintiffs Against all Defendants)

562. Plaintiffs repeat, reallege and incorporate every prior allegation in the preceding paragraphs as if fully set forth herein.

563. The Georgia RICO law provides that "[i]t shall be unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money," and "it shall be unlawful for any person employed by or

00470619

associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity." O.C.G.A. §§16-14-4(a) and (b). The Georgia RICO Act provides a civil cause of action for "[a]ny person injured by any violation of Code Section 16-14-4" including a trial by jury. Id., §16-14-6(c).

564. Plaintiffs incorporate, as though fully set forth herein, their allegations regarding the Enterprise, the Defendants' pattern of racketeering activity, and the Defendants' respective roles in and control of the RICO Enterprise.

565. The Defendants, who are employed by and/or associated with and a part of the Enterprise, conduct the Enterprise's affairs through racketeering, as set forth in this Complaint. Through the fraudulent and wrongful conduct described in this Complaint, Defendants sought to obtain financial gain by depriving the Plaintiffs of their money and property rights in Georgia.

566. To successfully execute their scheme, Defendants needed a system that allowed them to access their victims in a manner to effectuate the fraudulent transactions. The Enterprise allowed the Defendants this access.

567. With respect to the activities alleged herein, the Defendants have acted at all times with malice toward the Plaintiffs in their efforts to acquire and maintain an interest in an Enterprise that affects interstate commerce.

154

568. In carrying out the overt acts and fraudulent scheme described above, the Defendants have engaged in conduct in violation of Georgia state law, and applicable federal law, as set forth more fully above and below.

569. The Defendants have each engaged in "racketeering activity" as set out in §16-14-3(5)(C) of the Georgia RICO Act.

570. As a proximate result of Defendants' unlawful pattern of illegal and fraudulent conduct, as described above, the Plaintiffs have been injured in their business or property in Georgia, to the tune of millions of dollars.

## A.    The Enterprise.

571. Plaintiffs repeat, reallege and incorporate every prior allegation in the preceding paragraphs as if fully set forth herein.

572. An enterprise need not be a specific legal entity but rather may be "any union or group of individuals associated in fact although not a legal entity."

573. In this case, the Enterprise for Georgia RICO purposes consists of: (1) the Defendants; (2) all other persons and entities that associated for the shared goal of soliciting persons to participate in the fraudulent SCE Scams for the purpose of generating and sharing fees and commissions derived from the SCE Scams and alleged tax liability reduction they purported to provide.

00470619

574. The RICO Enterprise consists of various professionals across the Southeast whose services were necessary and indispensable to facilitating the Enterprise's many highly complex and technical SCE Scams.

575. The individuals and entities, individually and through their agents, represented to their victims that the charitable contribution deduction purportedly generated by the SCE Scams arose from a bona fide, Code-compliant, CE entitling Plaintiffs to a noncash charitable contribution deduction under Section 170(h) and relevant regulations.

576. In reality, the noncash charitable contribution deductions purportedly generated by the SCE Scams did not qualify as legitimate tax deductions under the Code, and the SCE Scams, as structured, could not possibly support the promised tax benefits; something the Enterprise's many licensed professionals well knew.

577. The SCE Scams, and the Enterprise that designed, promoted, sold, and implemented them, were devised solely to facilitate the generation of significant fees, commissions, kickbacks, and 'under the table' payments without any regard to the very real damage these schemes were causing the victims. None of the Defendants would have generated such fabulous profits but for the SCE Scams' improper and illegal implementation.

156

578. These professionals were organized by prolific SCE fraud promoters Nancy Zak, Joseph Skalski, and Robert Keller.

579. Zak is still promoting SCE Scams and operating her SCE Scam Empire, in spite of her civil injunction.

580. As recently as January 31, 2022, Nancy Zak has continued to contact victims like Plaintiffs, complaining of the IRS "compliance campaign" and instructing victims about how she plans to defend her fraudulent syndicates before the IRS on behalf of the very syndicates she is enjoined from managing.

581. Zak is, therefore, presently violating the terms of her civil injunction as an act in furtherance of the Enterprise's continued operation.

582. Zak's motivations here are obvious; she personally profited to the tune of hundreds of thousands of dollars for every one of her hundreds of SCE Scams, all from funds fraudulently raised from her own victims.

583. The fraudster Nancy Zak influenced nearly every part of the RICO Enterprise, but she was not the only leader. Robert Keller and Joseph Skalski were also leaders in the Enterprise and have personally reaped millions of dollars from the illegal funds.

584. Zak, Skalski, and Keller did not organize the many professionals in the Enterprise for the mere noble goal of conserving land. Instead, these Defendants organized the other Defendants to facilitate highly technical and

00470619

specifically structured tax transactions with the express purpose of illegally obtaining a minimum four to one return on shareholder investment.

585. Accordingly, due to the complex nature of the SCE Scams, the Enterprise required the assistance of several professionals who were all inducted into the Enterprise. Each of the Defendants were vital to the implementation of the SCE Scams, played an important role in the success of the Enterprise, and either controlled the Enterprise or knowingly implemented the decisions of others in the Enterprise; thus, each had some part in directing the Enterprise's affairs, not just their own.

586. The Enterprise knew that its schemes were entirely dependent on the proper participation of each professional, as the Enterprise would completely fall apart if only one of these professionals refused or failed to carry out the SCE Scams in the exact way the Enterprise required.

587. For example, the Enterprise repeatedly hired the Benson Defendants and Kenny Defendants because the Enterprise knew that they were willing to forgo their legal, professional, and ethical duties in exchange for fifteen times the market rate.

588. The Enterprise depended on captured appraisers like the Benson Defendants and Kenny Defendants. The Enterprise could not risk hiring a

158

reputable and independent appraiser because such an appraiser would refuse to fraudulently appraise the land in the way the Enterprise required.

589. Likewise, the Enterprise could not hire reputable, ethical, and independent CPAs and tax return preparers, as such professionals would refuse to prepare fraudulent K-1s, Form 8283s, Form 8886s in the way the Enterprise required.

590. This is why the Enterprise hired Kimberly Skalski, Joseph Skalski's wife, to provide many of these services, as Kimberly could be trusted to further her and her husband's own fraud.

591. The Enterprise ran numerous identical SCE scams in a relatively short period of time. Accordingly, it needed professionals that the Enterprise could rely on to consistently play their part, even when doing so violated their professional duties and federal law.

592. The Enterprise's need for trust and consistency is why the Enterprise continued to hire and utilize the same pool of professionals over and over again.

593. To unwitting victims like Plaintiffs, the Enterprise's professionals appeared to be nothing more than independent businesspeople performing legitimate professional services for their own legitimate financial gain at arm's length.

594. But a painstaking investigation into the Enterprise reveals that this is merely an illusion created by the Enterprise to hide its illicit affairs.

595. As shown herein, the Enterprise consisted of an incestuous pool of relatives, longtime friends, and longtime business partners who colluded together to defraud victims for the kind of financial gain that they would not have been able to obtain in a legitimate transaction.

596. To find these various professionals, the Enterprise did not pull out a phone book and call businesses at random. Rather, the Enterprise utilized its network of longtime friends, business partners, and even family members to fill the Enterprise's many professional needs.

597. For example, Joseph Skalski is a longtime associate and partner of Nancy Zak and a leader in the RICO Enterprise.

598. The IRS determined that Attorney Skalski lied during an interview about the nature and length of his relationship with Zak.

599. Several other witnesses interviewed by the IRS testified about Joseph Skalski's longtime relationship with Zak.

600. Were Skalski and Zak independently pursuing their own economic interests in a legitimate transaction, there would be no reason for Skalski to risk such liability by lying to the IRS about such a basic fact.

00470619

601. Yet, Joseph Skalski chose to commit a felony rather than to tell the obvious truth, in an attempt to evade detection of the Enterprise and his role therein.

602. No reasonable attorney would make such a material factual misrepresentation to the IRS unless they perceived that lying was less risky than telling the truth.

603. As described herein, the Enterprise owned and controlled: (1) the donated land; (2) the PropCo that owned the land; (3) the CapCo that owned the PropCo; and (4) the land trust that accepted the donated land.

604. The Enterprise could not simply select any land trust to serve as the Qualified Organization.

605. Legitimate land trusts across the country refuse to accept land donations that are used to generate improper tax deductions.

606. It is no coincidence that the Enterprise used ACC and the ACC Defendants to serve as the Qualified Organization for the so-called donations.

607. The Enterprise hand selected ACC to serve as the Qualified Organization because Joseph Skalski sat on its board of directors and served as its Treasurer, and because CEO Robert Keller was a longtime trusted associate and friend of Zak and Skalski.

00470619

608. ACC and its CEO Robert Keller are notorious for accepting land donations that legitimate organizations would not touch. Legitimate land trusts take great pains to ensure that the donations and donors comply with all of the Code's strict requirements.

609. One prominent publication labeled Keller as the "[m]ost prominent among the renegade land-trust leaders" as well as someone known to accept easements that other groups had refused due to excessive valuations.[7]

610. As previously mentioned, ACC applied to become an accredited member of the Land Trust Alliance but withdrew ACC's application. In the words of Keller himself, he withdrew the application because "it was clear 'they were not going to let us through,'" due to disagreements about ACC's repeated failure to question appraisers about excessive valuations being done in a short period of time for CEs that ACC had accepted. See The Billion-Dollar Loophole.

611. The ACC Defendants hold themselves out to be experts in CE donations. Yet, the ACC accepted land donations from the Enterprise that would be facially fraudulent to such a veteran organization.

---

[7] See "The Billion-Dollar Loophole" (December 20, 2017) at https://www.propublica.org/article/conservation-easements-the-billion-dollarloophole/ amp (written in collaboration with Fortune) ("Billion Dollar Loophole").

162

612. The ACC Defendants served as the "qualified organization" in each of the three SCE scams that Plaintiffs were victimized by.

613. ACC also served as the "qualified organization" for several different SCE Scams that are the subject of similar lawsuits. See *Lechter v. Aprio* Case 1:20-cv-01325-AT (N.D. Ga.); see also *Hoover v. Strategic Capital Partners*, Case 1:21-cv-01299-SDG (N.D. Ga.).

614. Indeed, the ACC Defendants purport to oversee 80,000 acres of "conserved" land in 11 states, and it has been suggested that they are responsible for as much as a billion dollars in improper tax write offs in 2017 alone.

615. The ACC Defendants generated millions of dollars for laundering the Enterprise's land donations. The ACC Defendants would not have generated these fabulous profits if they would have refused to accept these facially-fraudulent donations.

616. Furthermore, the ACC Defendants prepared facially flawed BDRs that the IRS found cannot possibly support a qualified donation and qualified conservation easement or serve as the basis for a Code-compliant charitable tax deduction.

617. For example, the Benson Defendants' Muskogee appraisal repeatedly contradicts itself about basic facts, such as the city where the land is located.

00470619

618. The Muskogee appraisal also dramatically understated the percentage of the land that is within a hazardous flood zone, and grossly inflated the value of the land by a factor of ten.

619. Benson's Walnut Creek appraisal was also fatally flawed and grossly overvalued.

620. A reasonable land trust organization serving as a Qualified Organization under the strictures of the Code would have known that Benson's appraisals were a farce, and that they would not satisfy the IRS in the likely case of an audit.

621. Accordingly, a reasonable land trust would have refused to serve as a Qualified Organization for the Muskogee Scam and the Walnut Creek Scam.

622. Section 17(H)(1)(C) of the Code states that a charitable contribution of qualified property must be made exclusively for conservation purposes. The relevant laws provide that a CE subject to a prior mortgage, that is not subordinated to the land trust, can be extinguished at any time by a bank. Therefore, a property encumbered by a mortgage, that is not subrogated by the lenders to the land trust, cannot possibly be a Qualified Donation for a Code-compliant CE or QCC deduction.

623. This knowledge is elementary to an experienced land trust such as ACC.

624. The Muskogee Land was subject to three mortgages, none of which were subrogated by the lenders.

625. Accordingly, the CE on the Muskogee Land failed to satisfy even the Codes' most basic perpetuality requirements.

626. Yet, ACC happily accepted a CE on the Muskogee Land despite these many facial flaws and was paid handsomely for it.

627. The ACC Defendants knew that these donations were being used to generate improper tax deductions, as ACC Board Member, Joseph Skalski, and his wife were preparing the very tax documents that claimed these improper tax deductions.

628. One of the key responsibilities of such a land trust is to prepare a BDR. This report is required to document the condition of the land at the time of the donation, per Treas. Reg. §1.170A-14(g)(5).

629. Without a proper BDR, a land trust, and the relevant regulatory authorities, cannot know the true condition of the land that is meant to be preserved. In other words, one cannot preserve land in a certain condition if one does not know it's true condition.

630. The IRS found that the BDR prepared and signed by ACC and Keller were patently inadequate and failed to meet the Code's requirements in both the Muskogee Scam and Walnut Creek Scam.

631. The IRS found that "it is impossible to determine the condition of the [Walnut Creek Land] at the time of the donation," for several reasons.

632. First, the baseline document did not include a date when it was prepared. Indeed, the Enterprise often elects to not include dates on documents, a sure indication of fraud. Next, it was impossible to determine if the document was signed before the date of the baseline study, another sign of fraud. Finally, Keller stated that he personally visited the property, but does not include a date.

633. Upon information and belief, the BDR was prepared before the actual date of the so-called baseline study.

634. A reasonable land trust would not make such elementary and fatal mistakes when drafting their BDR – the chief responsibility of the land trust before donation.

635. The Defendants will inevitably argue that, at best, these issues are mere mistakes, not signs of a fraudulent RICO enterprise.

636. Yet, all of these "mistakes" facilitate a fraudulent CE donation and its accompanying charitable tax deduction.

637. Of course, none of these highly credentialed professionals were ignorant of these fatal flaws. As people who hold themselves out to be experts respecting CEs, they all knew the transactions were fatally flawed. Yet, the

00470619

Defendants ignored this in order to slam through as many CEs as possible, as this was in their financial interests.

638. Dolph Winders and FisherBroyles hired the Benson Defendants to prepare the Muskogee and Walnut Creek appraisals.

639. ACC hired the Kenny Defendants to prepare the Ancient Oaks appraisal; for the very land it would then purport to accept as a "donation."

640. The Benson Defendants' and Kenny Defendants' appraisals were facially flawed and grossly overstated the value of the lands.

641. Indeed, the Kenny Defendants overstated the value of the Ancient Oaks land by over one hundred million dollars.

642. Dolph Winders is a partner-level attorney who boasts of his legal expertise respecting CEs. Indeed, Winders regularly speaks on CEs at various events.

643. Of course, Dolph Winders knew that the IRS does not allow one to claim a $11,000,000 tax deduction by donating a $1,000,000 parcel of land simply because an appraiser fabricates the HBU of the land to be worth $12,000,000.

644. Attorney Winders knew that the tax deduction cannot exceed the true value of the CE, which must be calculated from the true FMV of the land.

00470619

Winders also knew that the IRS has warned against tax deductions such as the ones he facilitated for years.

645. Putting the issue of Benson's fraudulent valuations to one side, the IRS found that the Muskogee appraisal appeared to be hurriedly cut and paste from other unrelated appraisals.

646. The Qualified appraisal is perhaps the single most important document in a CE donation.

647. An experienced attorney like Winders would know that Benson's appraisals were fatally flawed many times over.

648. A reasonable attorney would immediately fire Benson and hire a different appraiser given the supreme importance of the Qualified Appraisal.

649. Yet, Winders allowed Benson's appraisal to be the basis for the QCC donation in the Muskogee Scam and Walnut Creek Scam. Winders allowed the Enterprise and its victims to claim improper tax deductions based on Benson's obviously fraudulent appraisal. Winders further allowed the Syndicates and the Enterprise to attach Benson's fraudulent appraisals to their federal tax returns.

650. Not only this, Winders continued to hire Benson to provide Qualified Appraisals for other SCE Scams.

00470619

651. Were Winders an innocent, independent attorney solely pursuing his own economic interests he would never have hired, let alone rehired, the Benson Defendants. This is because the civil, tax, and liability of using a facially fraudulent appraisal would far outweigh the benefits of hiring Benson.

652. Benson's fraud was not a bug, but a feature. Winders hired, and then rehired, Benson precisely because he knew Benson would fraudulently inflate the value of the land for the illicit gain of the Enterprise.

653. Benson was paid, at minimum, $15,000 for his appraisals; fifteen times more than a reputable appraiser with over forty years' experience was paid to appraise the same property Benson appraised.

654. Were Benson a regular independent appraiser, he would not have made fifteen times the going rate for a cut and paste appraisal, nor would Winders have allowed Benson to be paid this fabulous rate for such shoddy work.

655. For these same reasons, ACC would not have hired the Kenny Defendants to appraise an ~$1,000,000 piece of land to be worth ~$112,000,000 for the purposes of a charitable tax deduction.

656. The Muskogee PropCo, and therefore the Muskogee Land, was previously owned by Arthur Goolsby (95%) and Blair Cleveland (5%). Goolsby

and Cleveland retained a collective 1% interest in the PropCo when their shares were sold to the CapCo.

657. The IRS audit found that Benson's Muskogee appraisal failed to deduct the increase in value brought to Goolsby's personally-owned land, which sat only 1,200 feet to the south of the Muskogee Land.

658. This is significant because the Code provides there is an "enhancement rule" that applies to any contiguous or noncontiguous property owned by a relative party to the donation, such as Goolsby.

659. Benson's report noted that there are "homes located within 1,500 feet" of the Muskogee Land, yet Benson curiously neglects to mention one of these homes is owned by Goolsby, who held a minority interest in the PropCo.

660. Benson's letter to Attorney Winders stated that he searched nearby properties and found no contiguously owned properties by the subject owners or family members.

661. There is no reason why Benson, a licensed and experienced appraiser, would have omitted this crucial information were this a regular arm's length transaction.

662. Were this a regular, legitimate, arm's length transaction, Benson and Winders would have no reason to risk their professional licenses, and risk an IRS disallowance of the QCC deduction, for the benefit of Arthur Goolsby.

170

663. Yet, Benson and Winders did just this because it was not a legitimate arm's length transaction and the "enhancement rule" would only serve to reduce the value of the appraisal and, therefore, the value of the QCC.

664. Indeed, all of Benson's many errors served only to increase the value of the QCC and enable a quick and profitable QCC deduction for the Syndicate and RICO Enterprise.

665. Arthur Goolsby now unconscionably serves as the tax matters partner before the IRS in the Muskogee Scam. Goolsby now represents his own victims before the IRS audit caused by his own intentional fraud.

666. T.J. Heath is also a longtime friend and collaborator of the prolific fraudster Nancy Zak.

667. Heath played many different roles during multiple SCE Scams. Heath managed the Muskogee PropCo and recommended that victims vote to donate a CE on the Muskogee Land to ACC. Heath also previously owned the Walnut Creek Land and the Walnut Creek PropCo.

668. On paper, Fieldstone South managed the Walnut Creek PropCo, but this is a shell corporation and alter ego of Heath.

669. Behind the scenes and unbeknownst to the victims, Heath hired Nancy Zak's Forever Forests to manage the Walnut Creek PropCo for $150,000.

00470619

670. But Forever Forests did more than simply manage the PropCo. The FF Agreement is direct proof that the Enterprise members met and conspired to defraud victims and the IRS by abusing the appraisal process.

671. The FF Agreement between Forever Forests and Heath states that Nancy Zak's Forever Forests was hired to "manage team determination of highest & best use." (Emphasis added).

672. This is shocking as there is no such thing as a "team determination of highest & best use" allowed under the Code.

673. In a non-fraudulent CE transaction, an independent Qualified Appraiser is hired to draft a Qualified Appraisal under the strict standards of the Code and the USPAP.

674. Indeed, it is a violation of both the Code and the USPAP for an appraiser to delegate his professional judgment to self-interested parties like Zak and Heath.

675. Attorney Dolph Winders hired Benson to create these appraisals.

676. Upon information and belief, Zak, Winders, and Benson had similar agreements that purport to authorize Zak to direct and influence the land's appraisal values.

677. There was a meeting of the minds between Zak, Heath, Forever Forests, the Benson Defendants, Dolph Winders, and FisherBroyles to

00470619

influence Benson's appraisals for the sole purposes of inflating the value of a QCC tax deduction.

678. Winders and FisherBroyles knew that Zak was managing and influencing Benson's appraisals in violation of the Code and the USPAP.

679. Agent Young determined that one of the altered data entries involved Dolph Winders' role in the scam. On June 22, 2017, Winders was paid $20,000, which was originally coded as "Easement Expense" but was changed to "Development Cost" before being provided to the IRS.

680. The data was likely altered to hide Benson's role in the Enterprise.

681. It is no accident that this data was altered, as it was likely done to intentionally hide Benson's and Winder's role in the "easement."

682. Upon information and belief, Joseph Skalski, T.J. Heath, Nancy Zak, Dennis Benson, and Dolph Winders conspired to delete this data to evade detection of the Enterprise.

683. Upon information and belief, these same Defendants altered the Syndicate's data prior to providing it to the IRS.

684. Heath contributed $100 to purchase 100 shares of Walnut Creek. These same shares would be offered to victims at a rate of $2,460 a share.

685. Heath now serves as the Tax Matters Partner for the Walnut Creek Scam before the IRS. Here, he unconscionably seeks to represent the victims before the IRS audit that his own fraud caused.

686. Heath and his wife also received nearly $400,000 for their role in the Walnut Creek Scam alone; all with funds raised from the victims.

687. Following the closing of the Walnut Creek Scam, Heath's bank was wired $1,180,618.40, which relieved Heath of his personal re-financing debt for the Walnut Creek Land that he had purchased.

688. The Walnut Creek PropCo, through Heath, borrowed $1,199,279 from Morris Bank to refinance the Walnut Creek Land.

689. To obtain this $1,199,279 loan, Heath and Morris Bank obtained an appraisal from C.A. Yarbrough, III of Yarbrough & Company.

690. Yarbrough determined that the highest and best use of the property was agricultural/timberland/residential and valued the property at $1,520,000. Yarbrough states that the intended user of his appraisal was Morris Bank, which paid Yarbrough $1,000 for his appraisal.

691. Yarbrough completed his appraisal on March 2, 2017.

692. Three months later, on June 7, 2017, Heath, through Dolph Winders, requested a new appraisal from Benson. The intended use of Benson's

appraisal was "to assist the client in asset evaluation for a conservation easement."

693. Benson appraised the very same land for $11,535,000. The Walnut Creek PropCo paid Benson $15,000 for his appraisal, fifteen times what Morris Bank paid Yarbrough for his appraisal.

694. Benson was hired to draft both a preliminary appraisal, which was shown to investors to justify the ridiculous valuation fabricated by the Enterprise, and a final appraisal. Yet the two appraisals were all but identical, as determined by Agent Young.

695. Winders, Heath, the Zak Defendants, and Joseph Skalski knew that the Walnut Creek Land had been appraised at $1,520,000 by Morris Bank only three months before the Enterprise hired Benson for his appraisal. This $1,520,000 valuation was used to obtain the $1,199,279 loan. Accordingly, these Defendants knew that the value of the Walnut Creek Land was around this figure.

696. These Defendants also knew that Benson would provide a fraudulently exaggerated appraisal. These Defendants knowingly committed fraud when they represented to the victims that this land was worth $11 million, for the purposes of a QCC tax deduction, when they knew it was truly worth only a fraction of this value.

175

697. Likewise, the Defendants knew the Ancient Oaks Land was not worth $112,000,000, as the Kenny Defendants ridiculously and fraudulently opined.

698. The Enterprise controlled the appraisers, the lawyers who oversaw the appraisers, the land on which the CE was donated, and the land trust to which the CE was donated.

699. The Enterprise also controlled both the CapCos and the PropCos. In other words, the Enterprise controlled both the buy and sell sides of these ostensibly arm's length transactions.

700. Nancy Zak's Green Earth Reserve managed and controlled the Enterprise's CapCos and Nancy Zak's Forever Forests managed and controlled the Enterprise's PropCos.

701. In other words, the Enterprise solicited unwitting victims to buy shares in a CapCo (that was controlled and managed by Zak), which was set up to buy shares in a PropCo (that was also controlled and managed by Zak), which owned the land that was previously owned by Zak's longtime friends, employees, associates, and partners; and which then donated a CE on such land to a land trust controlled by Zak's longtime friends and associates.

176

702. Both Green Earth Reserve and Forever Forests were paid hundreds of thousands of dollars from victim funds to "manage" both the buy and sell sides of the transactions.

703. The Zak-controlled PropCo would then "donate" a CE on the land to ACC, which was controlled and owned by Joseph Skalski and Robert Keller, both of whom are longtime friends and partners of Zak.

704. The Enterprise then hired Joseph Skalski to provide accounting and legal services for the PropCo side, and hired Kimberly Skalski to provide accounting services for the CapCo and victim side.

705. The Enterprise's own Form 8886 states that Forever Forests "provided project oversight, facilitated communications between professionals and team members, [and] reviewed project documentation."

706. This document shows a meeting of the minds that occurred between the Zak Defendants and the various professional Defendants, such as the Appraiser Defendants, Legal Services Defendants, and Accounting Services Defendants. The Defendants agreed to design and implement SCE Scams in accordance with the Enterprise's financial incentives, not the Code.

707. Zak maintained a close circle of employees whose job was to fulfill the Enterprise's many administrative needs, such as regularly communicating

with victims and coordinating the various captured professionals and other Enterprise members.

708. Josh Stanley and Lisa Cantrell are two of Zak's primary confidants. Stanley and Cantrell worked interchangeably with both Green Earth Reserve, which managed the CapCos, and Forever Forests, which managed the PropCos.

709. For example, in the Muskogee Scam, Josh Stanley served as Project Manager for both Green Earth Reserve and Forever Forests. Likewise, Lisa Cantrell served both as Assistant Project Manager for Forever Forests and as Manager of Investor Relations for Green Earth Reserve.

710. Mandy W. Cantrell served as an office administrator for ACC. Zak is already connected to ACC via longtime friend and partner Joseph Skalski.

711. Upon information and belief, Mandy Cantrell is related to Lisa Cantrell.

712. Josh Stanley, Lisa Cantrell, and Nancy Zak were in regular contact with the Nesmith Rogers Defendants regarding the Enterprise's SCE Scams.

713. In the Walnut Creek Scam, victims were instructed to email the requisite subscription documents to Josh Stanley in his capacity at Green Earth Reserve, among other victim communications, as discussed in detail herein.

178

714. On June 15, 2017, Lisa Cantrell emailed victims, acting on behalf of Forever Forests. She informed victims that the Enterprise had drafted the necessary Form 8886s that victims would have to attach to their tax returns per the IRS rules and the Accounting Services Defendants' express instructions.

715. The IRS requires taxpayers who claim CE-related deductions to file Form 8886s with their tax returns as CE deductions are now listed transactions. Many legitimate accountants refer to IRS Form 8886 as a "please audit me" form, as the IRS requires taxpayers participating in highly scrutinized listed transactions, like SCE donations, to submit this informational form with their tax returns.

716. Cantrell told victims that the forthcoming 8886s "contain carefully chosen suggested language answering the complex questions contained in Form 8886. You may use this language as it stands or amend it to your satisfaction. Hopefully this will greatly diminish the time and research your tax professional will have to utilize to complete this newly required disclosure."

717. Cantrell knew these 8886s were insufficient and fraudulent. Yet, she encouraged victims to submit them to the IRS as is.

718. On June 30, 2017, Josh Stanley, acting as Project Manager for Forever Forests, sent victims the Enterprise's 8886s. Stanley took great pains

179

to downplay the importance of these 'Please Audit Me Forms,' stating "if [P4C's] lobbying efforts are successful, it may be unnecessary to file these informational forms. Consequently, we are recommending that you delay your filing until closer to the deadline."

719. Victims were not given any more information about the Form 8886s until Stanley suddenly emailed them again on September 28, 2017. Stanley informed the victims that the Form 8886s he previously sent were patently inadequate, as he well knew, and he attached amended 8886s on September 28, 2017.

720. Yet, even the amended Form 8886s contained several material misrepresentations of fact and material omissions, as discussed herein. In particular, the amended Form 8886s failed to include all of the material advisors and falsely stated that Dennis Benson was a Qualified Appraiser performing Qualified Appraisals.

721. Stanley told the Victims that the amended forms "must be modified for your use. Do not use them as-is." Stanley also told the victims that "most legal and tax professions are strongly recommending that your Form 8886 be submitted no later than the original deadline of October 2. This next Monday."

722. Of course, Stanley knew that the Enterprise did not want victims consulting with their own tax professionals.

723. This is why Stanley gave victims months to file the Enterprise's admittedly insufficient Form 8886 in June, recommended victims delay their filings until the deadline, and then gave victims only a single business day to consult with their own tax professionals, change the Form 8886 accordingly, and file them with the IRS.

724. Stanley knew this was impossible as the Enterprise wanted the victims to file this document as-is while simultaneously enjoying the imagined legal protections that would accompany such a disclaimer.

725. Stanley and Cantrell were also tasked with sending victims Kimberly Skalski's fraudulent K-1s and Lamb & Braswell's fraudulent Form 8886s.

726. Josh Stanley and Lisa Cantrell were Zak's right hands. They were hand selected by Zak to run her numerous fraudulent businesses as Zak knew they could be trusted to perform the SCE transactions in accordance with her and the Enterprise's fraudulent intentions, not the Code's strict procedures.

727. The Enterprise hired Lamb & Braswell to draft the language for the fraudulent Form 8886s.

728. Lamb & Braswell holds itself out to be a legitimate accounting firm. As such, it well knew that the IRS does not allow taxpayers to claim QCC deductions for well above the true FMV of the donated CE.

00470619

729. Lamb's fraudulent Form 8886s contain several material misstatements of fact, which were designed to trick the victims and the IRS into believing the QCC deductions claimed by the Syndicates were legitimate, when Lamb knew they were not. This includes the false and fraudulent statement that Benson was a Qualified Appraiser issuing Qualified Appraisals.

730. Lamb's 8886s also fail to mention several key material advisors, to hide the true scope of the Enterprise and grossly understate the monies obtained by the various disclosed material advisors, like Nancy Zak and the Nesmith Rogers Defendants.

731. Lamb's 8886s also claimed tax deductions that would appear patently improper to such an accounting firm.

732. Upon information and belief, Lamb was aware that Nancy Zak was directing and managing the so-called "team determination" of HBU instead of a legitimate and independent Qualified Appraiser.

733. A reasonable accounting firm, such as Lamb purports itself to be, would not draft the Enterprise's Form 8886s. These forms describe in detail the improper and flawed methodologies that the Enterprise used to fabricate improper and grossly inflated QCC deductions.

00470619

734. A reasonable accounting firm outside the Enterprise's control would have refused to prepare the Form 8886s in this way, as Lamb knew they would be attached to each victim's tax return and sent to the IRS.

735. Upon information and belief, Lamb has deep and long-running ties with Nancy Zak, Joseph Skalski, Robert Keller, Kimberly Skalski, and other Defendants.

736. The Enterprise used funds fraudulently raised from its victims to fuel its nine-figure fraud empire. The Enterprise thus relied on its many promoters, to leverage their positions as ostensibly legitimate CPAs and tax professionals, to lure victims into "investing" into the Enterprise's CapCos.

737. The CPA Promoters were some of such promoters. They traveled across the country attending various professional conferences, in niche economic industries, with the intention of targeting successful and high net worth individuals like Plaintiffs.

738. Here, the CPA Promoters targeted the pharmaceutical services industries and infiltrated conferences for those in such industries. The CPA Promoters purchased sponsorship packages with these conferences, which allowed them to pitch their illicit tax scams to unsuspecting victims.

739. The CPA Promoters were not innocent third parties. The Nesmith Rogers Defendants partially owned Green Earth Reserve, which generally

183

represented, managed, and controlled the very CapCos the CPA Promoters solicited Victims to "invest" in.

740. Likewise, the Sykes Defendants were longtime friends and associates of the Nesmith Rogers Defendants.

741. The Sykes Defendants are longtime friends and associates of Nancy Zak.

742. The Sykes Defendants are longtime friends and associates of the Zak Defendants, the ACC Defendants, and the Skalskis.

743. Plaintiffs were lured into the Enterprise's SCE Scams when Plaintiff Kyle McHugh saw the CPA Promoters presenting on the purported tax savings a SCE "investment" could offer.

744. The Nesmith Rogers Defendants and the Sykes Defendants presented on the purported benefits of SCE transactions to victims at multiple conferences.

745. There was a meeting of the minds between the CPA Promoters and the other Enterprise members to pitch the SCE Scams to unwitting victims such as McHugh.

746. The Sykes Defendants referred Plaintiffs to the Nesmith Rogers Defendants. The Nesmith Rogers Defendants then referred Plaintiffs to their

00470619

longtime collaborators, Green Earth Reserve, owned and operated by themselves and the prolific fraudster Nancy Zak.

747. After the completion of one SCE Scam, the Nesmith Rogers Defendants would notify Plaintiffs and other victims about upcoming SCE Scams, each of which was managed by Green Earth Reserve.

748. The Nesmith Rogers Defendants directly solicited McHugh's participation in six scams, including the three SCE Scams described herein, all of which Nesmith and Rogers were personally interested in financially.

749. Green Earth Reserve regularly contacted the Plaintiffs and provided them with false and fraudulent information through the mail and wires, as described herein.

750. The Nesmith Rogers Defendants never disclosed their own financial stake in the scams they were promoting to victims.

751. Plaintiffs first learned about the SCE Scams when McHugh attended a conference for pharmacists in or about October 2016.

752. There, the Nesmith Rogers Defendants, who comprise a financial consulting company in Florida, and the Sykes Defendants, who comprise an accounting firm in North Carolina, jointly presented about the SCE Scam to the attendees.

753. After hearing the Sykes Defendants' pitch, McHugh engaged the Sykes Defendants for accounting services. On reliance of their then-CPA Sykes' advice, Plaintiffs agreed to participate in an SCE Scam offered by the Sykes Defendants' Enterprise.

754. The Sykes Defendants, acting as McHugh's CPAs, prepared a preliminary tax plan for McHugh, which included a $210,000 conservation easement "investment" that CPA Scotty Sykes told McHugh "will correlate to an approximate charitable contribution deduction of $840,000."

755. Scotty Sykes is a fraudster who knew that his Enterprise could yield a minimum 4:1 return on investment by abusing the IRS rules that Sykes, as a CPA, is charged with knowing and upholding.

**B.   Operation and Control of the RICO Enterprise.**

756. Plaintiffs repeat, reallege and incorporate every prior allegation in the preceding paragraphs as if fully set forth herein.

757. Syndicated CEs caught the attention of unscrupulous professionals for four reasons: (1) these deals purported to generate tax deductions that, due to provisions in the Code, could substantially reduce an individual's tax liability[8]; (2) the rules involved were highly technical and thus unlikely to be

---

[8] The deduction for a qualified conservation easement under Code Section 170(h) is a noncash charitable contribution deduction. A noncash charitable

00470619

understood by laypersons, like the Plaintiffs, who were thus also unlikely to question the advice being offered by reputable professionals who were alleged experts in the area; (3) due to a rampant oversupply of unproductive real estate that was devalued in the 2008-2009 recession, a vast supply of deals were available to participants in a buffet-like fashion;[9] and (4) a group of eager under-employed real estate appraisers, short on engagements in the wake of the 2008-2009 recession, that were willing to engage in fictitious valuations under the guise of a subject property's HBU that was wildly fabricated.

758. Tax deductible CEs are allowed for taxpayers who meet the requirements of Code Section 170(h). However, Section 170(h) has a rigorous set of qualification criteria that Defendants did not meet with respect to the SCE Scams and did not intend to meet. Nevertheless, CEs are spelled out in the Tax Code itself, specifically Code §170(h), giving professional advisors a hook upon which to lure potential victims who would otherwise steer clear of

---

contribution deduction is unique because, unlike most itemized deductions, it is not subject to the alternative minimum tax ("AMT"). Since there is no risk of AMT, the tax benefits flowing from a 170(h) deduction are especially valuable. A taxpayer with $500,000.00 of adjusted gross income could use these deductions to reduce his or her tax to $25,000, thereby enabling the taxpayer in this example to have an effective tax rate of 5%.

[9] Some states like Georgia also had the presence of a state tax credit for conservation easements. Credits, unlike deductions, offer participants a dollar-for-dollar reduction of tax.

00470619

these transactions. Conservation easement promoters had no difficulty convincing potential participants of the validity of the deduction because they pointed to Code §170(h). This "illusion of validity" is what the Defendants fraudulently used to persuade and mislead the Plaintiffs to agree to participate in the SCE Scams.

759. Unbeknownst to the Plaintiffs and other victims, Section 170(h) of the Code did not contemplate the use of partnerships to realize these tax benefits and did not allow the fraudulent appraisal tactics used by the Enterprise.

760. Each of the Defendants were vital to the implementation of the SCE Scams and played a necessary role in the success of the Enterprise. Each of the Defendants either controlled the Enterprise or knowingly facilitated and implemented the decisions of others in the Enterprise.

    a.    The Sykes Defendants: Without victims, there is no scam and, accordingly, no fabulous profits for the scammers. The Sykes Defendants own and operate a successful and ostensibly reputable accounting firm. Regular CPAs and accountants pride themselves on providing Code-compliant tax advice in exchange for a duly earned fee. The Sykes Defendants, however, traveled across the country with the Nesmith Rogers Defendants and solicited

00470619

countless victims to participate in the SCE Scams, knowing them to be illegitimate. The Sykes Defendants abused their ostensible credibility, professional degrees, and professional licenses to lure unwitting lay people into participating in what the Sykes Defendants knew to be improper charitable deductions. The Sykes Defendants also used the ostensibly amazing tax benefits of participating in the SCE scams to lure victims away from legitimate accountants to the frauds at Sykes & Co. The Sykes Defendants frivolously and falsely savaged the work of reputable accountants and put victims under the impression that Sykes & Co. could deliver spectacular tax benefits that were beyond the capabilities of other accounting firms. The Sykes Defendants referred Plaintiffs to the Enterprise, and told the Plaintiffs that an SCE investment "will" yield a 4:1 return on investment, while acting as Plaintiffs' retained CPAs. The Sykes Defendants were handsomely compensated for each victim they lured into the Enterprise, thereby providing the Enterprise a never-ending supply of unwitting victims who all believed they were investing in legitimate Code-compliant transactions.

189

b.     The Nesmith Rogers Defendants: played a similar role to the Sykes
       Defendants. The Nesmith Rogers Defendants traveled across the
       country to promote SCE Scams and lure unwitting victims into
       them. The Nesmith Rogers Defendants were co-owners of Nancy
       Zak's Green Earth Reserve, which represented the CapCos that
       Plaintiffs and other unwitting victims were solicited to "invest" in
       by the Sykes Defendants and the Nesmith Rogers Defendants.
       Naturally, victims would not be willing to "invest" hundreds of
       thousands of dollars in the SCE transactions if they knew that the
       Nesmith Rogers Defendants or the Sykes Defendants directly
       profited from such transactions. So, the Nesmith Rogers
       Defendants kept this information secret from the Plaintiffs and
       solicited their involvement in the SCE Scams as though they were
       legitimate at-arm's length transactions. The Nesmith Rogers
       Defendants served several roles in the Enterprise. First, they
       helped Nancy Zak develop and implement the SCE Scams in their
       capacities as licensed financial consultants, attorneys, and
       accountants. They also managed and owned Green Earth Reserve,
       which owned the CapCos. The Nesmith Rogers Defendants then
       solicited unwitting victims' involvement in the SCE Scams run by

00470619

their own company. The Nesmith Rogers Defendants would encourage victims to invest, promising significant tax benefits structured and blessed by licensed accountants and attorneys. The Nesmith Rogers Defendants then liaised and corresponded with the victims, as they had garnered trust from the victims they solicited.

c.   The Zak Defendants: Zak designed and promoted over a hundred fraudulent SCE Scams that generated billions in improper tax deductions and caused untold harm to her countless victims. Zak recently signed a civil injunction with the United States Government to never promote another SCE Scam for the rest of her life. Zak, however, could not run her billion-dollar fraud empire alone and relied on the assistance of a select, hand-picked, and highly-trusted team to organize, design, and implement her scams. The Zak Defendants were selected by Zak to do everything, including running the day-to-day operations of Zak's many entities, coordinating the various corrupt and captured professionals, making a fraudulent "team determination" of highest and best use, representing the victims before the IRS, and more. The Zak Defendants controlled both the buy and sell sides of

191

the SCE Scams through Green Earth Reserve and Forever Forests. These entities were set up to make it appear as though the transactions were legitimate and arm's length, when in reality they were owned and controlled by the Zak Defendants.

d.   Joseph Skalski: was also a leader in the Enterprise. Joseph Skalski had as much, or nearly as much, power in directing the Enterprise as Nancy Zak. Skalski also profited as much, or nearly as much, from his role in the Enterprise as Zak, who made millions off the backs of her victims. Skalski played more roles in the  Enterprise than one can count. Skalski operated and controlled the PropCos and provided legal and accounting services for them. Skalski also partly controlled and operated ACC, which accepted the very CE donations he structured and solicited. Skalski also unconscionably represented his own victims before the IRS audits, which were caused by his fraudulent activities.

e.   The ACC Defendants: were tasked with the crucial role of providing the ostensibly Qualified Organization for the Enterprise. One cannot donate a CE without a Qualified Organization to donate it to under the Code. The ACC Defendants are generally known to be an illegitimate land trust that accepts "donations"

that reputable organizations would not touch. The ACC Defendants are directly linked to the Enterprise through Joseph Skalski, who simultaneously (1) sat on the Board of and served as Treasurer for ACC; (2) played several crucial roles in the Enterprise; and (3) unconscionably represented his own victims before the IRS for the audits caused by his own fraud. The ACC Defendants prepared the woefully deficient and fraudulent BDRs that purport to memorialize the state of the land at the time of the CE donation. The ACC Defendants prepared and signed the Enterprise's fraudulent Form 8283s and accepted the CE donations for the primary purpose of generating substantial and improper QCC tax deductions, which the Zak Defendants and CPA Promoters then sold to unwitting victims.

f.   The Appraiser Defendants: Without a Qualified Appraisal by a Qualified Appraiser, as defined by the Code and relevant Treasury Regulations, there cannot be a CE and a QCC tax deduction. The Appraiser Defendants, accordingly, were the lynchpin of the entire Scam. Of course, the Enterprise could not afford to trust this crucially important role to a legitimate appraiser, as a legitimate appraiser would refuse to appraise the land in the way the

Enterprise needed. It is no surprise, then, that all of the Appraiser Defendants just so happened to use the same flawed methodologies to arrive at the same grossly inflated valuations which the Enterprise would use to claim significant and improper tax deductions that well exceeded the donated CE's fair market value. Nancy Zak and Forever Forests believed they could "manage team determination" of HBU. The Appraiser Defendants knew their role in the Enterprise was not to provide a legitimate appraisal but rather to provide the minimally necessary documentation to give the appearance of a Qualified Appraisal. This is why the IRS determined that the Benson Defendants' Muskogee appraisal appeared to be a sloppily cut-and-paste template. In reality, their methods and valuations were directly dictated by the Enterprise. The Appraiser Defendants were sometimes rewarded with fifteen times the regular rate for their fraudulent appraisals.

g.   The Legal Services Defendants: The Enterprise's many SCE Scams were complex and governed by an extremely complex set of IRS and Treasury Regulations. Just as the Enterprise required accountants and appraisers, it also required legal counsel. These Legal Services Defendants, however, were not ordinary attorneys

00470619

hired to provide arms-length legal services to their clients. The Legal Services Defendants were key members of the Enterprise. Joseph Skalski was a leader the Enterprise and sat on the board of the organization that accepted the very same donations he promoted and structured. Dolph Winders is an experienced partner-level attorney who holds himself out to be a CE legal expert. Yet, Winders allowed Benson's facially inadequate and fraudulent appraisal to support a massively improper QCC deduction. Rather than fire Benson, Winders repeatedly hired him to provide similar fraudulent appraisals for the Enterprise's other SCE Scams, and paid Benson fifteen times the going rate to do so.

h.   The Accounting Services Defendants: The Enterprise's many SCE Scams are complex and are governed by an extremely complex set of IRS and Treasury Regulations. The Enterprise's Scams ultimately involved complex tax and accounting issues that required significant accounting help. Of course, the Enterprise could not afford to hire legitimate accounting firms that provided legitimate accounting services. Rather, the Enterprise hired accountants it knew would conduct the Enterprises' affairs according to the Enterprise's desires, not the Code. The Accounting

195

Services Defendants were charged with drafting the Enterprise's fraudulent K-1's, Form 8283s, Form 8886's, and the tax returns which claimed the improper tax deductions.

i.   The Landowner Defendants: Months before victims were solicited to purchase shares in the CapCos, the Landowner Defendants were purchasing the land that made the SCE Scams possible and profitable. They purchased the necessary land with full knowledge that such land would be used for a fraudulent SCE Scam. The Landowner Defendants profited handsomely for their ownership role in the Enterprise. They also served other roles in the Enterprise and were longtime friends and associates of fraudsters Nancy Zak, Robert Keller, and Joseph Skalski.

C.   **Pattern of Racketeering and Predicate Acts.**

761. Plaintiffs repeat, reallege and incorporate every prior allegation in the preceding paragraphs as if fully set forth herein.

762. With respect to the overt acts and activities alleged herein, each Defendant conspired with each other, the other participants, and with others not named as defendants herein, to violate O.C.G.A. §16-4-4(b). Each Defendant agreed and conspired with the other Defendants and their co-conspirators to participate, directly or indirectly, in interfering with,

196

obstructing, delaying or affecting commerce by attempting to obtain and/or obtaining property interests to which the Defendants and their co-conspirators were not entitled.

763. The Enterprise operated continuously for several years and, indeed, is still operating today.

764. Nancy Zak effectuated hundreds of different SCE Scams. All the Defendants played repeat roles to further the Enterprise and its financial opportunities.

765. For instance, the Muskogee Scam was operational in 2016, the Walnut Creek Scam was operational in 2017, and the Ancient Oaks Scam was operational in 2018. McHugh was then solicited to participate in multiple additional SCE Scams after 2018. The Sykes Defendants and the Nesmith Rogers Defendants are still, to this day, soliciting victim participation in SCE Scams, even after their past-referred SCE projects have been challenged and or disallowed by the IRS.

766. Each Defendant engaged in at least two acts of racketeering activity in furtherance of the incidents, schemes, and transactions that have the same or similar intents, results, accomplices, victims, and methods of commission. These acts of racketeering activity are not isolated events but, rather, are identical actions take in furtherance of identical SCE Scams.

00470619

767. Georgia law defines racketeering activity as committing, or attempting to commit, or to solicit, coerce, or intimidate another person to commit any crime which is chargeable by indictment under Georgia law. Case law makes clear that federal mail and wire fraud can serve as the predicate racketeering activity for RICO purposes.

768. The Defendants intended to commit wire and/or mail fraud in connection with the design, promotion, sale, and implementation of the SCE Scams because the IRS has made it clear to professional advisors, including the Defendants, that it intended to disallow any deductions for CE donations implemented in the manner the SCE Scams were implemented, as further set out in detail herein. Defendants' conduct was not consistent with ordinary lawful business practices because Defendants' conduct violated IRS guidance, federal law, and professional standards such as USPAP appraisal standards. Defendants' racketeering activity in designing, promoting, selling, and implementing the SCE Scams involved numerous false and misleading misrepresentations and omissions that amount to a scheme or artifice to defraud using the mail and wires.

769. The IRS has disallowed the charitable deductions at the partnership level and made clear its intent to also disallow the charitable contribution deductions at the individual level, assessing the Plaintiffs with back taxes,

interest, and penalties. Moreover, Plaintiffs have incurred and will continue to incur substantial amounts of accounting and legal fees in connection with the audits and tax court proceedings regarding their individual tax returns and their related partnership returns.

770. With respect to the activities alleged herein, the Defendants acted at all times with malice toward the Plaintiffs, intending to engage in the conduct complained of for the benefit of Defendants and their co-conspirators, and with knowledge that such conduct was unlawful. Such conduct was done with actionable wantonness and reckless disregard for the rights of the Plaintiffs, as well as the laws to which the Defendants and their co-conspirators are subject, the same amounting to actionable wantonness.

771. With respect to the activities alleged herein, each Defendant agreed to the operation of the transaction or artifice to deprive the Plaintiffs of property interests. In furtherance of these agreements, each of them also agreed to interfere with, obstruct, delay, or affect interstate commerce by attempting to obtain and/or actually obtaining property interests to which the Defendants were not entitled.

772. The numerous predicate acts of wire and/or mail fraud, in addition to other fraudulent acts, are part of separate fraudulent transactions by the Defendants and their co-conspirators, which are designed to defraud the

00470619

Plaintiffs of their money and property interests under false pretenses. As victims of these unlawful patterns of illegal activity, Plaintiffs have and continue to suffer losses in Georgia, as a result of these activities. The acts that caused injuries to the Plaintiffs were performed for financial gain.

773. In carrying out the overt acts and fraudulent transactions described above, the Defendants and their co-conspirators engaged in, inter alia, conduct in violation of federal laws, including 18 U.S.C. §1343-1346, and 18 U.S.C. §1961 et seq. See also O.C.G.A. §16-4-3(5)(C).

774. Section 1961(1) of the federal RICO law provides that "racketeering activity" means any act indictable under any of the following provisions of Title 18, United States Code: 1341 (relating to mail fraud), 1343 (relating to wire fraud), and 1346 (relating to scheme or artifice to defraud).

775. Section 16-4-3(5)(C) of Georgia law provides that "racketeering activity" means, inter alia, "any conduct defined as 'racketeering activity' under 18 U.S.C. Section 1961(1).

### i.     Violations of 18 U.S.C. §1341 and 1343.

776. Plaintiffs repeat and reallege each and every prior allegation in this Complaint as if fully set forth herein.

777. For the purpose of executing and/or attempting to execute their transaction to defraud and to obtain money by means of false pretenses,

200

representations or promises, the Defendants and their co-conspirators, in violation of 18 U.S.C. §§1341 and 1343, transmitted and received by wire and/or mail matter and things therefrom, including but not limited to, contracts, instructions, correspondence, and other transmittals.

778. The Defendants' and their co-conspirators' violations of 18 U.S.C. §§1341 and 1343 are too numerous to list exhaustively. By way of illustration but not limitation, however, the Plaintiffs provide the following representative examples of predicate acts related to these 18 U.S.C. §§1341 and 1343 violations:

   a.   November 18, 2016 emails between the Sykes Defendants, Nesmith Rogers Defendants, and Plaintiffs, soliciting and acquiring Plaintiffs' participation in the Muskogee Scam. These emails purport to engage Plaintiffs' participation in a valid, Code-compliant easement transaction, even though the senders knew this to be false. In particular, one such email contains a confidential investor questionnaire and private placement memorandum, which contain multiple false statements about the legitimacy of the transactions and the Enterprise's strategy;

   b.   November 21, 2016 emails from the Sykes Defendants to Plaintiffs which provides Plaintiffs with a "tax plan" from his then-CPAs at

00470619

Sykes & Co. This email states, "All columns include a conservation easement investment of $210,000 which will correlate to an approximate charitable contribution deduction of $840,000;"

c.   November 23, 2016 emails by the Nesmith Rogers Defendants which confirm their receipt of the cash contribution raised from McHugh by fraudulent representations and material factual omissions;

d.   November 30, 2016 and December 3, 2016 emails from the Sykes Defendants to McHugh, wherein they falsely and fraudulently disparage the work of their legitimate and sterling competitors at Wegner CPAs, for the purposes of obtaining McHugh's future business;

e.   January 20, 2017 emails from Josh Stanley and Brian Sullivan, which attempted to downplay the seriousness and high risk posed to victims by IRS Notice 2017-10. This email, among other things, falsely stated: "we remain confident our project valuations are not over-exaggerated and will withstand IRS scrutiny";

f.   January 27, 2017 emails from Lisa Cantrell, Nancy Zak, and Green Earth Reserve, which falsely stated that the majority of the votes cast by the victims was to encumber the land with a

202

conservation easement. This email falsely states that Dennis Benson's fraudulent Muskogee appraisal served as a Qualified Appraisal by a Qualified Appraiser which must be attached to Plaintiffs' taxes;

g.   March 28, 2017 emails from Nancy Zak, Lisa Cantrell, and Green Earth Reserve, which also sought to downplay the seriousness of IRS Notice 2017-10. This email stated in part that "Counsel, [presumably the fraud Joseph Skalski] has advised that the filing of [the Form 8886] should not significantly change the risk profile of your investment;"

h.   April 12, 2017 emails from Josh Stanley and Green Earth Reserve, which informed victims of a delay in the K-1s. Stanley stated, "we should have the draft K-1s ready for you next week. For purposes of estimating 2017 tax payments, our suggestion is to estimate your deduction at 4.5 times the amount of your investment." This email also falsely stated: "we are working with tax counsel and our CPA's to determine the language to assure compliance with the regulations of Notice 2017-10;"

i.   April 13, 2017 emails from Kimberly Skalski and Kimberly A Skalski CPA PLLC, which contained fraudulent K-1s;

00470619

j.  June 15, 2017 emails from Lisa Cantrell, Nancy Zak, and Forever Forests, suggesting victims wait until the deadline to file their Form 8886s with the Enterprise's drafted language;

k.  June 30, 2017 emails from Josh Stanley and Forever Forests, which stated that the Enterprise's lobbying efforts would likely result in the elimination of IRS Notice 2017-10 and, again, recommended that victims delay filing of the Form 8886 until the deadline, and suggested that victims use the Enterprise's drafted language;

l.  August 5, 2017 emails from Kimberly Skalski and Kimberly Skalski CPA, PLLC, which provided McHugh with a fraudulent K-1;

m.  August 14, 107 emails from Lisa Cantrell, which provided McHugh with incomplete and fraudulent Form 8918s that failed to disclose all of the material advisors to the transaction who were required to be disclosed;

n.  September 28, 2017 emails from Josh Stanley and Forever Forests, which reversed the Enterprise's prior advice about using the Enterprise's language on the Form 8886. This email demanded, in bold, that victims must consult with their own financial advisors

204

to modify the Form 8886 and gave them only one business day to do so. This email contained the Enterprise's incomplete and fraudulent Form 8886 draft, which reflected improper tax deductions and falsely stated that Dennis Benson was a Qualified Appraiser issuing a Qualified Appraisal;

o.     November 7, 2017 emails from the Nesmith Rogers Defendants, which solicited McHugh's participation in the Walnut Creek Scam. Specifically, this email contained a subscription agreement and wiring instructions for the victim's funds. This email crucially failed to include a PPM which would have described the details of the Scam. The Nesmith Rogers Defendants fraudulently omitted this document to conceal the true nature of the Scam;

p.     November 30, 2017 subscription acceptance document from Nancy Zak;

q.     December 11, 2017 emails from Josh Stanley and Green Earth Reserve, which included a ballot for a sham vote and instructed victims that Manager T.J. Heath recommended that victims vote for the so-called "conservation option." Victims were not informed that Heath owned the very land he was recommending they "donate" a CE on, nor were they informed about the Nesmith

205

Rogers Defendants' personal financial interests in Green Earth Reserve;

r.    January 25, 2018 emails from the Nesmith Rogers Defendants, which thanks investors for investing in the Walnut Creek Scam. The Nesmith Rogers Defendants falsely stated that the Walnut Creek Land "has been placed under conservation easement." The email goes on to inform victims that the fraudulent documents prepared by the Enterprise's CPAs and attorneys must be attached to the victims' tax returns. Again, the Nesmith Rogers Defendants failed to inform the victims of their own personal financial interests in Green Earth Reserve;

s.    May 18 and 29, 2017 emails from Kimberly Skalski, which included her fraudulent K-1s and instructed the victims to file her fraudulent K-1 alongside their tax returns;

t.    August 27, 2018 emails from the Nesmith Rogers Defendants, announcing the Little Ocmulgee Scam. This document states in pertinent part: "This is a $1.2 million project that once voted into conservation is expected to have a 4.6 to 1 deduction." This email was designed to lure victims into "investing" into the SCE Scams offered by Green Earth Reserve, owned by the Nesmith Rogers

Defendants and their longtime friend, the prolific fraudster Nancy Zak;

u.  December 2018 ballots purporting to entitle victims to vote for whether to develop or conserve the Little Ocmulgee land. Of course, the vote was a total façade as proven by the Nesmith Rogers' August 27, 2018 email, which stated, "once [the Little Ocmulgee Scam is] voted into conservation is expected to have a 4.6 to 1 deduction." This communication was designed to provide a veneer of legitimacy to the scheme, dupe Victims into believing they were participating in a legitimate transaction, and evade detection of the scheme;

v.  June 14, 2019 emails from Kimberly Skalski, containing her fraudulent K-1 and instructing victims to attach it to their tax returns. This communication also contained a fraudulent Form 8886 drafted by the Accounting Services Defendants and others;

w.  November 13, 2019 emails from Marcus Rogers, attempting to downplay concerns raised by McHugh about the propriety of the Enterprise's transactions;

x.   All K-1s prepared by the Accounting Services Defendants for members of any SCE Scam, sponsored or managed by the Enterprise or any of its affiliates;

y.   All Appraisals prepared by any of the Appraiser Defendants on property owned by any SCE Scam Syndicate, sponsored or managed by the Enterprise or any of its affiliates and sent by emails or mail to any potential or actual member of the Syndicates;

z.   All Legal Opinions prepared by the Legal Services Defendants to any potential or actual members in any SCE Scam Syndicate, sponsored or managed by the Enterprise or any of its affiliates;

aa.   All Form 8283s prepared by the Zak Defendants, Accounting Services Defendants, Legal Services Defendants, and Appraiser Defendants;

bb.   All template Form 8886s and Form 8886s sent by email from the Zak Defendants to any member of any SCE Scam Syndicate, sponsored or managed by the Enterprise or any of its affiliates;

cc.   All ballots which purport to entitle the Scam Syndicate victims the ability to "vote" for their desired outcome for the subject land;

dd.   All Baseline Documentation Reports prepared by the Appraiser Defendants and ACC Defendants;

208

ee.   All Contemporaneous Written Acknowledgments prepared by the ACC Defendants;

ff.   All Deeds of Conservation Easement prepared by the Legal Services Defendants, Zak Defendants, and ACC Defendants;

gg.   All Private Placement Memorandums either to or withheld from the victims of the Scams by the Legal Services Defendants and the Nesmith Rogers Defendants;

hh.   All K-1s prepared by Kimberly Skalski and sent to unwitting victims through the mail and wires;

ii.   All other mailed or emailed communications between any of the Defendants and any potential or actual member of any SCE Scam, sponsored or managed by the Enterprise or any of its affiliates regarding the promotion or implementation of the SCE Scams; and

jj.   All other mailed or emailed communications between any of the Defendants and any potential or actual member of any SCE Scam, sponsored or managed by the Enterprise or any of its affiliates regarding the audit of any such SCE Scams.

### ii.   Other Predicate RICO Acts.

779. Plaintiffs repeat, reallege and incorporate every prior allegation in the preceding paragraphs as if fully set forth herein.

00470619

780. The Defendants and their co-conspirators committed several other acts in furtherance of the RICO Enterprise's successful operation and to conceal the existence of the RICO Enterprise. These violations are too numerous to count. By way of illustration but not limitation, however, the Plaintiffs provide the following as additional predicate acts:

a. The Nesmith Rogers Defendants, the Sykes Defendants, the Zak Defendants, Joseph Skalski, Dolph Winders, FisherBroyles, and others violated Chapter 5 of Article 10 of the Georgia Uniform Securities Act of 2008.

b. These above-listed Defendants are persons that advise others for compensation, either directly or indirectly, or through publications or writings, as to the value of securities or the advisability of investing in, purchasing, or selling securities or that, for compensation and as part of a regular business, issues or promulgates analyses or reports relating to securities. In doing so, these Defendants employed a device, scheme, or artifice to defraud another person, and engaged in an act, practice, and course or business that operates or would operate as a fraud or deceit upon another person, like the Plaintiffs.

210

00470619

c.  All Defendants also violated Georgia Code §16-8-3 by committing theft by deception. To wit, all Defendants obtained Plaintiffs' property by deceitful means or artful practices with the intention of depriving the Plaintiffs of the property. Defendants acted intentionally because they created or confirmed Plaintiffs' impression of an existing fact or past event which is false and which the accused knows or believes to be false; failed to correct a false impression of an existing fact or past event which they have previously created or confirmed; prevented another from acquiring information pertinent to the disposition of the property involved; and promised performance of services which Defendants did not intend to perform or knew would not be performed.

d.  Joseph Skalski and Ernest Nesmith made false material statements of fact to IRS Revenue Agent Chris Young in violation of countless federal and state laws.

e.  Nancy Zak is currently committing a cornucopia of federal offenses by organizing, promoting, selling, and facilitating SCE Scams that involve a deduction for a qualified conservation contribution under 26 U.S.C. §170(h); making or furnishing statements about the allowance of federal tax benefits as a result of participating in a

211

CE syndicate or any other plan or arrangement that involves a deduction for a qualified conservation contribution under 26 U.S.C. §170(h), which she knows to be false; and more in violation of her permanent civil injunction. See *United States v. Nancy Zak*, 1:18-cv-05774-AT, Doc. 226.

### D.    Defendants' RICO Violations Caused Injury to Plaintiffs.

781. Plaintiffs repeat, reallege and incorporate every prior allegation in the preceding paragraphs as if fully set forth herein.

782. The Defendants, who are employed by and/or associated with and a part of the Enterprise, conduct the Enterprise's affairs through racketeering, as set forth in this Complaint. Through the fraudulent and wrongful conduct described in this Complaint, Defendants sought to obtain financial gain by depriving the Plaintiffs of money and property rights. In order to successfully execute their scheme, in the manner set forth in this Complaint, Defendants needed a system that allowed Defendants to access their victims in a manner to effectuate the fraudulent transactions. The Enterprise allowed the Defendants this access.

783. With respect to the activities alleged herein, the Defendants have acted at all times with malice toward the Plaintiffs in their efforts to acquire and maintain an interest in an Enterprise that affects interstate commerce.

00470619

784. In carrying out the overt acts and fraudulent scheme described above, the Defendants have engaged in conduct in violation of Georgia law and federal law as set forth more fully herein.

785. Therefore, Defendants have each engaged in "racketeering activity" as set out in Section 16-14-3(5)(C) of the Georgia RICO Act.

786. As a proximate result of Defendants' unlawful pattern of illegal fraudulent conduct as described above, Plaintiffs have been injured in their business or property in Georgia, as described herein.

787. The collective fraud of these various professionals was designed to induce reliance and cause victims like McHugh to unknowingly claim inflated and improper tax deductions arising from their participation in the SCE Scams.

788. Defendants' overt and/or predicate acts, in furtherance of the conspiracy and/or aiding and abetting, based on the unlawful acts alleged herein and incorporated by reference, resulted in, or proximately caused and continues to directly cause, injury to the Plaintiffs' business or property in Georgia, or irreparably harmed and continues to harm the Plaintiffs in Georgia.

789. The acts that caused injuries to the Plaintiffs were performed by the Defendants for their own financial gain.

00470619

790. Plaintiffs did not discover the wrongful acts of the Defendants, or the injuries caused by the wrongful acts of the Defendants alleged herein, until shortly before the filing of this lawsuit.

## COUNT TWO

### CONSPIRACY TO VIOLATE GEORGIA RICO (O.C.G.A. §16-14-4(c)) (By all Plaintiffs Against all Defendants)

791. Plaintiffs repeat, reallege and incorporate every prior allegation in the preceding paragraphs as if fully set forth herein.

792. This claim for relief arises under and seeks relief from the Defendants' activities described herein as part of their conspiracy to violate O.C.G.A. §§16-14- 4(a) and (b).

793. Plaintiffs incorporate, as if fully set forth herein, their allegations regarding the Enterprise.

794. Plaintiffs incorporate, as if fully set forth herein, their allegations that Defendants have engaged in a pattern of racketeering activity.

795. Absent Defendants' conspiracy and joint efforts, the Defendants' scheme would not be successful. Acting jointly with their co-conspirators, Defendants possessed greater power, were able to exert greater influence, were able to successfully engage in the activities set forth herein, and had greater ability to conceal their activities.

00470619

796. The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the Enterprise through racketeering activity.

797. Defendants, and their employees and multiple agents, have been joined in the conspiracies to violate O.C.G.A. §§16-14-4(a) and (b) by various third parties not named as Defendants herein, such as the Other Participants.

798. As demonstrated in detail above, the Defendants and their co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including systemic fraudulent practices designed to defraud the Plaintiffs of money and other property interests.

799. The nature of the above-described acts, material misrepresentations, and omissions, in furtherance of the conspiracy, give rise to an inference that Defendants not only agreed to the objective of conspiring to violate the Georgia racketeering statute, but they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

800. The Defendants have sought to and have engaged in the commission of and continue to commit overt acts and unlawful racketeering predicate acts that have generated and continue to generate income or proceeds received by

Defendants from such pattern of racketeering activity, including acts that involve a scheme or artifice to defraud, as set forth more fully above.

801. As a proximate result of Defendants' conduct, as described above, the Plaintiffs have been injured in their business or property in Georgia.

## COUNT THREE

### FRAUD
### (By all Plaintiffs Against all Defendants)

802. Plaintiffs repeat, reallege, and incorporate every prior allegation in the preceding paragraphs as if fully set forth herein.

803. To induce Plaintiffs to participate in the SCE Scam and pay substantial fees and other monies to the Defendants, the Defendants directly and indirectly made numerous knowingly false affirmative misrepresentations and intentional omissions of material fact to Plaintiffs, as set forth above, and including the following:

    a.    Misstating, in light of published authorities, the tax treatment Plaintiffs would receive from the purported charitable contribution made for tax purposes by each Syndicate in the SCE Scam;

    b.    Advising the Plaintiffs that the donation of the CE is fully tax deductible as a qualified charitable contribution deduction;

216

c.   Advising the Plaintiffs that the syndicates contributed a qualified real property interest, as required to be a valid "qualified conservation contribution";

d.   Failing to advise the Plaintiffs that the alleged value of the CE, and associated tax benefits in the SCE Scam, constituted a gross valuation overstatement, thus subjecting Plaintiffs to penalties;

e.   Advising the Plaintiffs that the appraisal commissioned by the Defendants relied on appropriate assumptions, data, and methodology;

f.   Failing to advise the Plaintiffs that the appraisal commissioned by the Defendants relied on inappropriate assumptions, data, and methodology;

g.   Advising the Plaintiffs that the appraisal commissioned by the Defendants complied with §170 of the Code, applicable regulations thereunder, the USPAP, and with general and substantive real property appraisal standards and practices;

h.   Failing to advise the Plaintiffs that the appraisal commissioned by the Defendants did not comply with §170 of the Code and regulations thereunder, the USPAP, and with general and substantive real property appraisal standards and practices;

217

i.  Advising the Plaintiffs that the appraisal commissioned by the Defendants provided accurate valuation statements, including the FMV of the CE;

j.  Providing false valuation statements to the Plaintiffs, including the FMV of the land and, accordingly, the FMV of the CE;

k.  Failing to advise the Plaintiffs that the Syndicate did not donate a "qualified real property interest" because the property that was the subject of the CE could be modified;

l.  Failing to advise the Plaintiffs that the Syndicates retained or reserved rights to the property that were inconsistent with the conservation purposes of the CE;

m.  Failing to advise the Plaintiffs that Benson and Kenny were not "qualified appraisers" and did not prepare "qualified appraisals" as required by the Code and Regulations thereunder;

n.  Advising the Plaintiffs that the Syndicates donated a "qualified real property interest";

o.  Advising the Plaintiffs that the SCE Appraisers were "qualified appraisers" and prepared "qualified appraisals" as required by the Code and Regulations thereunder;

218

p.    Failing to advise the Plaintiffs that the SCE Appraisers relied upon inappropriate assumptions, utilized inappropriate methodology, and used various techniques to improperly inflate the value of the CEs;

q.    Failing to advise the Plaintiffs that the SCE Appraisers incorrectly reached unsupportable and/or predetermined HBU conclusions;

r.    Failing to advise the Plaintiffs that the SCE Appraisers arrived at the fabricated and unsupportable HBUs by ignoring local zoning rules and other legal restrictions on purported developments, physical and financial feasibility, market conditions, and market data;

s.    Failing to advise the Plaintiffs that the SCE Appraisers failed to employ recent, local, or similar sales that competed with the subject property or would have been considered "substitutes" for the subject property by potential buyers when employing the "comparable sales method";

t.    Advising the Plaintiffs that the Appraisals conformed with USPAP;

219

u.      Advising the Plaintiffs that the Appraisals complied with the Code
        and Regulations thereunder for valuing CEs and preparing
        qualified appraisals;

v.      Failing to advise the Plaintiffs that the Appraisals failed to comply
        with the Code and Regulations thereunder for valuing CEs and
        preparing qualified appraisals;

w.      Advising the Plaintiffs that the charitable deduction was based on
        the FMV of the conservation easement;

x.      Failing to advise the Plaintiffs that the charitable deduction was
        not based on the FMV of the conservation easement;

y.      Advising the Plaintiffs that the property has specific conservation
        values that satisfy the Code;

z.      Failing to advise the Plaintiffs that the property did not have
        specific conservation values that satisfy the Code;

aa.     Advising the Plaintiffs that the CE restrictions complied with the
        Code requirement that they must be perpetual;

bb.     Failing to advise the Plaintiffs that the CE restrictions did not
        comply with the Code requirement that they must be perpetual;

220

00470619

cc.   Advising the Plaintiffs that the CE met the requirement that it was exclusively for conservation purposes in perpetuity and met at least one of the conservation purposes set out in §170 of the Code;

dd.   Failing to advise the Plaintiffs that the CE did not accomplish any of the permissible conservation purposes set out in §170 of the Code and permitted destruction of other significant conservation easements and, as a result, did not meet the requirement that the CE be exclusively for conservation purposes in perpetuity and meet at least one of the conservation purposes set out in §170 of the Code;

ee.   Advising the Plaintiffs that the "after easement" analysis met Treasury Regulations establishing the standards for the valuation of CEs, when in fact it did not because it (a) used an incorrect and unsupportable HBU conclusion; (b) failed to employ recent, local and similar sales; (c) lacked objectivity and appropriate analysis of after easement sales; (d) lacked consideration of easement sales; and (e) advocated a loss in value due to lost development rights when the market data indicates there is no market for the residential development;

ff.    Failing to advise the Plaintiffs that the "before" value is hypothetical and unreasonable, and is not a true estimate of the FMV of the land;

gg.    Advising the Plaintiffs that the value of the CE and, thus, the charitable contribution deduction, was proper;

hh.    Failing to advise the Plaintiffs that the fabricated HBU was not financially feasible and, therefore, improper;

ii.    Advising the Plaintiffs that the CE substantiated a valid conservation purpose;

jj.    Advising the Plaintiffs that the BDR supported a valid conservation purpose on the property;

kk.    Failing to advise the Plaintiffs that the BDR did not support a valid conservation purpose on the property;

ll.    Advising the Plaintiffs that the Deed of Conservation protected the land in perpetuity and, therefore, qualified for a federal charitable deduction;

mm.    Failing to advise the Plaintiffs that the Deed of Conservation did not protect the land in perpetuity and, therefore, did not qualify for a federal charitable deduction;

222

nn.   Advising the Plaintiffs that the Deed of Conservation permits activity that is consistent with a valid conservation purpose, including preserving habitat and open space;

oo.   Advising the Plaintiffs to report the charitable contribution deduction on their individual tax returns;

pp.   Advising the Plaintiffs that the K-1, reporting the charitable contribution deduction allocated to each Plaintiff, was proper and accurate and should be used to report the deduction on their individual return;

qq.   Failing to advise the Plaintiffs that the K-1, reporting the charitable contribution deduction allocated to each Plaintiff, was not accurate and should not be relied upon in reporting the charitable contribution deduction on their individual tax return;

rr.   Preparing and signing the Syndicate's tax return and individual investors' K-1s, reporting the charitable contribution deduction based on the fraudulent FMV of the CE, as determined in the appraisal;

ss.   Making and endorsing the statements and representations contained in the Defendants' and the Other Participants' written advice, instructions, and recommendations; and

223

tt.  Failing to advise the Plaintiffs that each of the Defendants and the Other Participants were not "independent" of one another and, in fact, were involved in a conspiracy to design, market, sell, and implement the SCE Scams.

804. The above affirmative misrepresentations and/or intentional omissions of material fact were false when made, and the Defendants knew them to be false when made, with the intention that the Plaintiffs rely upon them to engage the SCE Scams, pay substantial funds to participate in the SCE Scams, and pay substantial fees to the Defendants. In addition, the above affirmative misrepresentations and/or intentional omissions of material fact were committed knowingly by the Defendants with the intent to induce the Plaintiffs to engage in the SCE Scams, pay substantial funds to participate in the SCE Scams, and pay substantial fees to the Defendants.

805. In reasonable reliance on the Defendants' false affirmative misrepresentations and intentional omissions of material facts regarding the SCE Scams, the Plaintiffs engaged in the SCE Scams, paid substantial sums to participate in the SCE Scams, paid substantial fees to the Defendants, lost the tax savings that could have been provided had the SCE been properly structured and implemented in compliance with Section 170(h) of the Code,

00470619

and filed federal and state tax returns that reflected charitable contribution deductions in connection with the SCE Scams.

806. But for Defendants' intentional misrepresentations and material omissions described above, the Plaintiffs would not have hired Defendants for advice and services, engaged in the SCE Scams, paid substantial sums to participate in the SCE Scams, paid substantial fees to the Defendants in connection with the SCE Scams, signed and filed federal and state tax returns that reported charitable contribution deductions in connection with the SCE Scams, failed to file a qualified amended return, and incurred professional fees and expenses in connection with the IRS and Tax Court disputes.

807. As a direct and proximate result of Defendants' conduct, set forth herein, the Plaintiffs have suffered injury in that they (1) paid substantial funds to participate in the SCE Scams, (2) paid significant fees to the Defendants, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (4) lost the tax savings that could have been provided had the SCE been properly structured and implemented in compliance with Section 170(h) of the Code; and (5) incurred professional fees and expenses in connection with the IRS and Tax Court disputes.

808. As a proximate cause of the foregoing injuries, the Plaintiffs have been injured in an actual amount to be proven at trial, but in the millions of

dollars, and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## COUNT FOUR

### CIVIL CONSPIRACY
### (By all Plaintiffs Against all Defendants)

809. Plaintiffs repeat, reallege and incorporate every prior allegation in the preceding paragraphs as if fully set forth herein.

810. As described more fully above, the Defendants knowingly acted in concert to design, market, sell, and implement the SCE Scams. In furtherance of their conspiracy, the Defendants conspired to perpetrate fraud on the Plaintiffs and to breach fiduciary duties owed to the Plaintiffs. In doing so, the Defendants acted with full knowledge and awareness that the transactions were designed to give the false impression that a complex series of financial transactions were legitimate business transactions, when the transactions in fact lacked those features that were necessary for a legitimate CE charitable contribution deduction.

811. The Defendants acted in the respective roles, as described above, according to a predetermined and commonly understood and accepted plan of action to perpetrate fraud on the Plaintiffs and to breach fiduciary duties owed to the Plaintiffs, all for the purpose of convincing the Plaintiffs to participate

226

in the SCE Scams and pay substantial fees. The Defendants authorized, ratified, and/or affirmed the fraudulent misrepresentations and omissions of material fact that each Defendant made to the Plaintiffs.

812. The acts of the Defendants and the Other Participants were contrary to numerous provisions of law, as stated above, and constitute a conspiracy to perpetrate fraud on Plaintiffs and a conspiracy to breach fiduciary duties owed to Plaintiffs.

813. There was a meeting of the minds between and among the Defendants to commit the unlawful acts alleged herein, including a conspiracy to perpetrate fraud on and to breach fiduciary duties owed to the Plaintiffs. The conspiracy to commit these unlawful and fraudulent acts proximately caused and continues to cause damages to the Plaintiffs, as previously set forth herein. This is demonstrated by the deep and long running ties between the various Defendants, as described throughout this Complaint.

814. As a direct and proximate result of Defendants' conduct set forth herein, the Plaintiffs have suffered injury in that they (1) paid substantial sums to participate in the SCE Scams, (2) paid significant fees to the Defendants, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (4) lost the tax savings that could have been provided had the SCE been properly structured and implemented in

00470619

compliance with Section 170(h) of the Code; and (5) have and will continue to incur substantial additional costs to rectify the situation.

815. The Plaintiffs have been injured in an actual amount to be proven at trial, but in the millions of dollars, and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## COUNT FIVE

### NEGLIGENCE AND NEGLIGENCE PER SE
#### (By all Plaintiffs Against all Defendants)

816. Plaintiffs repeat, reallege and incorporate every prior allegation in the preceding paragraphs as if fully set forth herein.

817. Every one of the Defendants held themselves out as independent legitimate professionals. Many of them solicited victim participation in the SCE Scams by telling victims that they intended to create a valid CE to protect land in perpetuity and generate a Code-compliant tax deduction.

818. Each one of the Defendants owed the Plaintiffs a duty of care to act as a similar person would under similar circumstances.

819. Defendants breached their duties of care by participating in a fraudulent RICO Enterprise that is designed to promote what Defendants

00470619

knew to be illicit and unlawful scams, rather than legitimate conservation and professional work.

820. In any event, regardless of privity, the Plaintiffs are foreseeable persons for whom the Defendants' services and information was intended, either directly or indirectly, and thus a duty was owed by each of the Defendants to each of the Plaintiffs.

821. The Defendants failed to meet their applicable standards of care.

822. The Defendants' failures to meet the applicable standards of care constitute negligence.

823. The Defendants' actions rise to the level of gross negligence.

824. The Plaintiffs seek punitive/exemplary damages against the Defendants, jointly and severally.

825. The Defendants' negligence/gross negligence was a proximate cause of the Plaintiffs' damages. In reasonable reliance of the Defendants' advice, verbal statements, and written statements, Plaintiffs (1) paid substantial funds to participate in the SCE Scam; (2) paid significant fees to the Defendants; (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and penalties; (4) lost the tax savings that could have been provided had a SCE been properly structured and implemented in compliance

with Section 170(h) of the Code; and (5) have incurred and will continue to incur substantial additional costs to rectify the situation.

826. But for the Defendants' negligence/gross negligence, the Plaintiffs would not have engaged in the SCE Scams, paid substantial sums of money to participate in the SCE Scams, paid substantial fees in connection with the SCE Scams, filed and signed federal and state tax returns that reported charitable contribution deductions in connection with the SCE Scams, failed to avail themselves of other legitimate tax savings opportunities, failed to file qualified amended returns earlier, and spent substantial funds in connection with the IRS audits and Tax Court proceedings.

827. As a result of the Defendants' negligence/gross negligence, the Plaintiffs have incurred substantial additional costs in hiring new tax and legal advisors to rectify the hazardous situation caused by Defendants.

828. Due to the foregoing, the Plaintiffs should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

00470619

## COUNT SIX

### NEGLIGENT MISREPRESENTATION
### (By all Plaintiffs Against all Defendants)

829. Plaintiffs repeat, reallege and incorporate each and every prior allegation in the preceding paragraphs as if fully set forth herein.

830. During the course of their representation of and services to the Plaintiffs, the Defendants each negligently made affirmative representations, including those misrepresentations and omissions detailed in the Fraud Claim (above), that were incorrect, improper, or false; negligently made misleading omissions of material fact; and negligently gave improper, inaccurate, and wrong recommendations, advice, instructions, and opinions to the Plaintiffs. In addition, each Defendant is liable for each negligent misrepresentation and omission made by each of their co-conspirators.

831. The Defendants knew that their representations, recommendations, advice, and instructions were improper, inaccurate, or wrong. The Defendants knew that their failures to disclose material information to the Plaintiffs were improper and wrong and would mislead the Plaintiffs.

832. As advisors who provided services and advice to the Plaintiffs in connection with SCEs, the Defendants owed the Plaintiffs a duty to correctly state all facts regarding the SCE transactions. Regardless of privity, the

00470619

Plaintiffs are foreseeable persons for whom the services and information were intended, either directly or indirectly, and thus a duty was owed by each of the Defendants to each of the Plaintiffs.

833. The Plaintiffs reasonably relied upon the Defendants' misrepresentations and advice to their detriment.

834. The Defendants' (and their co-conspirators') negligent and grossly negligent misrepresentations were a proximate cause of the damages of the Plaintiffs. In reasonable reliance on Defendants' advice regarding the SCE Scams, the Plaintiffs: (1) paid substantial sums to participate in the SCE Scams; (2) paid substantial fees to the Defendants for professional advice and services; (3) lost the tax savings that could have been provided had the SCE been properly structured and implemented in compliance with Section 170(h) of the Code; (4) filed federal and state tax returns that reflected charitable contribution deductions in connection with the SCE Scams; (5) did not file a qualified amended return; and (6) spent substantial funds in connection with IRS audits and Tax Court proceedings.

835. The Defendants' conduct set forth herein proximately caused the Plaintiffs to suffer injury in that the Plaintiffs (1) paid substantial sums to participate in the SCE Scams, (2) paid significant fees to the Defendants for advice and services, (3) have been exposed to liability to the IRS for substantial

00470619

back-taxes, interest, and/or penalties, (4) lost the tax savings that could have been provided had the SCE been properly structured and implemented in compliance with Section 170(h) of the Code; and (5) have and will continue to incur substantial additional costs to rectify the situation.

836. Due to the foregoing, the Plaintiffs have been injured in an actual amount to be proven at trial, but in the millions of dollars, and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## COUNT SEVEN

### BREACH OF FIDUCIARY DUTY AND DISGORGEMENT
### (By All Plaintiffs Against All Defendants).

837. Plaintiffs repeat, reallege and incorporate each and every prior allegation in the preceding paragraphs as if fully set forth herein.

838. As professional advisors who provided services and advice to the Plaintiffs, the Professional Defendants (as defined in Count Five above) became fiduciaries of the Plaintiffs. The Plaintiffs placed their trust and confidence in these Defendants and these Defendants had influence and superiority over the Plaintiffs. Thus, these Defendants owed the Plaintiffs the duties of honesty, loyalty, care, and compliance with the applicable codes of professional responsibility. These Defendants breached these duties and

caused the Plaintiffs harm and injury, including but not limited to their failures to disclose their conflicts of interest.

839. The Professional Defendants' breaches were a proximate cause of damages to Plaintiffs. In reasonable reliance on these Defendants' advice regarding the SCE Scams, Plaintiffs: (1) paid substantial sums of money to participate in the SCE Scams; (2) paid fees to the Defendants for professional advice and services; (3) lost the tax savings that could have been provided had the SCE been properly structured and implemented in compliance with Section 170(h) of the Code; (4) filed federal and state tax returns that reflected charitable contribution deductions in connection with the SCE Scams; (5) failed to file a qualified amended return; and (6) spent substantial funds in connection with IRS audits and Tax Court proceedings.

840. The Professional Defendants' conduct set forth herein proximately and directly caused the Plaintiffs to suffer injury in that the Plaintiffs (1) paid substantial sums to participate in the SCE Scams, (2) paid significant fees to the Defendants for advice and services, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (4) lost the tax savings that could have been provided had the SCE been properly structured and implemented in compliance with Section 170(h) of the Code; and (5) have and will continue to incur substantial additional costs to rectify the situation.

234

841. Due to the foregoing, the Plaintiffs have been injured in an actual amount to be proven at trial, but in the millions of dollars, and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

842. Further, as a result of the Professional Defendants' breach of their fiduciary duties, including but not limited to their failures to disclose their conflicts of interest, they should be required to disgorge all payments received by them from any party, including Plaintiffs, any other Defendants, and/or any other co-conspirator for work performed in connection with the SCE Scams.

843. Accordingly, the Professional Defendants must disgorge all such payments in favor of the Plaintiffs in an amount to be proven at trial. In addition, Plaintiffs seek an award of attorneys' fees, interest, and costs.

## COUNT EIGHT

### VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULES 10b-5(1), (2), AND (3) PROMULGATED THEREUNDER
### (By All Plaintiffs Against All Defendants)

844. Plaintiffs repeat, reallege and incorporate every prior allegation in the preceding paragraphs as if fully set forth herein.

00470619

A. **Defendants' Materially False and Misleading Statements and Omissions and Other Acts in Furtherance of a Scheme to Defraud.**

845. As detailed herein, Defendants misrepresented and omitted material facts about the purported tax benefits of investing in the SCEs, the ability to realize those benefits, the historical investment performance, the true FMV of the properties that were to be encumbered, the kickbacks paid to promoters and purportedly neutral tax consultants, and a host of other things. In addition, each Defendant committed acts in furtherance of a scheme to defraud that encompassed conduct beyond the misrepresentations and omissions at issue here.

### i. The CPA Promoters.

846. Defendants Olin Sykes, Scotty Sykes, Ernest Nesmith, Marcus Rogers, and their respective businesses, were Plaintiffs' primary contacts prior to consummating their initial investment in the Muskogee SCE on November 21, 2017.

847. In 2016, Kyle McHugh attended a conference hosted by National Community Pharmacists Association where each of the CPA Promoters were featured speakers. As discussed in detail above, each of these promoter Defendants disseminated false material information regarding the purported tax benefits and the claimed 4:1 return on investment by either making the

236

false statement themselves or failing to correct when they had an obligation to do so. Moreover, each of these Defendants failed to disclose the actual compensation each would receive from the investment.

848. In particular, Nesmith and Rogers failed to disclose the kickback payments these self-dealing promoters would receive from payments funneled to them through Green Earth Reserve, which each of these Defendants owned together with the prolific fraud Nancy Zak. Further, none of these Defendants explained the risks the investors would be taking if the IRS disqualified the charitable contribution. These risks included the imposition of stiff penalties and interest, including the gross valuation misstatement penalty under I.R.C. §6662(h) and the penalty for a reportable transaction understatement under I.R.C. §6662A.

849. The purported tax benefits were non-existent and the claimed 4:1 investment return was a mathematical impossibility. The investment scheme expressly contemplated the sale of shares of a security at prices greatly in excess of the pro rata FMB of the non-income producing property that was to be encumbered by the CE. This additional premium above the current FMV of the property was used to pay professional fees and make donations to LLCs that were supposedly necessary to ensure the investor could make a qualified charitable contribution.

237

850. In reality, these payments were a deadweight loss to the investors which simply diminished the values of the shares by the exact amount of these payments. Because the amount of any qualified deduction was limited to the FMV of the property encumbered, the investors could never achieve the promised 4:1 investment return. Indeed, the investors were actually destined to lose money on the investment, and once the property became encumbered, they would lose all their money and would be potentially subject to stiff penalties and interest to boot. The claimed 4:1 investment return was, therefore, mathematically impossible and a smoke-and-mirrors illusion.

851. At all relevant times, each of these four CPA Promoters represented the 4:1 investment return as a statement of present fact based on the current Internal Revenue Code and implementing regulations, rather than a projection of future economic performance. Moreover, the claimed 4:1 investment return was accompanied by misrepresentations of present fact regarding the historical investment performance and the alleged safety of the investments. At no relevant time were the risks the investor would be taking or the penalties that could be imposed carefully and accurately explained to the investors. Moreover, the promised 4:1 investment return was based an inadequate consideration of the available data and an unsound and fatally flawed

00470619

methodology and was not accompanied by any substantive and tailored cautionary statements.

852. At all relevant times, including the aforementioned October 2016 conference, each of these CPA Promoters held themselves out as competent and licensed tax professionals with the required background, training, and experience to render competent advice regarding the tax treatment and benefits of the conservation easements they were promoting.

853. After the presentation, these promoter Defendants solicited private questions and comments from the audience. Curious about the purported tax benefits provided by syndicated conservation easements, as falsely described by the promoter Defendants, Kyle McHugh approached Ernest Nesmith with questions about the propriety and practicality of participating in a SCE syndication.

854. Nesmith assured McHugh that SCEs were a remarkable tax savings strategy that were both legal and safe investments. Nesmith told McHugh that the SCE's offered by these Defendants consistently yielded a 4:1 return on investment. Each of these statements was false.

855. The SCEs these Defendants offered could never have legally yielded a 4:1 investment return for any investor, much less consistently done so for all the reason cited above. Indeed, because the shares were sold at prices greater

00470619

than the FMV of the property to be encumbered, the investor, losing money on the investment was a mathematical certainty. Accordingly, Nesmith must have misrepresented the historical performance of the investments.

856. Further, the investments could hardly be described as safe in any non-fanciful sense of that term. The IRS has consistently disallowed CE deductions in excess of the FMV of the property encumbered. Nesmith not only failed to mention this fact but failed to explain the stiff penalties and interest the investor would be facing if the IRS disallowed the charitable contribution deduction. Indeed, the investments were far from safe as Nesmith represented. Accordingly, Nesmith omitted key information regarding the IRS's prior tax treatment of the CE deductions as well as the potential penalties the investor would be facing in the event of disallowance of the deductions. Any reasonable investor would have included the true information into the mix of information to consider prior to making the decision to invest.

857. In addition, Nesmith failed to disclose the kickbacks this self-dealing promoter would receive by virtue of payments or "donations" funneled to him through Green Earth Reserve, which Nesmith owned together with confederates and co-conspirators Rogers and Zak. The Muskogee CapCo would later pay Green Earth Reserve, LLC a $365,000 "donation" out of approximately $2.45M the CapCo would raise from investors. As explained

240

above, the sole asset of the CapCo was property valued at less than $800,000 based on its most recent sale price. Nesmith also never disclosed that the Muskogee CapCo itself was 100 percent owned by Green Earth Reserves at the time the shares of this CapCo were sold to the investors.

858. On November 21, 2016, and immediately prior to consummating the sale of shares in the Muskogee SCE, Scotty Sykes emailed McHugh on behalf of Sykes & Co., sending him a preliminary tax plan. Of note here, the Sykes & Co.'s plan included a $210,000 conservation easement "investment" which CPA Sykes told McHugh "will correlate to an approximate charitable contribution deduction of $840,000."

859. The claimed 4:1 investment return was a false material statement and mathematically impossible as explained above. The claimed investment return was not based on a projection of future economic performance, or indeed, any projection. Further, the statement was based on an inadequate consideration of the available data and on an unsound and fatally flawed methodology. In addition, the statement was not accompanied by a substantive and tailored cautionary statement and was accompanied by a misrepresentation of past historical performance. Finally, the statement had no reasonable basis and could not have been believed by anyone with the

background and experience of Sykes, who at all events held himself out to be an expert tax consultant.

860. At all relevant times, Olin Sykes and Scotty Sykes were acting in their official capacities as partners of Sykes & Company, P.A. At all relevant times, Ernest Nesmith and Marcus Rogers were acting in their official capacity as partners of Nesmith Rogers Financial Consulting and in undisclosed capacity as owners of Green Earth Reserves, LLC.

> ii.   **Joseph Skalski, Kimberly Skalski, Josh Stanley, Lisa Cantrell, Lamb & Braswell, and FisherBroyles.**

861. Each of these tax Defendants prepared, executed, or disseminated false or fraudulent Form K-1s, Form 886s, or Form 8283s which were sent to Plaintiffs as part of package with instructions to execute the Form 8886s and include information contained therein on their tax return.

862. The K-1s and 8886s contained the following material affirmative misrepresentation or omissions:

> a.   Misrepresenting, in light of published authorities, the tax treatment Plaintiffs would receive from the purported charitable contribution made for tax purposes by each Syndicate in the SCEs;

> b.   Falsely representing that the donation of the CE is fully tax deductible as a qualified charitable contribution deduction;

00470619

c.      Falsely representing that the syndicates contributed a qualified real property interest, as required to be a valid "qualified conservation contribution";

d.      Falsely representing that the appraisal commissioned by the Defendants relied on appropriate assumptions, data, and methodology;

e.      Falsely representing that the appraisal commissioned by the Defendants complied with §170 of the Code, applicable regulations thereunder, the USPAP, and with general and substantive real property appraisal standards and practices;

f.      Falsely representing that the CE met the requirement that it was exclusively for conservation purposes in perpetuity and met at least one of the conservation purposes set out in §170 of the Code;

g.      Falsely representing that the "after easement" analysis met Treasury Regulations establishing the standards for the valuation of CEs, when in fact it did not because it (a) used an incorrect and unsupportable HBU conclusion; (b) failed to employ recent, local and similar sales; (c) lacked objectivity and appropriate analysis of after easement sales; (d) lacked consideration of   easement sales; and (e) advocated a loss in value due to lost development rights

00470619

when the market data indicates there is no market for the residential development;

h.   Falsely representing that the value of the CE and, thus, the charitable contribution deduction, was proper;

i.   Falsely representing that the K-1, reporting the charitable contribution deduction allocated to each Plaintiff, was proper and accurate;

j.   Failure to disclose that the alleged value of the CE, and associated tax benefits in the SCE, constituted a gross valuation overstatement and would, therefore, subject Plaintiffs to substantial penalties;

k.   Failure to disclose that the Syndicate did not donate a "qualified real property interest" because the property that was the subject of the CE could be modified;

l.   Failure to disclose that the Syndicates retained or reserved rights to the property that were inconsistent with the conservation purposes of the CE;

m.   Failure to disclose that the SCE Appraisers failed to employ recent, local, or similar sales that competed with the subject property or would have been considered "substitutes" for the

244

subject property by potential buyers when employing the "comparable sales method";

n.   Failure to disclose that the CE did not accomplish any of the permissible conservation purposes set out in §170 of the Code and permitted destruction of other significant conservation easements and, as a result, did not meet the requirement that the CE be exclusively for conservation purposes in perpetuity and meet at least one of the conservation purposes set out in §170 of the Code.

863. Lamb & Braswell prepared the fraudulent 8886s for the Muskogee SCE, (as well as the Walnut Creek, and Ancient Oaks SCEs). Lisa Cantrell disseminated these false and fraudulent tax forms by mailing these forms to Plaintiffs on June 15, 2017.

864. Kimberly Skalski prepared the fraudulent K-1s for the Muskogee, Walnut Creek, and Ancient Oaks SCEs and mailed them to Plaintiffs on August 5, 2017; May 18, 2018; and June 14, 2019, respectively.

865. On September 28, 2017, Josh Stanley mailed the 8886 Muskogee Appraisal Report and signed Form 8283 to Plaintiffs. The Appraisal Report and Form 8283 were referenced in the 8886 that were prepared by Lamb & Braswell and mailed to Plaintiffs by Lisa Cantrell.

245

866. Joseph Skalski prepared the Walnut Creek PropCo's Form 8283 which was referenced in the Form 8886 and included in a package that Plaintiffs received on or about May 18, 2018.

867. FisherBroyles drafted operating agreements and other legal documents and reviewed the deed of conservation easement, the baseline documentation report, and the appraisal and rendered legal consultation services in connection with the transaction.

868. Each of these tax professional Defendants Joseph Skalski, Kimberly Skalski, Josh Stanley, Lisa Cantrell, Lamb & Braswell, and FisherBroyles prepared documents containing material misrepresentations or omissions or disseminated these same documents to Plaintiffs knowing that they contained false or misleading information.

869. At all relevant times, each of these Defendants held themselves out as competent and licensed tax professionals with the required background, training, and experience to offer competence tax advice with respect to the transactions reviewed or forms prepared or disseminated.

870. Each of the misrepresentations or omissions identified above were made in connection with the purchase of a security because the use of each of these professionals was contemplated at the time of purchase of the Muskogee

00470619

securities, as reflected in both remarks made at the October, 2016 conference and, in the Muskogee, Private Placement Memorandum.

871. Additionally, or on the alternative, each of the misrepresentations and omissions was made in connection with the purchase of a security because each was intended to induce Plaintiffs to purchase other securities offered by Defendants or from which they would benefit financially, and the Plaintiffs did purchase such securities in reliance on the misrepresentation or omission.

872. At all relevant times, Defendants Lisa Cantrell and Josh Stanley were acting in their capacities as officers of Green Earth Reserve.

873. At all relevant times, Joseph Skalski was acting in his capacity as officer or partner of Atlantic Coast Conservancy, Inc. and the Skalski Law Firm.

### iii.   Dennis Benson, Dolph Winders, Douglas Ross Kenny, Rick Kenny, and Robert Keller.

874. Each of the following Dennis Benson, Dolph Winders, Douglas Ross Kenny, Rick Kenny, and Robert Keller prepared, executed, or disseminated an appraisal report in connection with the Muskogee, Walnut Creek, or Ancient Oaks SCEs that contained material misrepresentations or omissions which the Defendant knew were false or misleading.

00470619

875. The Benson appraisal report for the Muskogee SCE contained numerous misrepresentations or omissions. The report:

    a.    Falsely representing that the appraisal commissioned by the Defendants complied with §170 of the Code, applicable regulations thereunder, the USPAP, and with general and substantive real property appraisal standards and practices;

    b.    Falsely representing that Benson visited the Muskogee property he was commissioned to appraise;

    c.    Falsely representing the situs of the Muskogee property by claiming that the property is both inside and outside the city limits of Hawkinsville, Georgia;

    d.    Falsely representing that the Muskogee appraisal was developed for the Muskogee property appears when in fact it was developed for another property, with names changed where necessary;

    e.    Falsely representing that only half of the Muskogee Land's acreage is in a flood zone when in fact 90 percent of the Muskogee and is located in a Zone A flood zone;

    f.    Reached incorrect and unsupportable HBU conclusion which were manifestly (a) unreasonable on their face; (b) failed to employ recent, local, and similar sales; and (c) failed to consider market

00470619

data that showed there was no market for residential development on the Muskogee property.

876. In light of these glaring deficiencies, Benson (a) had no basis to believe; and (b) did not, and indeed could not possibly have believed, that the FMV of the worthless flood hazard Muskogee Land, before being encumbered by a CE, was a preposterous $12,000,000 as claimed in the appraisal report.

877. Defendant Dolph Winders disseminated the report containing the false information by commissioning Benson to prepare the report and paying him 15 times what the bank appraiser was paid.

878. Additionally, or in the alternative, Winders' commissioning Benson to prepare the false report was done in furtherance of a scheme or artifice to manipulate the market for other securities and SCEs offered by Defendants which encompasses conduct beyond the misrepresentations or omission at issue here.

879. The issuance of the Benson appraisal was in connection with the purchase of a security because the services of a licensed appraiser were contemplated at the time of purchase. Additionally, or in the alternative, issuance of the appraisal was in connection with the sale of a security because the report was intended to induce Plaintiffs to purchase other securities offered

by Defendants and Plaintiffs did, in fact, consummate such purchases in reliance on the Benson appraisal.

880. At all relevant times, Benson held himself out as a qualified appraiser with the required background, training, and experience to prepare an appraisal in full compliance with all applicable IRC and USPAP standards. To the extent that Benson did not possess the appropriate credentials, Benson misrepresented his credentials. In any events, Benson did not act like a qualified appraiser.

881. The Kenny report, which formed the basis for the fraudulent Form 8283 issued in connection with the Ancient Oaks Partners SCE, contained the following false statements:

a.   That a Qualified Conservation Contribution was donated to ACC;

b.   That ACC was a Qualified Organization under the Code;

c.   That the so-called donation was compliant with §170(h) of the Code;

d.   That the Deed and Baseline Documentation Report prohibits the construction and or development of the land consistent with the Code's perpetuity requirements;

e.   That the easement will exclusively serve the Code's mandatory Conservation Purposes;

00470619

f.    That the conservation easement will yield a "significant public benefit" under Treasury Regulation §1.70A-14(d)(4)(iv).

882. On June 14, 2019, the McHughs received a K-1 and Form 8886 for the Ancient Oaks Partners SCE from Kimberly Skalski for tax year 2018.

883. Skalski instructed victims to attach (1) the Form 8283; (2) the Kenny Defendant's Appraisal; (3) the Baseline Documentation Report; (4) the Deed of Conservation Easement; and (5) Keller's Contemporaneous Written Acknowledgement. The Kenny Defendants signed the Syndicate's fraudulent form 8283 alongside Robert Keller of ACC.

884. The misrepresentations and omissions identified above were in connection with the purchase of a security because the Kenny appraisal was expressly contemplated at the time of sale of the Ancient Oaks Partners SCE and because the statements were intended to induce Plaintiffs to purchase other securities offered by one of more of the Defendants.

885. At all relevant times, the Kenny Defendants held themselves out as qualified appraisers with the required background, training, and experience to prepare an appraisal in full compliance with all applicable IRC and USPAP standards. To the extent that the Kenny Defendants did not possess the appropriate credentials, they misrepresented their credentials.

00470619

886. At all relevant times, the Kenny Defendants were acting in their capacities as officers of Kenny & Associates, Inc.

887. At all relevant times, Defendant Keller was acting in his official capacity as officer of Atlantic Coast Conservancy, Inc.

### iv.    The Role of Prolific Fraudster Nancy Zak.

888. Defendant Nancy Zak may aptly be described as a leader in the operation/Enterprise. According to 2018 complaint seeking injunctive relief and filed by the United States against Zak and five other defendants, "Defendants [including Zak] organize, promote, or sell, (or assist in the organization, promotion, or sale of) a highly structured – and abusive – tax scheme involving the syndication of conservation easement donations." Zak's conservation easement syndication scheme encourages customers to "invest" in a conservation easement syndicate under the assumption that the syndicate will donate a conservation easement, claim a tax deduction for the conservation easement, and allocate a portion if that deduction to each customer who invests in the syndicate.

889. According to that same complaint, this "conservation easement syndication scheme amounts to nothing more than a thinly-veiled sale of grossly overvalued federal tax deductions under the guise of investing in a partnership." In organizing, promoting, and selling this scheme, "Defendants

252

[including Zak] make (or cause others to make) statements about the allowance and amount of federal tax deductions a customer is entitled to claim" based on the investment in this syndicate, "that are false."

890. Collectively, since 2009 these "Defendants have organized, promoted, or sold" at least 96 conservation easement syndicates, of which Zak has organized, promoted, or sold 42 such syndicates. Zak's website boasts that she has been involved in "91 CE projects from coast to coast" that have generated over $780M in federal tax deductions "declared by [her] clients."

891. The promotion and orchestration of between 42 and 91 conservation easement syndication schemes which induce customers to invest in grossly overvalued securities based on false statements regarding the tax benefits of these same securities constitutes a scheme or artifice to manipulate the value of these securities and to defraud investors. A scheme that vast plainly encompasses conduct far beyond the misrepresentations or omissions at issue here.

892. At all relevant times, Nancy Zak was acting in her official capacity as owner of Forever Forests, LLC and Green Earth Reserve, LLC.

## v.   The Landowner Defendants.

893. Landowner Defendants Arthur Goolsby, Jr., Blair Cleveland, and T.J. Heath are essential players in Zak's scheme to defraud investors. These

00470619

Landowner Defendants made the SCE Scams possible by purchasing the land to be encumbered. They purchased the necessary lands with full knowledge that such lands would be used for a fraudulent SCE Scam.

894. As explained above, the syndicated conservation easement scheme is structured to include tiered entities. As sponsor of the scheme, Zak forms (or causes to be formed) two LLCs, one which owns the land ("PropCo") and one which owns 90 percent or more of the LLC that owns the land ("CapCo"). The customers invest in the LLC that owns the land-owning LLC.

895. At the time the land-owning LLC is formed, the Landowner (Goolsby, Cleveland, and Heath) is the 100% owner, or near 100% owner, of this LLC. The Landowner then deeds the subject land into the PropCo in exchange for LLC membership interests, in a transaction that is considered a "nonrecognition" transaction for federal income tax purposes. This means that the parties to the transaction do not have to recognize the gain or loss on the transaction for federal tax purposes.

896. The Landowner is central to the scheme because he retains controlling interest in the land-owning LLC in the Muskogee SCE and can rig the vote to ensure that the property is encumbered with a CE that is then donated to a land trust for a substantial QCC tax deduction. In this way, the

promoter can ensure that the CE option is always a foregone conclusion and the "vote" of CapCo members is a meaningless gesture.

897. The acts of these Landowners as described herein were committed in furtherance of a scheme or artifice to defraud that encompasses conduct beyond the misrepresentations and omissions at issue in this case.

### B.    Additional Allegations of Scienter.

898. Plaintiffs repeat, reallege and incorporate every prior allegation in the preceding paragraphs as if fully set forth herein.

899. As detailed above, Defendants misrepresented and omitted material facts about the purported tax benefits of investing in the SCEs, the ability to realize those benefits, the historical investment performance, the true FMV of the properties that were to be encumbered, the kickbacks paid to promoters and purportedly neutral tax consultants, and a host of other things. Numerous facts support the strong inference that they knew or were recklessly indifferent to the true state of affairs and that the statements were made with an intent to deceive, manipulate, or defraud.

00470619

i. **Defendants Rogers and Nesmith Were Paid Undisclosed Kickbacks While Purportedly Offering Impartial Tax Advice Regarding the Putative Benefits of the SCEs.**

900. As explained above, Defendants Nesmith and Rogers failed to disclose the kickback payments these self-dealing promoters would receive from payments funneled to them through Green Earth Reserve, which each of these Defendants owned together with promoter Nancy Zak. The Muskogee CapCo alone paid Green Earth Reserves, LLC $365,000 out of approximately $2.45M the CapCo would raise from investor-victims. The CapCo's sole asset was a non-income producing property whose FMV was less than $800,000 based on its most recent sales price. The over the table kickback payment to Green Earth Reserve represented 40 percent of the total value of the Muskogee CapCo and 15 percent of the amount raised by the sale of the Muskogee SCE shares. Moreover, the Muskogee CapCo itself was 100 percent owned by Green Earth Reserve at the time the shares of this CapCo were sold to the investors.

901. At all relevant times, Defendants Rogers and Nesmith held themselves out as objective and unbiased tax professionals offering advice regarding the purported benefits of investing in the SCEs. Nesmith even aggressively solicited McHugh's participation in the Muskogee SCE, telling him that the SCE is "a great strategy."

00470619

902. However, not a single Defendants ever disclosed the true ownership of the Green Earth Reserves even though it must have been known by at least two of the Defendants and probably many more given the extent to which documents were scrutinized by attorneys. And Nesmith simply lied to IRS Revenue Agent Young, or at least made materially misleading statements, when he claimed that the Nesmith and Rogers were not paid through Green Earth Reserve.

### ii.     Each of the Appraisal Defendants' "Qualified Appraisals" Were a Farce.

903. The methodology used in the Benson and Kenny appraisals was such an extreme departure from the requirements set forth in the USPAP and IRC that to call them "qualified appraisals" would deprive that term of all meaning.

904. Taking the Muskogee appraisal first, Benson was paid $15,000 or an amount 15 times what a bank appraiser received for an appraisal of that same property only weeks earlier. That alone should be sufficient to create a strong inference of scienter. But Benson did not simply perform work worth $1,000 and pocket the rest. Indeed, he never even visited the property he was commissioned to appraise, but instead simply cut and pasted the appraisal from appraisal(s) of other properties.

257

905. In the words of IRS Revenue Agent Athena O'Connor, the appraisal "appears to have been developed for another property, with names changed where necessary." Agent O'Connor further noted that the information Benson used "to prepare the appraisal was irrelevant (from another county) or incorrect (city limits)."

906. The appraisal even contradicted itself as to the situs of the property; falsely claimed that only half of the Muskogee land was located in a flood zone when 90 precent of it was; and ignored all the evidence that there was simply no market for what was essentially a worthless flood hazard.

907. As bad as the Benson appraisal was, the Kenny appraisal may have been even worse. While withholding key facts from the investors regarding the actual condition of the property, hand-picked appraisers Douglas Ross Kenny and Rick Kenny claimed that a roughly one-to-two-million-dollar parcel of undeveloped swamp land could be donated for a one hundred-and-twelve-million-dollar charitable tax deduction. And they even falsely represented on the Form 8283 that the Deed prohibited the construction or development of new land in perpetuity, as required by the IRC, when it plainly did not.

### iii.   Defendants' Interpretation of the Relevant Sections of the IRC was Patently Unreasonable.

908. The tax professionals who advised Plaintiffs of the tax benefits of the SCEs and who prepared, reviewed, and disseminated tax forms and other documents did not merely commit professional negligence. Instead, they acted with conscious and reckless disregard for both the facts and their clients' interests and in a manner so highly unreasonable as to constitute an extreme departure from the standards of ordinary care.

909. To be sure, with so many tax professionals boasting of august credentials telling the McHugh and Meek Plaintiffs that the deductions were perfectly legal and that none of the investors had ever been harmed, it was easy for them to be taken in. However, the advice these professionals offered created a danger so palpable that any professional armed with the knowledge the Defendants had would have known of it.

910. Under §170 of the Code, a QCC tax deduction may not exceed the FMV of the contributed CE on the date of the contribution. See Treas. Reg. §1.170A-1(c)(1), (h)(1) and (2). The FMV is the price at which the contributed property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell, and each having reasonable

knowledge of relevant facts, per Treas. Reg. §1.170A-1(c)(2) and Treas. Reg. §1.170A-14(h)(3) and (4).

911. The Muskogee land had recently changed hands for total price of less than $800,000, although even this fact was withheld from investor-victims Kyle McHugh and Larry Meek. Defendants must have known that the property could not possibly be sold in the near future for an amount fifteen times that amount, whatever the hypothetical value of a developed parcel might be many years down the road.

912. Defendants not only failed to disclose the FMV based on the most recent purchase, but they also failed to disclose that the IRS had consistently disallowed QCC deductions greater than FMV as defined above. Moreover, they even failed to explain the significant penalties and the interest the McHughs and Meeks would be forced to pay if the IRS disallowed the investment.

913. The Defendants thus acted with conscious and reckless disregard to both the facts and their clients' interests, and they created a risk so palpable that any tax professional would have seen it and taken appropriate steps to avoid it.

00470619

### iv.     Defendants Had Access to Information that Contradicted their Public Statements but Deliberately Withheld it From Plaintiffs.

914. Defendants had access to considerable information that showed that the SCEs were simply scam investments and could not possibly have generated the promised investment return or purported tax benefits.

915. Among other things, Defendants failed to disclose that the FMV of the Muskogee property was less than $800,000 based on the most recent sale, and that the IRC limited the amount of the QCC deduction to the price at which the property would have changed hands at the time of the donation. But if the total QCC deduction was limited to the price at which the property could presently change hands, there would be no point to paying high priced professional to prepare complicated easement documents and associated tax forms. The CapCo (or PropCo) could simply resell the land and collect a handsome profit.

916. Indeed, the entire scam depended on misleading the investors regarding the actual law. Moreover, the tax professional Defendants must also have known that the IRS has consistently disallowed QCC deductions that were greater than FMV as defined above and that it had imposed stiff penalties and interest on taxpayers when these deductions had been disallowed.

### v.   Because the Enterprise's Core Business is to Defraud the Public, Knowledge of the True Facts and Misleading Disclosures May Be Imputed to the Defendants.

917. Each of the Defendants acted individually and in concert to further a scheme or artifice to manipulate the securities market and defraud investors by inducing them to purchase securities at greatly inflated and distorted prices.

918. In 2018, the United States Government filed a lawsuit against Zak for promoting dozens of fraudulent SCE scams that reported more than $3 billion in improper tax deductions. Zak agreed to a civil injunction, promising to never promote or participate in another SCE scam again. Zak could not have implemented these complex scams and brought them to fruition alone. Instead, she relied on a hand-picked team of captured professionals whom Zak knew would disregard their respective professional standards in return for lavish financial rewards.

919. Because the Enterprise's core business is to defraud the public, the fact a defendant held a position in which s/he would have been aware of the true facts and misleading disclosures supports a strong inference of scienter.

920. Each of the named Defendants performed a central role that materially contributed to the success if the Enterprise. Each individual

00470619

Defendant is either a partner or officer of an entity that Zak hand-picked because of some special expertise. Scienter may, therefore, be imputed to each of these Defendants.

### C.    Inapplicability of the Statutory Safe Harbor.

921. The statutory safe harbor for forward-looking statements under certain circumstances does not apply to any of the false statements described in this complaint. The specific statements described in this complaint were not identified as "forward-looking" when made. For the most part, the statements are representations of present fact, such as the historical performance of investments, or representations of law made by persons who held themselves out as legal experts and who benefited financially from Plaintiffs' reliance on the misrepresentations. To the extent that there were any forward-looking statements, there was no meaningful or substantive cautionary language identifying factors that could cause actual results to differ materially from those in the purported forward-looking statements. Alternatively, the statement was accompanied by a statement of present fact; the statement was based an inadequate consideration of the available data; or the statement was based on an unsound and fatally flawed methodology. Additionally, or in the alternative, to the extent that the statutory safe harbor does apply to any forward-looking statements, Defendants are liable for those forward-looking

00470619

statements because at the time each was made, the particular speaker knew that the statement was false or misleading, or the forward-looking statement was authorized or approved by a Defendant who knew that the statement was false or misleading when made.

### D.    Loss Causation.

924. As detailed in this complaint, Defendants made materially false and misleading statements and omissions and engaged in a scheme to deceive investors as to the purported tax benefits of investing in syndicated conservation easements and of the shares offered for sale by the SCEs or the CapCos. As a result of these deceptions, Plaintiffs purchased essentially worthless securities at artificially inflated and distorted prices.

925. Each of these shares is now essentially worthless and were worthless at the time of purchase. Plaintiffs do not own a particular tract of land. Instead, Plaintiffs own shares of an LLC whose only asset is a non-income producing property that is currently encumbered by a conservation easement and over which they have no power of conveyance. These securities pay no dividends. Moreover, now that the reported transaction has been challenged by the IRS, any prospective purchaser could face increased scrutiny. Indeed, any prospective seller could even face exposure from the new buyer. Accordingly, the securities are essentially worthless.

00470619

924. Indeed, the securities were essentially worthless at the time of purchase because the landowner Defendants rigged the vote to ensure that the CE option would always be chosen and that the property would be encumbered and therefore, worthless.

925. Plaintiffs sustained additional losses as a direct and proximate result of Defendants' deceptions when they executed false tax forms and now run the risk of incurring substantial penalties and interest as a result. These penalties and interest are a direct and proximate result of frauds committed in connection with the purchase of a security and, therefore, must be included to determine Plaintiffs' total damages.

### E.     Violations of Section 10(b) of the Exchange Act and Rules 10b-5(1), (2), and (3) Promulgated Thereunder.

926. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

927. Defendants carried out a plan, scheme, or course of conduct that was intended to and did deceive Plaintiffs as alleged in this Complaint, and cause Plaintiffs to purchase shares at artificially inflated and distorted prices.

928. Defendants (i) employed devices, schemes, to artifices, to defraud; (ii) made untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in

265

acts. practices, and a course of business that operated as a fraud and deceit on share purchasers including Plaintiffs in an effort to maintain artificially high prices in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

929. Defendants individually and in concert, directly and indirectly, by the use, means and instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information.

930. Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that the statements contained misrepresentations and failed to disclose material facts necessary to make the statements made, in light of the circumstances in which they were made, not misleading.

931. Defendants had actual knowledge of the misrepresentations and omissions of material fact alleged in this complaint or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal the true facts and to support artificially inflated and distorted prices of shares of the securities.

932. Defendants engaged in a scheme or artifice to defraud investors that encompassed these misrepresentations and omissions;

266

933. As a direct and proximate result of Defendants' actions and in reliance on the material misrepresentations described herein, Plaintiffs have suffered damages in connection with their purchases of shares of the securities.

934. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

## JURY DEMAND

935. The Plaintiffs hereby demand a trial by jury.

## PRAYER FOR RELIEF

936. Based on the forgoing, the Plaintiffs request that Defendants be cited to appear and answer; and that, on final hearing, the Plaintiffs have judgment against Defendants, jointly and severally for;

 a. Actual, consequential, and incidental damages;

 b. Disgorgement;

 c. Pre and post judgment interest at the highest legal rate allowed by law;

 d. All attorneys' fees and costs in pursuing this matter;

 e. All costs of investigation;

 f. All expert witness fees and costs in pursuing this matter;

 g. Punitive and treble damages in an amount to be determined at trial; and

00470619

h.     Such other and further relief, both at law and in equity, to which

Plaintiffs show themselves to be justly entitled.

Respectfully submitted on April 28, 2022.

THE BERNHOFT LAW FIRM, S.C.

*/s/ Robert G. Bernhoft*
Robert G. Bernhoft, Esq.
Wisconsin Bar No. 1032777
1402 E. Cesar Chavez Street
Austin, Texas 78702
(512) 582-2100 telephone
(512) 373-3159 facsimile
rgbernhoft@bernhoftlaw.com

*Pro hac vice* Application to be Filed

WIMBERLY, LAWSON, STECKEL,
SCHNEIDER & STINE, P.C.

*/s/ James W. Wimberly*
James W. Wimberly, Jr., Esq.
Georgia Bar No. 769800
Kathleen J. Jennings, Esq.
Georgia Bar No. 394862
3400 Peachtree Road NE, Suite 400
Atlanta, Georgia 30326
(404) 365-0900 telephone
(404) 261-3707 facsimile
jww@wimlaw.com
kjj@wimlaw.com

*Attorneys for the Plaintiffs*

268

00470619

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rules 5.1(C) and 7.1(D), I certify that the foregoing pleading is typewritten using Century Schoolbook, thirteen-point type.

DATED this 28th day of April 2022.

*/s/ Kathleen J. Jennings*

Kathleen J. Jennings
Bar No. 3948762

WIMBERLY, LAWSON, STECKEL,
SCHNEIDER & STINE, P.C.
Suite 400, Lenox Towers
3400 Peachtree Road, N.E.
Atlanta, Georgia 30326
Phone: (404)365-0900
Fax: (404) 261-3707
kjj@wimlaw.com

00470619